SEALED

ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2016 MAY 24  AM 8: 35

DEPUTY CLERK_____

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § |
| | § |
| **Plaintiff,** | § |
| | § |
| **vs.** | § |
| | § |
| **ASH NARAYAN,** | § **Civil Action No.:** |
| **THE TICKET RESERVE INC.** | § |
| **a/k/a FORWARD MARKET MEDIA, INC.,** | § **FILED UNDER SEAL** |
| **RICHARD M. HARMON, and** | § |
| **JOHN A. KAPTROSKY,** | § |
| | § |
| **Defendants.** | § |
| | § |

# 3-16CV1417-M

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") alleges as follows:

## SUMMARY

1.      The SEC is bringing this case to stop an ongoing multi-million dollar fraud scheme.  The scheme has been principally orchestrated by Defendant Ash Narayan.  He has carried it out with the assistance of Defendants Richard Harmon, John Kaptrosky, and The Ticket Reserve Inc. ("TTR").  Almost always without their knowledge or consent, Narayan directed his clients into high-risk investments in TTR.  In exchange, he received almost $2 million in undisclosed finder's fees.  He, Harmon, and Kaptrosky obscured this arrangement by mischaracterizing the finder's fees as either "director's fees" or "loans."  They further attempted to conceal the scheme by creating fraudulent documents—sometimes backdated—and by making Ponzi-like payments in order to hide TTR's huge losses from Narayan's clients.

2.     Throughout most of the scheme, Narayan was employed as an investment adviser representative and Managing Partner in the California office of Dallas-based RGT Capital Management, Ltd.  In that capacity, Narayan invested over $33 million of his advisory clients' assets in TTR.  As noted above, this was regularly done without their knowledge of consent— sometimes using forged or copied signatures.  Narayan did not tell his clients key information that he knew about TTR, including that TTR was financially distressed.  Nor did he tell them about serious conflicts of interest, including that he:

- sat on TTR's Board of Directors;

- owned millions of shares of TTR stock; and

- secretly obtained nearly $2 million in undisclosed finder's fees—usually paid out of client funds—in exchange for securing investments in TTR.

3.     Together with Narayan, TTR and its Chief Executive Officer ("CEO") Harmon, and Chief Operating Officer ("COO") Kaptrosky, carried out the scheme by:

- making undisclosed finder's fee payments to Narayan—often paid out of client funds—and concealing their true nature by memorializing them as "directors fees" or "loans";

- drafting and executing sham promissory notes between TTR and Narayan in order to further conceal the fraudulent payments (and also help Narayan dodge taxes); and

- attempting to conceal the fraud by approving and executing Ponzi-like payments to existing investors using new investor funds.

4.     In February 2016, Narayan was fired from RGT.  Around that time, he and the Defendants learned that the scheme was being investigated by the SEC.  Consequently, in March 2016, the Defendants entered into an agreement requiring Narayan to repay TTR monies owed under the sham "loan" agreements.  In reality, he is merely paying TTR back proceeds obtained

as part of the fraud scheme. These funds are being used to pay for TTR's ongoing expenses—including expenses, reimbursements, and salaries for Harmon and Kaptrosky. This arrangement is actively depleting the funds available to repay TTR's defrauded investors. Narayan is due to make another payment to TTR on May 31, 2016.

5.      In addition to engaging in the TTR scheme, Narayan knowingly or recklessly lied to his clients about his qualifications. Narayan held himself out as a Certified Public Accountant ("CPA"). In truth, he is not and never has been a CPA.

6.      By engaging in the conduct alleged in this Complaint, the Defendants have committed and are committing—and unless immediately restrained and enjoined by the Court will continue to commit—intentional violations of the antifraud provisions of the federal securities laws. Thus, in the interest of protecting the public from further illegal activity, the SEC brings this action seeking all available relief—including temporary, preliminary, and permanent injunctions; disgorgement of all ill-gotten gains plus prejudgment interest; and civil money penalties. In order to preserve any remaining assets for the benefit of defrauded investors, the SEC further seeks an order: freezing the Defendants' assets; requiring sworn accountings from them; and appointing a receiver to take control of TTR's assets.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this action under Sections 20(b), 20(d) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d) and  77v(a)]; Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e),  and 78aa]; and Section 209(d) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-9(d)]. Venue is proper because a substantial part of the events and omissions giving rise to the claims occurred in the Northern District of Texas.

## PARTIES

8.      Plaintiff SEC is an agency of the United States government.

9.      Defendant Narayan is a natural person residing in Newport Coast, California.
Between 1997 and his termination in February 2016, Narayan was employed as an investment
adviser representative and Managing Director at RGT, an SEC-registered investment adviser.

10.     Defendant TTR is an Illinois corporation operating in Lake Forest, Illinois.
TTR also operates under the name Forward Market Media, Inc.

11.     Defendant Harmon is a natural person residing in Austin, Texas.  He has been
TTR's CEO since at least 2002.

12.     Defendant Kaptrosky is a natural person residing in Lake Forest, Illinois.  He has
been TTR's COO since at least 2008.  He was previously TTR's Senior Vice President of
Finance and Vice President of Finance/Controller.

## FACTS

### I.     NARAYAN WAS AN INVESTMENT ADVISOR WHO OWED FIDUCIARY DUTIES TO HIS CLIENTS.

13.     Narayan joined RGT in 1997.  He was Managing Director of RGT's Irvine,
California office and an investment adviser representative of RGT.  In that capacity, Narayan
was in the business of advising his clients regarding the value of securities and the advisability of
investing in, purchasing, or selling securities. He advised over 50 RGT clients.  From January
2010 through February 2016, Narayan received approximately $3.8 million in compensation
from RGT.

14.     Although Narayan worked in RGT's California office, the great majority of RGT's
senior executives live and work in Dallas.  Narayan regularly traveled to the Dallas area to meet
with them.  He also met with his clients in the Dallas area.  From 2013-15, he made at least 15

business-related trips to the Dallas area.

15.     As an investment adviser representative, Narayan had fiduciary duties to his clients. He had an affirmative duty of utmost good faith to them. He was required to make full and fair disclosure of all material facts—including all actual or potential conflicts of interest. He was required to act in his clients' best interest and to place their interest above his own. And he was required to provide suitable investment advice to each client in light of that client's financial situation, investment experience, and investment objectives.

## II.    NARAYAN DEVELOPED, AND LATER EXPLOITED, RELATIONSHIPS OF TRUST WITH HIGH PROFILE, HIGH NET WORTH CLIENTS.

16.     Many of Narayan's former advisory clients are high net worth individuals. His clients included many current and former professional athletes. Three of these former clients— Client One, a former Major League Baseball ("MLB") players; Client Two, a current MLB player; and Client Three, a current National Football League ("NFL") player—exemplify the type of clients Narayan advised.

17.     Many of these clients—including Client One, Client Two, and Client Three— lacked meaningful financial or investment expertise. They therefore relied on Narayan, who owed each of them fiduciary duties, to make important financial decisions on their behalf. Perhaps most importantly, Narayan advised them on what investments their investment portfolios should include. Narayan's clients—including Client One, Client Two, and Client Three—entered into advisory agreements with RGT under which Narayan would manage their investments.

18.     Narayan's clients trusted him—not only because of their fiduciary relationship, but also because of his professional qualifications and experience. Narayan knowingly or recklessly represented to these clients that he was a certified public accountant ("CPA"). For

instance, both his RGT email signature block and his letterhead read "Ash Narayan, J.D., CPA." His claim that he was a CPA boosted Narayan's credibility. It served as a basis on which his clients—like Client One, Client Two, and Client Three—believed he was capable of managing their money conservatively and in accordance with the law. In reality, Narayan is not—and never has been—a CPA. Knowing that Narayan was falsely holding himself out as a CPA would have been important to his clients—both in deciding whether to retain him as an investment adviser and in deciding whether they could trust his investment recommendations.

**A.      Client One trusted and relied upon Narayan to manage his investments.**

19.      Client One is a former MLB player who retired in 2013. He met Narayan through his agent in the 2002-03 timeframe. When they met, Client One learned that Narayan advised a number of other professional baseball players.

20.      Narayan built a relationship of trust with Client One. That trust was based, in part, on their shared Christian faith and interest in charitable work. Client One's personal trust in Narayan—as well as his understanding of Narayan's competence and experience providing sound financial advice—were important to Client One when he was considering whether to hire Narayan as his investment adviser representative.

21.      Before hiring Narayan, Client One told him that he wanted to pursue conservative investments that would not place his principal at risk. Narayan agreed to pursue a low-risk investment strategy aligned with Client One's goals. With this understanding, Client One engaged Narayan as his investment adviser representative in the 2002-03 timeframe.

22.      At Narayan's direction, as much as 80% of Client One's MLB salary was directly deposited to a brokerage account. Narayan managed these funds on Client One's behalf. Client One understood that these funds would be managed by Narayan as they had discussed—by

investing in conservative, low-risk investments.

23.     Narayan or people working for him regularly delivered investment-related paperwork to Client One.  Because Client One often traveled for work, the paperwork was typically delivered to the various locations where Client One's team was playing.  In 2012, when Client One was employed by the Texas Rangers, deliveries were made to the Rangers' clubhouse in Arlington, Texas.  During 2001-10, when Client One played for the Houston Astros, paperwork was also sent to Houston, Texas.  In addition, Client One and Narayan had various business meetings in Texas from 2001-15.

24.     When necessary, Client One signed the paperwork that Narayan sent him.  He always did so with the understanding that Narayan was pursuing the conservative investment strategy they had agreed upon.  He further believed that the documents he signed for Narayan were consistent with that strategy.  Finally, Client One also trusted Narayan and understood him to be acting as a fiduciary—putting Client One's interests above his own and fully disclosing all material facts, including conflicts of interest.

   **B.     Client Two also trusted and relied upon Narayan to manage his investments.**

25.     Client Two is a current MLB player.  He met Narayan in the 2004-05 timeframe through another MLB player who was a Narayan client.  When they met, Client Two understood that Narayan was also managing Client One's investments.

26.     As with Client One, Narayan forged a relationship of trust with Client Two.  That trust was based, in part, on their shared Christian faith and interest in charitable work.  Client Two's personal trust in Narayan—as well as his understanding of Narayan's competence and experience providing sound financial advice—were important to Client Two when he was considering whether to hire Narayan as his investment adviser representative.

27.     Before retaining Narayan, Client Two explained to him that he wanted to pursue an investment strategy with minimal risk. This was true for at least two reasons. First, Client Two was still working under his first MLB contract. Second, Client Two knew that as an MLB player his earning potential might be realized within a very limited time window. Client Two therefore told Narayan that his goal was to achieve financial security through conservative investments while he was still playing. Narayan agreed to pursue a low-risk strategy. With this understanding, Client Two engaged Narayan as his investment adviser representative in the 2004-05 timeframe.

28.     Once Narayan became Client Two's investment adviser representative, a significant portion of Client Two's MLB salary was transmitted to Narayan. Client Two understood that those funds would to be invested pursuant to the low-risk strategy that Narayan had agreed to follow.

**C.     Client Three also trusted and relied upon Narayan to manage his investments.**

29.     Client Three is a current NFL player. He met Narayan in 2009—the same year he left college to pursue an NFL career. At that time, he was looking for someone to help him invest his NFL earnings. Client Three learned by talking to Narayan that he was advising many other professional athletes, including a number of NFL players.

30.     As with Client One and Client Two, Narayan forged a relationship of trust with Client Three. That trust was based, in part, on their shared Christian faith and interest in charitable work. Client Three also learned that they had attended the same church in California. Client Three's trust in Narayan personally—as well as his understanding of Narayan's competence and experience providing sound financial advice—were important to Client Three

when he was considering whether to hire Narayan as his investment adviser representative.

31.     Before retaining Narayan, Client Three explained to him that he wanted to pursue safe, conservative investments that would not put his investment principal at risk.  He and Narayan also discussed the fact that as a professional athlete in a sport that has a high risk of injury, his earnings might be realized within a short window.  Narayan thus agreed that he would pursue a conservative strategy involving minimal risk.  With this understanding, Client Three engaged Narayan as his investment adviser representative in 2009.

32.     Narayan, working with Client Three's NFL employers, arranged for the direct deposit of his NFL paychecks.  His weekly paychecks were deposited into accounts that were setup by Narayan and RGT.  Narayan was responsible for allocating and managing Client Three's earnings in an investment account as they had discussed—by investing in conservative, low-risk investments.

**III.     NARAYAN FRAUDULENTLY TRANSFERRED OVER $33 MILLION IN ADVISORY CLIENTS' FUNDS TO TTR, OFTEN WITHOUT THEIR KNOWLEDGE OR CONSENT.**

33.     TTR was founded in 2002.  TTR licenses intellectual property that that lets fans reserve face-value tickets to high-demand sporting events whose teams are yet to be determined—college football bowl games, for example.  Fans pay a fee for the right to reserve these tickets.  CEO Harmon has described TTR's business model as "monetizing anticipation" in a world in which "people spend a lot more time anticipating stuff than actually doing stuff."[1]

34.     Narayan has been on TTR's Board of Director's since at least 2003.  He has also amassed over three million shares of TTR stock.  As a practical matter, however, he was TTR's primary fundraiser.  In that capacity, he raised as much as 90% of TTR's investment capital.

---

[1] *See, e.g.,* http://www.chicagobusiness.com/article/20140830/ISSUE01/308309961/this-company-lets-you-reserve-a-seat-for-the-big-game

35.     As detailed below, between 2010 and early 2016, Narayan fraudulently directed over $33 million in client funds to TTR.  He knowingly or recklessly concealed material information from his clients—including TTR's poor financial condition and the conflicts of interest created by the finder's fees and his heavy involvement with TTR.  In addition, with the assistance of Harmon and Kaptrosky, he is engaged in a continuing scheme to conceal this illegal activity.

**A.      Narayan fraudulently directed millions in client funds to TTR while failing to disclose material information.**

36.     Between March 2010 and January 2016, Narayan directed at least 77 client investments to TTR.  These investments totaled more than $33 million.  As detailed below, Narayan directed that Client One, Client Two, and Client Three alone invest over $30 million.  The TTR investments were in securities—including long-term notes payable, stock, and stock warrants.

37.     Narayan knowingly or recklessly misled or failed to inform his clients about a number of material facts related to the TTR investments.  He often failed to tell them that they were investing at all.  But even in the rare instances where Narayan's clients knew they were investing, Narayan knowingly, recklessly, or unreasonably misled them or omitted material information.

*i.      Narayan failed to disclose that he received almost $2 million in finder's fees.*

38.     As TTR's internal records show, Narayan received a total of at least $1,848,000 in finder's fees in exchange for directing over $33 million in client funds to TTR.  He requested— and Harmon and Kaptrosky approved, paid, and tracked—these fees.  These fees were often paid

to Narayan out of his clients' funds—as opposed to being invested in TTR's business.

39.     Considering only the Client One, Client Two, and Client Three investments, Narayan received more $1.6 million in undisclosed fees in exchange for directing over $30 million to TTR, as follows:

|  | Investments | Fees |
|---|---|---|
| Client One | $    7,580,000 | $      668,193 |
| Client Two | $  15,105,000 | $      957,432 |
| Client Three | $    7,750,000 | $        23,682 |
| **Total** | **$  30,435,000** | **$   1,649,307** |

40.     This arrangement was material—both because it created a conflict of interest and because client funds were being misappropriated and sent to Narayan rather than used to build TTR's business.  Nonetheless, Narayan knowingly, recklessly, or unreasonably failed to disclose it to his clients.

> ii.     *Narayan failed to disclose that he was a member of TTR's Board of Directors and a major TTR shareholder.*

41.     As noted above, Narayan has been on TTR's Board of Directors since at least 2003.  Narayan was also a major TTR stockholder—owning approximately 3 million shares of stock.  This arrangement presented an actual or apparent conflict of interest since Narayan was also investing his clients' money in TTR.

42.     Narayan knowingly, recklessly, or unreasonably failed to disclose these conflicts of interest to his clients.  This information was material to Narayan's clients, as it would have been to any reasonable investor.

iii.    *Narayan failed to disclose that TTR was a financially distressed company and a high-risk investment.*

43.    As the Narayan and the other Defendants knew or were reckless in not knowing, TTR is and has been in severe financial distress for years.  TTR's financial statements for 2012-15 showed:

| Year | Operating Loss | Operating Cash Flow | Cumulative Net Equity |
|------|----------------|---------------------|------------------------|
| 2012 | -$3,434,438 | -$4,446,197 | -$27,211,469 |
| 2013 | -$3,725,808 | -$3,258,049 | -$33,296,152 |
| 2014 | -$4,275,064 | Not available | -$40,562,593 |
| 2015 | -$3,252,336 | Not available | -$47,129,702 |

44.    As they also knew or were reckless in not knowing, in both 2012 and 2013, the company's external auditor issued an adverse opinion regarding TTR's ability to continue as a going concern.  This reflected the auditor's substantial doubt that TTR would be able to meet its current and future financial obligations.  Harmon himself may have summarized TTR's financial condition best in a May 26, 2014 email to Narayan: "To be sure our revenue sucks.  Our balance sheet is a disaster."

45.    Only Narayan's ability to keep injecting investor funds into TTR kept it afloat.  As noted in TTR's 2012-13 financial statement notes, which Narayan, Harmon, and Kaptrosky saw:

> Management has also provided correspondence from a shareholder/board member [Narayan] who has a highly successful record of raising additional capital to fund operations, that he will again raise the capital necessary to meet the Companies' obligations. However, without a firm commitment for additional capital and firm commitments from the debt holders of their intentions to forego payment within the next

twelve months, there is substantial doubt if the Companies will be able to meet their current and future obligations.

46.     Given its precarious financial position throughout the relevant period, investments in TTR posed considerable risk to Narayan's clients.  Yet Narayan knowingly, recklessly, or unreasonably failed to inform them about this risk. This information was material to Narayan's clients, as it would have been to any reasonable investor.

> iv.     *Narayan failed to disclose that the TTR investments violated RGT's policies.*

47.     Throughout the time Narayan was employed by RGT, RGT maintained a Code of Ethics that describes the standards of conduct expected of all personnel.  He agreed to comply with it.  The Code of Ethics required Narayan to: (1) place the interests of clients above RGT's or any employee's interests; (2) disclose any activities that may create an actual or potential conflict of interest; and (3) disclose all material facts conflicts of interest.  He was also required to obtain approval of RGT's Chief Compliance Officer ("CCO") prior to engaging in any outside business activity.

48.     Narayan violated the Code of Ethics by failing to disclose the TTR business activity he was involved in.  He further violated it by knowingly or recklessly failing to disclose to his clients (or to RGT) the many conflicts of interests created by the TTR arrangement.

49.     Narayan knowingly, recklessly, or unreasonably failed to disclose his that he violated RGT's Code of Ethics—including by investing their money in TTR.  This information was material to Narayan's clients, as it would have been to any reasonable investor.

> v.     *Narayan violated his duties to his clients.*

50.     As noted above, as an investment adviser representative, Narayan was a fiduciary with duties to his clients.  He had a duty to act with the utmost good faith and to fully and fairly

disclose all material facts. He had a duty to disclose all actual and apparent conflicts of interest and to put his clients' interests above his own. And he had a duty to provide suitable investment advice.

51.     In addition to all of his deceptive conduct, Narayan violated each of these duties. As detailed above, he consistently failed to disclose material facts—including conflicts of interest. He also placed his own interests above those of his clients.

52.     Finally, he heavily concentrated clients—including Client One, Client Two, and Client Three—in investments in a high-risk, flailing, and debt-ridden private company. He did this despite the fact that these investors had explicitly directed him to pursue low-risk investment strategies—something he agreed to do. He also did this in spite of the fact that each of these investors is unique in that, as a professional athlete, he has a very short earnings window. By doing so, he violated his duty to provide suitable investment advice.

**B.      Each of the Defendants was part of a scheme to defraud investors.**

53.     The Defendants were part of a scheme to defraud investors. The scheme included Narayan transferring client funds to TTR without their knowledge or consent—including using forged or unauthorized signatures. It included the Defendants paying—and then trying to obscure—the undisclosed finder's fees through the use of sham promissory notes. It included the Defendants misappropriating investor funds to make Ponzi-like payments to prolong the scheme. And it now includes the Defendants entering into an agreement under which Narayan is redirecting fraud proceeds back to TTR to keep it afloat.

     i.      *Narayan regularly transferred his clients' funds to TTR without their knowledge or consent, often using forged or unauthorized signatures.*

54.     Narayan knowingly, recklessly, or unreasonably transferred client funds to TTR without his clients' knowledge or consent.  By doing this, Narayan abused his clients' trust and the discretion they gave him to manage their investments.  For example, he repeatedly did this with investments he managed for Client One, Client Two, and Client Three.  He had to do this, since the TTR investments were very risky and inconsistent with the conservative strategies he had agreed to pursue.

55.     In the rare instances where the investments were authorized, the client agreed only to make a small investment.  In Client One's case, he agreed in 2010 only to make a small investment in TTR of no more than $300,000.  After that, Narayan directed over $7 million to TTR without Client One's consent.

56.     Client Three agreed to invest only $100,000.  Instead, Narayan directed over $7 million of Client Two's funds to TTR.  Since learning about the unauthorized investments, Client Three has confirmed that Narayan made the investments using signatures that were forged, faked, obtained without his knowledge, or copied from other documents without his consent.

57.     Client Two never authorized a single TTR investment—and had never even heard of TTR until February 2016.  It was at that time that Client One called Client Two to tell him that Narayan had been fired and that he had been making unauthorized investments in TTR.  Client Two has since confirmed that Narayan made unauthorized investments in TTR using signatures that were forged, faked, or copied from other documents without Client Two's consent.

    ii.    *Harmon, Kaptrosky, and TTR participated in the fraud scheme.*

58.     As noted above, although Narayan was on TTR's Board of Directors, in reality he was TTR's chief fundraiser—raising as much as 90% of TTR's investment capital. With Harmon's and Kaptrosky's knowledge and at their direction, Narayan was regularly paid finder's fees—often using client funds. At least in part because Narayan never disclosed the finder's fees to his clients, he, Harmon, and Kaptrosky knowingly or recklessly took affirmative steps to conceal the payments.

59.     The Defendants knew that these payments were finder's fees. An October 2014 e-mail from Harmon to Narayan and Kaptrosky describes these payments as "finder's fee[s]." The same email notes that in order to make the payments appear "kosher," the men were careful that they were not "'turning around' more than 10%" of the amounts received from Narayan's clients.

60.     A November 2014 email, from Harmon to Kaptrosky describes payments to Narayan as "Ash money in/money out." And in January 2015, Harmon reiterated in an email to Narayan and Kaptrosky that "[w]e have addressed the matter of % amount of net funds wired back to [Narayan] before, and that number is 10%."

61.     Ultimately, Harmon and Kaptrosky redirected to Narayan approximately 6% of the funds Narayan's advisory clients invested in TTR. They did so knowingly, recklessly, or unreasonably—because without investments from Narayan's investors, TTR would have had to cease operations.

62.     The Defendants tried to conceal the true nature of the finder's fees. The TTR Board—which consisted of Narayan, Harmon, and one other person—voted to pay Narayan $1 million as a "director's fee." During the SEC's investigation of this matter, Harmon testified that Narayan was the only one who received director's fees, and that the fact that Narayan was the

source of as much as 90% of TTR's capital was "certainly" a factor in him receiving fees. Thus, the "director's fees" were nothing more than thinly-veiled finder's fees.

63.     At other times, however—including when it benefited Narayan by allowing him to dodge taxes—the TTR payments to Narayan were no longer finder's fees or director's fees, but "loans." This characterization had the additional effect of obscuring the finder's fees. The "loans" began at least at early as 2011.

64.     At Narayan's and Harmon's direction and with their knowledge, Kaptrosky drafted promissory notes to memorialize the sham loans. Each year, when Narayan had received additional undisclosed fees—even after they exceed the $1 million "director's fee"—Narayan, Harmon, and Kaptrosky simply drafted a new promissory note reflecting the fees paid to date. These notes were sometimes backdated. All of the finder's fee payments were ultimately characterized as $1,848,000 in loans to Narayan.

65.     In reality, the loans were a sham. As Narayan, Harmon, and Kaptrosky knew or were reckless in not knowing, the loan documents were designed to conceal the true nature of the payments to Narayan—both to hide the undisclosed finder's fees and to help Narayan avoid taxes. At the very least, it was unreasonable for the Defendants to participate in this arrangement.

66.     Narayan never made a single payment on the "loans" until early 2016—when he had been dismissed by RGT and had become aware that he was being investigated by the SEC. At that time, TTR and Narayan entered into an agreement purportedly requiring him to repay the sham loans. The agreement includes a $1,000,000 setoff for the "director's fees." This agreement is nothing more than an after-the-fact attempt to cover up the fraudulent conduct and to keep TTR afloat now that the Narayan funding has dried up.

67.     Narayan has made $350,000 in payments under the agreement.  These funds are being used to pay for TTR's ongoing expenses—including expenses and/or salaries for Harmon and Kaptrosky.  This arrangement is depleting the funds available for payments to defrauded investors.

68.     The Defendants also made Ponzi-like payments in order to prolong the scheme. In these transactions, the Defendants used new investments to pay off older investments.  This had the effect of concealing TTR's woeful financial condition and prolonging the scheme.

69.     Narayan knew of and directed the payments—which had his clients on each side of the transactions.  Examples of these payments include:

- on August 7-8, 2014, a payment was made in which over $2.6 million in funds from Client Two and another Narayan client were sent to Client One's wife;

- on January 9-12, 2015, a payment was made in which $350,000 in funds from Client Two were sent to Client Three;[2] and

- On January 26-27, 2016, a payment was made in which $2 million in funds from Client Three were sent to Client One.

70.     In addition to orchestrating these transactions, Narayan knowingly, recklessly, or unreasonably failed to disclose them to his clients—even though this was material information.

71.     Harmon and Kaptrosky also knowingly, recklessly, or unreasonably assisted in these fraudulent payments.  TTR internal documents—including contemporaneous emails— show that each was aware of these transactions, approved them, and/or executed them.

72.     Finally, Harmon and Kaptrosky created and executed backdated documents in connection with certain TTR transactions.  In July 2014, Narayan directed Harmon and

---

[2] Narayan also received $92,500 of these funds.

*Sec v. Narayan, et al.*
Complaint

Kaptrosky to create a promissory note—backdated to January 1, 2014—covering Client One's TTR investment. Among other things, the amended note extended the due date on the note—since Client One had not been repaid the millions TTR owed him. Kaptrosky followed Narayan's direction—creating the backdated note, executing it on TTR's behalf, and sending it to Narayan for execution.

## FIRST CLAIM
### (Against All Defendants)
### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
### and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5]

73.     Plaintiff SEC realleges and incorporates by reference paragraphs 1 through 72 of this Complaint as if set forth verbatim.

74.     Each Defendant, by engaging in the conduct described above, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly:

      a.     employed a device, scheme, or artifice to defraud; and/or

      b.     engaged in an act, practice, or course of business which operated or would

            operate as a fraud or deceit upon a person.

75.     Accordingly, each Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## SECOND CLAIM
### (Against Narayan)
### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
### and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5]

76.     Plaintiff SEC realleges and incorporates by reference paragraphs 1 through 72 of

this Complaint as if set forth verbatim.

77.     Narayan, by engaging in the conduct described above, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly made any untrue statements of material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

78.     Accordingly, Narayan violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### THIRD CLAIM
**(Against All Defendants)**
**Violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)]**

79.     Plaintiff SEC realleges and incorporates by reference paragraphs 1 through 72 of this Complaint as if set forth verbatim.

80.     Each Defendant, by engaging in the conduct above, singly or in concert with others, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

      a.     knowingly or severely recklessly employed a device, scheme, or artifice to defraud; or

      b.     knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

81.     Accordingly, each Defendant violated, and unless enjoined, will continue to

violate Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)].

## FOURTH CLAIM
### (Against Narayan)
### Violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)]

82.     Plaintiff SEC realleges and incorporates by reference paragraphs 1 through 72 of this Complaint as if set forth verbatim.

83.     Narayan, by engaging in the conduct above, singly or in concert with others, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly, recklessly, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

84.     Accordingly, Narayan violated, and unless enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)].

## FIFTH CLAIM
### (Against Narayan)
### Violations of Sections 206(1) and 206(2) of the Advisers Act [[15 U.S.C. §§ 80b-6(1)-(2)])]

85.     Plaintiff SEC realleges and incorporates by reference paragraphs 1 through 72 of this Complaint as if set forth verbatim.

86.     Narayan, directly or indirectly, singly or in concert, knowingly or recklessly, through the use of the mails or any means or instrumentality of interstate commerce, while acting as an investment adviser within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)]:

   a.      has employed, is employing, or is about to employ devices, schemes, and
              artifices to defraud any client or prospective client; or

b.    has engaged, is engaging in, or is about to engage in acts, practices, or courses of business which operates as a fraud or deceit upon any client or prospective client.

87.    Accordingly, Defendant Narayan has violated, and unless enjoined, will continue to violate Sections 206(1)-(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1)-(2)].

## **REQUEST FOR RELIEF**

The SEC respectfully requests that this Court:

I.

Temporarily, preliminarily, and permanently enjoin each Defendant from violating Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77e(a)] and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] thereunder.

II.

Temporarily, preliminarily, and permanently enjoin Defendant Narayan from violating Section 17(a)(2) of the Securities Act [15 U.S.C. § 77e(a)(2)], Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder and Sections 206(1)-(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

III.

Enter an Order immediately freezing the assets of all Defendants and directing that all financial or depository institutions comply with the Court's Order. Furthermore, order that Defendants immediately repatriate any funds held at any bank or other financial institution not subject to the jurisdiction of the Court, and that they direct the deposit of such funds in identified accounts in the United States, pending conclusion of this matter.

IV.

Order that Defendants shall file with the Court and serve upon Plaintiff and the Court, within 10 days of the issuance of this order or three days prior to a hearing on the SEC's motion for a preliminary injunction, whichever comes first, an accounting, under oath, detailing all of their assets and all funds or other assets received from investors and from one another.

V.

Order that Defendants be restrained and enjoined from destroying, removing, mutilating, altering, concealing, or disposing of, in any manner, any of their books and records or documents relating to the matters set forth in the Complaint, or the books and records and such documents of any entities under their control, until further order of the Court.

VI.

Order the appointment of a receiver for Defendant TTR, for the benefit of investors, to marshal, conserve, protect, and hold funds and assets obtained by TTR and its agents, co-conspirators, and others involved in this scheme, wherever such assets may be found, or, with the approval of the Court, dispose of any wasting asset in accordance with the application and proposed order provided herewith.

VII.

Order that the parties may commence discovery immediately, and that notice periods be shortened to permit the parties to require production of documents, and the taking of depositions on 72 hours' notice.

VIII.

Order each Defendant to disgorge an amount equal to the funds and benefits obtained

illegally, or to which that Defendant otherwise has no legitimate claim, as a result of the

violations alleged, plus prejudgment interest on that amount.

IX.

Order each Defendant to pay a civil penalty in an amount determined by the Court

pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the

Exchange Act [15 U.S.C. § 78u(d)] for the violations alleged herein.

V.

Order such other relief as this Court may deem just and proper.

May 24, 2016                                    Respectfully submitted,

                                               _____
                                               CHRIS DAVIS
                                               Plaintiff's Lead Attorney
                                               Texas Bar No. 24050483
                                               Jessica B. Magee
                                               Texas Bar No. 24037757
                                               United States Securities and Exchange Commission
                                               Burnett Plaza, Suite 1900
                                               801 Cherry Street, Unit 18
                                               Fort Worth, Texas 76102
                                               Telephone: (817) 900-2638
                                               FAX: (817) 978-4927
                                               E-mail: davisca@sec.gov

JS 44-TXND (Rev. 11/15)

# CIVIL COVER SHEET

RECEIVED

MAY 2 4 2016

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
U.S. Securities and Exchange Commission

**DEFENDANTS**
Ash Narayan, The Ticket Reserve, Inc., a/k/a Forward Market Media, Inc., Richard M. Harmon, and John A. Kaptrosky

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Dallas
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Chris Davis, U.S. Securities & Exchange Commission
801 Cherry St., Suite 1900, Fort Worth, TX 76102
(817) 900-2638

Attorneys *(If Known)*

**3-16CV 1417-M**

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question *(U.S. Government Not a Party)*
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                      *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

*PERSONAL INJURY*
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Medical Malpractice

*PERSONAL INJURY*
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

*PERSONAL PROPERTY*
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

**PRISONER PETITIONS**
*Habeas Corpus:*
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
*Other:*
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Management Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☒ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Sec 17(a) Securities Act [15 U.S.C. §77q(a)] Sec 10(b) Exchange Act [15 U.S.C.§78j(b)
Brief description of cause:
Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Secs 206(1) & (2) Advisers Act [15 U.S.C. §§ 80b-6(1)-(2)]

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE   5/23/16

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____