# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2016 MAY 24   AM 8: 45

DEPUTY CLERK_____

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § |
| | § |
| Plaintiff, | § |
| | § |
| vs. | § |
| | § |
| ASH NARAYAN, | § Civil Action No.: |
| THE TICKET RESERVE INC. | § |
| a/k/a FORWARD MARKET MEDIA, INC., | § FILED UNDER SEAL |
| RICHARD M. HARMON, and | § |
| JOHN A. KAPTROSKY, | § |
| | § |
| Defendants. | § |

**3-16CV1417-M**

## BRIEF IN SUPPORT OF EMERGENCY
### *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, ASSET FREEZE, APPOINTMENT OF A RECEIVER, AND OTHER EMERGENCY AND ANCILLARY RELIEF

Dated:  May 24, 2016

Respectfully submitted,

Chris Davis
Plaintiff's Lead Attorney
Texas Bar No. 24050483
Jessica B. Magee
Texas Bar No. 24037757
United States Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, Texas 76102
Telephone: (817) 900-2638
FAX: (817) 978-4927
E-mail: davisca@sec.gov

COUNSEL FOR PLAINTIFF SECURITIES AND
EXCHANGE COMMISSION

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................i-ii

TABLE OF AUTHORITIES ....................................................................iii-vi

STATEMENT OF FACTS ...........................................................................1

I.   BACKGROUND .................................................................................1

    A.   RGT employed Narayan as an investment adviser ......................................1

    B.   Narayan's built relationships of false trust with his clients—including by lying about being a CPA ........................................................................2

    C.   Narayan directed over $33 million in client funds to TTR .........................3

II.  THE NARAYAN-TTR FRAUD .........................................................4

    A.   Narayan directed over $33 million in client funds to TTR—usually without the client's consent ......................................................................4

    B.   Narayan did not disclose to his clients that he received almost $2 million in finder's fees .........................................................................4

    C.   Narayan did not disclose other material conflicts of interest....................6

    D.   Narayan did not disclose that TTR was financially distressed ..................6

    E.   Narayan did not disclose that the TTR investments violated RGT's Policies............7

    F.   Narayan violated his duty to provide suitable investment advice to his clients .........8

    G.   Harmon and Kaptrosky participated in the fraud.......................................8

    ARGUMENTS AND AUTHORITIES............................................................12

H.   The Court Should Issue an *Ex Parte* Temporary Restraining Order and a Preliminary Injunction Against Each of the Defendants.................................12

    A.   A Special Standard Applies to SEC Requests for Ex Parte Temporary Restraining Orders and Preliminary Injunctions........................................13

II.  The Defendants Have Committed and are Committing Securities Fraud...........14

A.  The Violations Involved Securities...................................................................14

B.  The Defendants used the Mails and Instrumentalities of Interstate Commerce .......15

C.  Narayan Committed Fraud by Making Material Misrepresentations
    and Omitting Material Information................................................................15

D.  The Defendants are Engaged in a Fraudulent Scheme ............................................17

E.  The Defendants Acted with *Scienter* ...............................................................18

F.  Narayan violated Sections 206(1) and 206(2) of the Advisers Act .........................18

III.  The Defendants Continue their Illegal Conduct .....................................................19

IV.  The Court Should Grant Additional Relief to Facilitate the Preservation of
     Investor Assets and the Prosecution of this Case.................................................20

A.  The Court Should Enter an Asset Freeze to Protect Investor Funds.........................20

B.  The Court Should Order an Accounting ................................................................21

C.  The Court Should Order that Documents not be Altered or Destroyed...................22

D.  The Court Should Authorize Expedited Discovery ..................................................22

E.  The Court Should Direct Financial Institutions and Others to Identify
    Accounts and Safeguard Assets...........................................................................22

F.  The Court Should Appoint a Receiver over TTR ....................................................23

G.  The Court Should Allow Service by U.S. Marshal or Alternative Service ..............24

    CONCLUSION.......................................................................................................24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aaron v. SEC,*
    446 U.S. 680 (1980)................................................................................14

*Affiliated Ute Citizens v. U. S.,*
    406 U.S. 128 (1972)................................................................................17

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)................................................................................15

*Bookout v. Atlas Fin. Corp.,*
    395 F. Supp. 1338 (N.D. Ga. 1974), *aff'd*, 514 F.2d 757 (5th Cir. 1975)....................23

*Broad v. Rockwell Int'l Corp.,*
    642 F.2d 929 (5th Cir. 1981) ................................................................18

*CFTC v. Muller,*
    570 F.2d 1296 (5th Cir. 1978) ........................................................20, 21

*Cox v. Collins,*
    7 F.3d 394 (4th Cir.1993) ....................................................................16

*First Tech. Safety Sys. v. Depinet,*
    11 F.3d 641 (6th Cir. 1993) ................................................................14

*In the Matter of Cady, Roberts & Co.,*
    40 S.E.C. 907, Exchange Act Rel. No. 6668, 1961 WL 60638 (Nov. 8, 1961) ..........17

*Koehler v. Pulvers,*
    614 F. Supp. 829 (S.D. Cal. 1985)........................................................16

*Long v. Shultz Cattle Co.,*
    881 F.2d 129 (5th Cir. 1989) ................................................................17

*Reves v. Ernst & Young,*
    494 U.S. 56 (1990)................................................................................15

*SEC v. Bloom,*
    1988 WL 50150 (S.D.N.Y. Jan. 12, 1988) ..........................................21

*SEC v. Capital Gains Research Bureau, Inc.*,
  375 U.S. 180, 84 S. Ct. 275, 11 L. Ed. 2d 237 (1963) ..................................... 17, 18-19

*SEC v. Cavanagh*,
  155 F.3d 129 (2d Cir. 1998)...................................................................................13

*SEC v. Cayman Islands Reins. Corp.*,
  734 F.2d 118 (2d Cir. 1984)...................................................................................13

*SEC v. Commonwealth Chem. Sec., Inc.*,
  574 F.2d 90 (2d Cir. 1978).....................................................................................19

*SEC v. Constantin*,
  939 F. Supp. 2d 288 (S.D.N.Y. 2013).....................................................................17

*SEC v. Continental Commodities Corp.*,
  497 F.2d 516 (5th Cir. 1974) ..................................................................................17

*SEC v. First Financial Group*,
  645 F.2d 429 (5th Cir. 1981) .............................................................................13, 23

*SEC v. General Refractories Co.*,
  400 F. Supp. 1248 (D.D.C. 1975)...........................................................................13

*SEC v. Ginder*,
  752 F.3d 569 (2d. Cir. 2014)..................................................................................18

*SEC v. Heden*,
  51 F. Supp. 2d 296 (S.D.N.Y. 1999).......................................................................21

*SEC v. Helms, et al*,
  2015 WL 5010298 (W.D. Tex. Aug. 21, 2015)....................................................16, 18

*SEC v. Int'l Swiss Inv. Corp.*,
  895 F.2d 1272 (9th Cir. 1990) ................................................................................21

*SEC v. Mgmt. Dynamics, Inc.*,
  515 F.2d 801 (2d Cir. 1975)....................................................................................13

*SEC v. Manor Nursing Ctrs.*,
  458 F.2d 1082 .......................................................................................................21

*SEC v. Materia*,
  745 F.2d 197 (2d. Cir. 1984)..................................................................................23

*SEC v. Murphy,*
    626 F.2d 633 (9th Cir.1980) ....................................................................16

*SEC v. Oxford Capital Sec., Inc.,*
    794 F. Supp. 104 (S.D.N.Y. 1992) ...........................................................21

*SEC v. Recile,*
    10 F.3d 1093 (5th Cir.1993) ....................................................................16

*SEC v. Savoy Indus., Inc.,*
    587 F.2d 1149 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 913 (1979) ..........................19

*SEC v. Scott,*
    565 F. Supp. 1513 (S.D.N.Y. 1983), *aff'd sub nom* ....................................................13

*SEC v. Unifund SAL,*
    910 F.2d 1028 (2d Cir. 1990), *rehearing denied*, 917 F.2d 98 (1990) ...... 13, 20-21, 22

*SEC v. W.J. Howey Co.,*
    328 U.S. 293 (1946)....................................................................................15

*SEC v. Zandford,*
    535 U.S. 813 (2002).............................................................................15, 17

*Steadman v. SEC,*
    603 F.2d 1126 (5th Cir 1979), *aff'd*, 450 U.S. 91 (1981)......................14, 19

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976)....................................................................................15

*U.S. v. Mansion House Center N. Redevelopment Co.,*
    419 F. Supp. 85 (E.D. Mo. 1976)................................................................23

*U. S. v. Naftalin,*
    441 U.S. 768 (1979)....................................................................................17

*Vernazza v. SEC,*
    327 F.3d 851 (9th Cir. 2003) ....................................................................16

## FEDERAL STATUTES

Section 17(a) of the Securities Act of 1933,
    [15 U.S.C. § 77q(a)]................................................................14, 15, 17, 18

Section 20(b) of the Securities Act of 1933,
    [15 U.S.C. § 77t(b)] .................................................................................13

Section 10(b) of the Securities Exchange Act of 1934
    [15 U.S.C. § 78j(b)] ...............................................................14, 15, 17, 18

Section 21(d) of the Securities Exchange Act of 1934,
    [15 U.S.C. § 78u(d)] ................................................................................13

Section 21(d)(5) of the Securities Exchange Act of 1934,
    [15 U.S.C. § 78u(d)(5)].............................................................................20

Sections 206(1)-(2) of the Investment Advisers Act of 1940,
    [15 U.S.C. § 80b-6(1)-(2)] ...................................................................18, 19

Rule 10b-5 of the Securities Exchange Act of 1934,
    [17 C.F.R. § 240.10b-5].........................................................14, 15, 17, 18

MISCELLANEOUS

12 Charles Alan Wright, Arthur R. Miller, "Federal Practice & Procedure"
    § 2983 (2d ed. 1997) ................................................................................23

As reflected in the accompanying Appendix[1], the Defendants have defrauded investors out of at least $33 million through an egregious investment scheme. The scheme took advantage of the investors' status as Defendant Ash Narayan's advisory clients—to whom he owed fiduciary duties. The scheme remains ongoing today, as Narayan is actively transferring funds to The Ticket Reserve, Inc. ("TTR"), which is controlled by Defendants Richard Harmon and John Kaptrosky. This is depleting funds available for defrauded investors. So far, these transfers total at least $350,000 since March 2016, with another $100,000 due May 31, 2016. Plaintiff Securities and Exchange Commission ("SEC") thus moves for a Temporary Restraining Order, Preliminary Injunction, Asset Freeze, Appointment of Receiver and Other Emergency and Ancillary Relief to halt these ongoing violations of the law and to protect the SEC's ability to recover investor funds.

## STATEMENT OF FACTS

### I.   BACKGROUND

####   A.   RGT employed Narayan as an investment adviser.

Between February 1997 and February 2016, Ash Narayan worked for RGT Capital Management, Ltd. ("RGT"). [App. 142; App. 342 (Griege Dec. ¶3)]. He was the Managing Partner of RGT's California office. *Id.* Before being fired by RGT in early 2016, he was registered with the SEC as an RGT Investment Adviser Representative. [App. 125; App. 117-118; App. 343, (Griege Dec. ¶8)]. While with RGT, Narayan advised over 50 clients. [App. 342, (Griege Dec. ¶4)] From January 2010 through February 2016, he received approximately $3.8 million in compensation from RGT. [App. 342, (Griege Dec. ¶5)].

---

[1]      The Statement of Fact section, below, reflects page-number citations to the Appendix. For example, "App. at 22" refers to Appendix, page 22.

**B.     Narayan built relationships of false trust with his clients—including by lying about being a CPA.**

Narayan's client base focused on high-profile, high-net-worth clients—primarily professional athletes. [App. 345, 349, 355]  He recruited his clients by building a relationship of trust with them.  *Id.* To build that relationship, he stressed his Christian faith, his interest in charity, and his success advising other similar clients.  [App. 346, 350, 356]  He also stressed his professional credentials—including the fact that he was a CPA.  *Id.*  Regrettably, these relationships were built on lies.

The relationships that he built with three professional athletes—Roy Oswalt, Jake Peavy, and Mark Sanchez—exemplify this pattern.  Peavy and Oswalt are current and former Major League Baseball ("MLB") players, respectively.  [App. 345, (Oswalt Dec. ¶3); App. 349]  Sanchez is a current National Football League ("NFL") player.  [App. 355]  In each case, Narayan built trust by emphasizing his background and qualifications—including his Christian faith, charitable works, success working with other pro athletes, and his status as licensed attorney and CPA.  [App. 346, 350, 356]  To further emphasize these qualifications, Narayan also stated that he was a CPA in his email signature block and RGT letterhead.  [App. 26; App. 119]  However, Narayan has never been a CPA.[2]  [App. 133-145; App. 120-122]  He never told his clients this important piece of information—even though they relied on the

---

[2] In addition to the public reports from the State of California and his own Background Questionnaire—which confirm he has never been a CPA—Narayan's testimony on this point during the SEC's investigation is telling.  He refused to give a straight answer to simple questions about his background as a CPA.  For instance:

80:1  you're a CPA, right?
80:2    A   I have an accounting background.
80:3    Q   You were a CPA.  When is the last time you were
80:4  a CPA?
80:5    A   I couldn't even tell you the date.
80:6    Q   Can you ballpark it?
80:7    A   I can't.

*See also,* App. at 187 (Narayan Tr. 70:9-13) ("I haven't been [a CPA] for a long time").  Even if Narayan's self-serving testimony that he ever was a CPA is to be believed in the face of all the evidence to the contrary, he has admittedly been falsely holding himself out as a CPA for a long time.

*SEC v. Narayan, et al.*                                                                 Page 2
Brief in Support of Emergency *Ex Parte* Motion for TRO

experience and expertise that being a CPA afforded Narayan. [App. 346, 350, 356] Thus, Narayan was misleading his clients from the very beginning.

Narayan also led these clients to believe that he would pursue a low-risk strategy when managing their investments. *Id.* For similar reasons—including the fact that, due to their status as professional athletes, they could expect to maximize their earnings within a relatively short timeframe—this low-risk strategy was important to Oswalt, Peavy, and Sanchez. *Id.* As detailed below, Narayan did not follow through on his word—often placing these clients in high-risk investments in exchange for undisclosed finder's fees. Worse, these investments were regularly made without their consent.

## C.     Narayan directed over $33 million in client funds to TTR.

TTR was founded in 2002. [App. 309 (Kaptrosky Tr. 9:20-24)] TTR also markets itself under the name Forward Market Media. [App. 258 (Harmon Tr. 40:10-23)] TTR licenses intellectual property that that lets fans reserve face-value tickets to high-demand sporting events whose teams are yet to be determined—college football bowl games, for example. [App. 257-258 (Harmon Tr. 36:2-17; 39:10-20)] Fans pay a fee for the right to reserve these tickets. [App. 259 Harmon Tr. 42:1-5)] Narayan has been on TTR's Board of Director's since at least 2003. [App. 136; App. 181-182 (Narayan Tr. 48:22-49:8)] He remains on the Board to this day. [App. 256 (Harmon Tr. 68:20-21)] He has also amassed over three million shares of TTR stock. [App. 177 (Narayan Tr. 32:9-20)] As detailed below, Narayan fraudulently directed over $33 million in client funds to TTR.

## II.   THE NARAYAN-TTR FRAUD

### A.   Narayan directed over $33 million in client funds to TTR—usually without the client's consent.

From 2010-16, Narayan directed over $33 million in funds to TTR.[3] [App. 1-7; App. 339 (Hahn Dec. ¶5)] These investments—which were very risky and inconsistent with the conservative strategy he had agreed to pursue—were almost always made without his clients' consent or knowledge. [App. 348, 351, 357] In the rare instances where the investments were authorized, the client agreed only to make a small investment. In Oswalt's case, he agreed in 2010 only to make a small investment in TTR of no more than $300,000. Thereafter, Narayan directed over $7 million to TTR without Oswalt's consent. [App. 348 (Oswalt Tr. ¶12); App. 1-7] Sanchez agreed to invest only $100,000. [App. 357] Instead, Narayan directed over $7 million of Sanchez's funds to TTR. [App. 1-7] Peavy never authorized a single TTR investment—and had never even heard of TTR until February 2016. [App. 351] It was at that time that Oswalt called him to tell him that Narayan had been fired and that he had been making unauthorized client investments in TTR. *Id.*

### B.   Narayan did not disclose that he received almost $2 million in finder's fees.

Narayan received almost $2 million in fees in exchange for directing client funds to TTR. [App. 5] Though the Defendants use the self-serving description "directors fees" to describe these payments, they were in fact finder's fees.[4] *See, e.g.,* [App. 192 (Narayan Tr. 90:7-91:19)] An October 2014 e-mail from Harmon to Narayan and Kaptrosky establishes that the three men knew that these payments were in fact "finders [sic] fee[s]." [App. 8] The same email notes that in order to make the payments appear

---

[3] The TTR investments included three components: debt (the long-term notes), equity, and stock warrants (granted in consideration of the debt investments). [App. 175 (Narayan Tr. 23:24-24:5)]

[4] As detailed further below, the Defendants engaged in a scheme to conceal the true nature of the payments to Narayan. As part of that scheme, they created sham, backdated loan documents.

"kosher," the men were careful that they were not "'turning around' more than 10%" of the amounts received from Narayan's clients. *Id.* And in January 2015, Harmon reiterated in an email to Narayan and Kaptrosky that "[w]e have addressed the matter of % amount of net funds wired back to [Narayan] before, and that number is 10%." [App. 20]

In short—and regardless of how they are labeled—Narayan was paid a percentage of the funds he gathered for TTR. Ultimately, Harmon and Kaptrosky redirected to Narayan approximately 6% of the funds Narayan's advisory clients invested in TTR.[5] [App. 1-7]

As each Defendant admits, these payments were made using client funds. [App. 192 (Narayan Tr. 91:5-19); App. 267 (Harmon Tr. 74:6-11); App. 314 (Kaptrosky Tr. 32:6-10) *see also* App. 340-341 (Hahn Dec. ¶6)] Although these payments created a conflict of interest, Narayan admits he did not disclose them to his clients. [App. 192 (Narayan Tr. 91:20-22 (admitting he did "not specifically" disclose the fees)); App, 347, 353, 357] Nor did he disclose that the fees were paid out of client funds. *Id.*

Narayan received a total of at least $1,848,000 in undisclosed fees in exchange for directing at least 77 investments to TTR. [App. 1-5] Considering only the Oswalt, Peavy, and Sanchez investments, Narayan received more $1.6 million in undisclosed fees in exchange for directing over $30 million to TTR, as follows [App. 3-7]:

|  | Investments | | Fees[6] | |
|---|---|---|---|---|
| Oswalt | $ | 7,580,000 | $ | 668,193 |
| Peavy | $ | 15,105,000 | $ | 957,432 |

---

[5] 6% is calculated as Narayan's total fees divided by the total amount he directed to TTR ($1,848,000/$30,956,667)

[6] In certain instances, payments to Narayan were based on investments from investors other than Oswalt, Peavy, or Sanchez alone. In those instances, fees were allocated *pro rata*. For example, on 4/2/10, Narayan was paid $120,000 for directing $450,000 to TTR. $300,000 of this total ($100,000 on 3/5/10 + $200,000 on 4/1/10) was attributable to Oswalt. Thus, 67.67% ($350,000/$450,000) of the $120,000 total fee was attributed to Oswalt's investments. [App. 7]

| Sanchez | $ | 7,750,000 | $ | 23,682 |
|---|---|---|---|---|
| **Total** | **$** | **30,435,000** | **$** | **1,649,307** |

### C.    Narayan did not disclose other material conflicts of interest.

As he admits, Narayan was heavily involved with TTR—as a Director and as an owner of over 3 million shares of TTR stock. [*See, e.g.,* App. 177 (Narayan Tr. 32:9-20); App. 179 (Narayan Tr. 38:10-15)] This arrangement presented a conflict of interest for Narayan, who was also raising funds for TTR. However, he did not disclose these conflicts to his clients—even on the rare occasions when the clients consented to the TTR investments. Neither Oswalt, Peavy, nor Sanchez was ever told that Narayan was on TTR's Board and a major stockholder. [App. 347, 353, 357][7]

### D.    Narayan did not disclose that TTR was financially distressed.

As each Defendant knew or was reckless in not knowing, TTR has been in severe financial distress for years. TTR's financial statements for 2012-15 showed [App. 32-48; App. 49-66; App. 67-68]:

| Year | Operating Loss | Operating Cash Flow | Cumulative Net Equity |
|---|---|---|---|
| 2012 | -$3,434,438 | -$4,446,197 | -$27,211,469 |
| 2013 | -$3,725,808 | -$3,258,049 | -$33,296,152 |
| 2014 | -$4,275,064 | Not available | -$40,562,593 |
| 2015 | -$3,252,336 | Not available | -$47,129,702 |

---

[7] Narayan's self-serving and totally unsubstantiated claim to have orally disclosed to Oswalt that he was on TTR's Board is simply unbelievable. [App. 176 (Narayan Tr. 25:1-26:21)] His claim is inconsistent with the sworn statements of Oswalt, Peavy, and Sanchez. [App. 347, 353, 357] It is inconsistent with the sworn statement of Mark Griege—which confirms that Narayan violated RGT's Code of Ethics by failing to disclose his involvement with TTR as an outside business activity. [App. 343 (Grieg Dec. ¶8)] And it is inconsistent with Narayan's regulatory disclosures—which, again, fail to include TTR as an outside business activity. [App. 131] In sum, the vast weight of the evidence shows that Narayan his TTR affiliation—from his clients, his employer, and his regulators.

As the Defendants also knew or were reckless in not knowing, in both 2012 and 2013, TTR's external auditor issued an adverse opinion regarding TTR's ability to continue as a going concern.  [App. 32-48; App. 49-66; App. 319, 320 (Kaptrosky Tr. 50:19-51:3; 54:2-54:6)]  This reflected the auditor's substantial doubt about whether TTR could meet current and future financial obligations.  *Id.*  Harmon himself may have summarized TTR's financial condition best in a May 26, 2014 email to Narayan: "To be sure our revenue sucks.  Our balance sheet is a disaster."  [App. 29]

In truth, only Narayan's ability to keep injecting investor funds into TTR kept it afloat.  Note 1 to TTR's 2012 and 2013 financial statements under the heading "Going Concern" states:

> Management has also provided correspondence from a shareholder/board member [Narayan] who has a highly successful record of raising additional capital to fund operations, that he will again raise the capital necessary to meet the Companies' obligations. However, without a firm commitment for additional capital and firm commitments from the debt holders of their intentions to forego payment within the next twelve months, there is substantial doubt if the Companies will be able to meet their current and future obligations.  [App. 41][8]

Even though it would have been important to an investor deciding whether to invest in TTR, Narayan knowingly, recklessly, or unreasonably failed to disclose TTR's poor financial condition.  [App. 347, 353, 357]

### E.    Narayan did not disclose that the TTR investments violated RGT's policies.

Throughout the time Narayan was employed by RGT, RGT maintained a Code of Ethics that required him to adhere to certain standards of conduct.  [App. 343 (Griege Dec. ¶7)]  RGT's Code of Ethics required Narayan to: (1) place the interests of clients above RGT's or any employee's interests; (2) disclose any activities that may create an actual or potential conflict of interest; and (3) disclose all material facts to his clients.  *Id.*  He was also required to obtain approval of the Chief Compliance

---

[8] As Narayan admitted under oath, TTR's main source of cash was not licensing revenue—but debt and equity.  [App. 187 (Narayan Tr. 72:7-72:25)]  And as Harmon testified, from 2011 until he was fired by RGT, Narayan was responsible for as much as 90% of TTR's capital investments.  [App. 265 (Harmon Tr. 68:4-19)]

Officer prior to engaging in any outside business activity. *Id.*

Narayan violated the Code of Ethics by failing to disclose the TTR business activity he was involved in. *Id.* He further violated it by failing to disclose to his clients (or to RGT) the many conflicts of interests created by the TTR arrangement—as detailed above. *Id.* Even though it would have been important for his clients to know that the TTR investments violated the Code of Conduct, Narayan knowingly, recklessly, or unreasonably failed to disclose this information. [App. 347, 353, App. 357]

### F.    Narayan violated his duty to provide suitable investment advice to his clients.

As an investment adviser Narayan owed a number of duties to his clients. These included the duty to provide suitable investment advice. In addition to all of his deceptive conduct, Narayan violated this duty. He heavily concentrated clients—including Oswalt, Peavy, and Sanchez—in investments in a high-risk, flailing, and debt-ridden private company. [App. 348, 351-352, 358] He did this despite the fact that these investors had explicitly directed him to pursue low-risk investment strategies—something he agreed to do. *Id.* He also did this in spite of the fact that each of these investors is unique in that, as a professional athlete, he has a very short earnings window. *Id.*

### G.    Harmon and Kaptrosky participated in the fraud.

Narayan engaged in a scheme to defraud his clients. In exchange for almost $2 million in undisclosed fees, he directed over $33 million in client funds to TTR. [App. 1-7] He usually did this without his clients consent—often using forged, copied, or unauthorized signatures. [App. 348, 351, 358] Along with Narayan, Harmon and Kaptrosky took affirmative steps to prolong and conceal the scheme.

As noted above, Narayan was on TTR's Board of Directors—but in reality was TTR's chief fundraiser. As Harmon admits, Narayan was responsible for as much as 90% of TTR's capital. [App.

265 (Harmon Tr. 68:1-19)] And as detailed above, the Defendants themselves referred to the payments as "finder's fees," spoke of "turning around" client funds, and of "% amount of net funds wired back to [Narayan]." [App. 8, 20] Another email between Harmon and Kaptrosky describes payments to Narayan as "Ash money in/money out." Thus with Harmon's and Kaptrosky's knowledge and at their direction, Narayan was regularly paid finder's fees—often using client funds.

The Defendants knowingly or recklessly took affirmative steps to conceal these undisclosed finder's fees. Despite the fact that Narayan's compensation was paid as a percentage of the investments that he brought in to TTR, the TTR Board—which consisted of Narayan, Harmon, and one other person—voted to pay Narayan $1 million as a "director's fee." [App. 192 (Narayan Tr. 90:7-11); App. 260, 263, and 267 (Harmon Tr. 48:21-49:1, 57:22-58:17, and 75:4-24)] Harmon testified that Narayan was the only one who received director's fees, and that the fact that Narayan was the source of as much as 90% of TTR's capital was "certainly" a factor in him receiving fees. [App. 267 (Harmon Tr. 75:4-24)] Emails between Harmon and Narayan also show that TTR regularly turned to Narayan for capital when it was desperate for short-term funding. [App. 22-23] (Harmon asking in June 2015 for "assurances of working capital" because TTR was "at a precipice"); [App. 24-25] (Harmon telling Narayan in September 2015 ("in terms of your bringing capital in, we have a situation"). And Narayan always delivered. [App. 1-7] (showing client funds coming to TTR within days of Harmon's demands) Thus, the "director's fees" were nothing more than thinly-veiled finder's fees.

At other times, however—including when it benefited Narayan by allowing him to dodge taxes—the TTR payments to Narayan were no longer finder's fees or director's fees, but "loans." This began at least at early as 2011—when Narayan and TTR entered into a "promissory note" for $413,000. [App. 79] A 2013 email between Narayan and Harmon makes clear at least one reason for this—it

allowed Narayan to avoid reporting the payments as taxable income. [App. 26-28][9] This

characterization had the additional effect of obscuring the finder's fees. At Narayan's and Harmon's

direction and with their knowledge, Kaptrosky drafted notes payable to memorialize the sham loans.

[App. 80-83; App. 84-90; App. 91-101] Each year, when Narayan had received additional undisclosed

fees—even after they exceed the $1 million "director's fee—Narayan, Harmon, and Kaptrosky simply

drafted a new note payable reflecting the fees paid to date. *Id.* These notes were sometimes backdated.

[App. 102-112] (email from Kaptrosky to Narayan attaching backdated promissory notes for execution);

[App. 79; App. 113] (executed notes).

Narayan never made a single payment on the "loans" until early 2016—when he had been

dismissed by RGT and had become aware that he was being investigated by the SEC. At that time, TTR

and Narayan entered an agreement purportedly requiring him to repay the sham loans. [App. 114-116]

The agreement includes a $1,000,000 setoff for the "directors fees." *Id.* This agreement is nothing more

than an after-the-fact attempt to cover up the fraudulent conduct and to keep TTR afloat now that the

Narayan funding has dried up. Narayan has made $350,000 in payments under the agreement. *Id.*;

[App. 341, Hahn Dec. ¶7] These funds are being used to pay for TTR's ongoing expenses—including

Harmon's expenses and TTR's payroll. This arrangement is perpetuating the fraud scheme and depleting

the funds available for defrauded investors.

Harmon and Kaptrosky also actively assisted in misappropriating client funds to pay Narayan's

undisclosed finder's fees. TTR's internal documents show that they "turn[ed] around" investment

proceeds for this purpose. [App. 8-19; App. 20-21] And they show that they know these payments were

---

[9] Harmon to Narayan: " I need to discuss with you the 'memorializing' of the timing etc. of the payments to you and the
accounting thereof. In particular, I'll need your thoughts on whether you will want this to be income to you in 2012 (1099) or
put in the form of a note payable to the company."

finder's fees—not director's fees or loans. *Id.*

Finally, the Defendants made Ponzi-like payments in order to prolong the scheme. In these transactions, the Defendants used new investments to pay off older investments. This had the effect of concealing TTR's woeful financial condition and prolonging the scheme. Narayan knew of and directed these payments—which had his clients on each side of the transactions. Examples of these payments include:

- on August 7-8, 2014, a payment was made in which over $2.6 million in funds from Peavy and another Narayan client were sent to Oswalt's wife;

- on January 9-12, 2015, a payment was made in which $350,000 in funds from Peavy were sent to Sanchez;[10] and

- On January 26-27, 2016, a payment was made in which $2 million in funds from Sanchez were sent to Oswalt. [App. 340-341]

In addition to orchestrating these transactions, Narayan knowingly, recklessly, or unreasonably failed to disclose them to his clients—even though this was material information. [App. 353, 357]

Harmon and Kaptrosky also knowingly, recklessly, or unreasonably assisted in these fraudulent payments. For instance, an August 7, 2014 email shows that Harmon and Kaptrosky assisted in making the August 8, 2014 payment. [RGT-SEC2179-80] Similarly, a January 5, 2015 email shows that Narayan directed a wire of $975,000 from Peavy's Schwab account into TTR's bank account. [App. 20-21] He then instructed Harmon and Kaptrosky to use a portion of those funds to pay other Ticket Reserve investors, including $350,000 to Sanchez—which they did.[11]

Finally, Harmon and Kaptrosky created and executed backdated documents in connection with

---

[10] Narayan also received $92,500 of Peavy's funds.

[11] Narayan also directed Kaptrosky to wire $175,000 of Peavy's funds to Narayan.

*SEC v. Narayan, et al.*
Brief in Support of Emergency *Ex Parte* Motion for TRO

certain TTR transactions.  In July 2014, Narayan directed Harmon and Kaptrosky to create a promissory note—backdated to January 1, 2014—covering Oswalt's TTR investment.  [App. 71-74; App. 75-77; App. 78]  Among other things, the amended note extended the due date on the note—since Oswalt had not been repaid the millions TTR owed him.  Kaptrosky followed Narayan's direction—creating the backdated note, executing it on TTR's behalf, and sending it to Narayan for execution.  *Id.*

Throughout the scheme, Harmon and Kaptrosky acted knowingly, recklessly, or unreasonably. For instance, Kaptrosky testified:

> 65:5 Q  A minute ago Mike asked you about the wires of
> 65:6 investor money to other investors.  And you said the
> 65:7 reason you did it because you were directed to do it.
> 65:8 Were you uncomfortable doing it?
> 65:9   A  It didn't feel right.
> 65:10   Q   Why is that?
> 65:11   A   Just the way I am personally.
> 65:12   Q   What do you mean by that?
> 65:13   A   It's wires in and wires out, just, you know.

Harmon similarly testified that he "was uncomfortable with [. . .] how much of the new incoming funds were, you know, being paid out to Ash."  And they ignored red flags—including Narayan's willingness to mischaracterize payments to him to avoid taxes, his orchestration of Ponzi payments between his own clients, and his direction to create and execute backdated documents.  Yet they both willingly did this because TTR could not survive without Narayan's funding.  Thus, they acted knowingly or recklessly.  At a minimum, their actions were unreasonable.

## ARGUMENT AND AUTHORITIES

### I.   THE COURT SHOULD ISSUE AN *EX PARTE* TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION AGAINST EACH OF THE DEFENDANTS.

The Defendants ran, and are continuing to run, a fraudulent scheme involving false and misleading statements, omissions, and misappropriation of funds.  The Court should issue an *ex parte*

temporary restraining order and a preliminary injunction to halt the scheme. To obtain this relief, the SEC must establish that: (1) the Defendants violated the federal securities laws; and (2) they will likely continue to do so absent the orders sought by the SEC.

**A.      A Special Standard Applies to SEC Requests for *Ex Parte* Temporary Restraining Orders and Preliminary Injunctions.**

Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)] authorize the SEC to seek and direct the courts to enter "a permanent or temporary injunction or restraining order" upon a "proper showing" that the defendant "is engaged or is about to engage" in securities law violations. The proper showing requires "a justifiable basis for believing, derived from reasonable inquiry or other credible information, that such a state of facts probably existed as reasonably would lead the SEC to believe that the defendants were engaged in violations of the statutes involved." *SEC v. General Refractories Co.*, 400 F. Supp. 1248, 1254 (D.D.C 1975). In sum, the SEC is entitled to entry of temporary and preliminary injunctive relief against future securities law violations upon "a substantial showing of likelihood of success as to both a current violation and the risk of repetition." *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998); *SEC v. First Financial Group of Tex.*, 645 F.2d 429, 434-35 (5th Cir. 1981). As detailed below, both of these elements are satisfied here.[12]

*Ex parte* relief is appropriate when notice to the opposing party could render fruitless further

---

[12] SEC enforcement actions seeking injunctions are not governed by the same criteria as private injunctive actions. Because the SEC is "not . . . an ordinary litigant, but . . . a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 808 (2d Cir. 1975). The SEC need not show irreparable injury or a balance of equities in its favor. *Management Dynamics, Inc.,* 515 F.2d at 808; *see also SEC v. Unifund SAL,* 910 F.2d 1028, 1035 (2d Cir. 1990). In addition, unlike private litigants, the SEC need not demonstrate the lack of an adequate remedy at law to obtain an injunction. *Id.*; *see SEC v. Scott,* 565 F. Supp. 1513, 1536 (S.D.N.Y. 1983), *aff'd sub nom.*; *SEC v. Cayman Islands Reins. Corp.,* 734 F.2d 118 (2d Cir. 1984).

prosecution of the action. *First Technology Safety Systems, Inc. v. Depinet*, 11 F.3d 641, 650-51 (6th

Cir. 1993). Here, the Defendants remain involved in an ongoing scheme. For years, TTR—under the

direction of the Defendants—has been a conduit for fraud. It has been propped up using fraudulently-

obtained proceeds. Initially, those proceeds were coming from Narayan's clients—both under false

pretenses and without their consent. Now that he has been fired by RGT, they are coming from

Narayan—who is keeping TTR afloat by diverting back hundreds of thousands of dollars in fraud

proceeds. He has paid back $350,000 so far with roughly $500,000 more due—including $100,000 on

May 31, 2016. These funds should be immediately secured without notice. Otherwise, the assets held

by the Defendants could be rapidly dissipated or hidden, potentially rendering fruitless further

prosecution to recover assets for victims.

## II.    THE DEFENDANTS HAVE COMMITTED AND ARE COMMITTING SECURITIES FRAUD.

The Defendants have violated—and are continuing to violate—Section 17(a) of the Securities Act

and Section 10(b) and Rule 10b-5 of the Exchange Act. These "antifraud provisions" collectively prohibit

both fraudulent statements and omissions and fraudulent schemes relating to the offer, purchase, or sale of

securities using interstate commerce. Section 17(a)(1) of the Securities Act and Section 10(b) and Rule 10b-

5 of the Exchange Act require a finding of *scienter*. *Aaron v. SEC,* 446 U.S. 680, 697 (1980); *see also*

*Steadman v. SEC,* 603 F.2d 1126, 1133-34 (5th Cir 1979), *aff'd,* 450 U.S. 91 (1981). Sections 17(a)(2) and

(3) of the Securities Act do not. *Id.* As detailed below, the Defendants violated each of these provisions.

### A.    The Violations Involved Securities.

Securities Act Section 2(a) and Exchange Act Section 3(a)(10) define securities to include any

"note…stock…evidence of indebtedness…investment contract…or warrant or right to subscribe to or

purchase, any of the foregoing."[13]  As Narayan testified, the TTR investments took the form of long-term promissory notes, equity, and stock warrants.  Thus, the investments involved securities.

**B.      The Defendants used the Mails and Instrumentalities of Interstate Commerce.**

To violate the antifraud provisions, the Defendants must use instrumentalities of interstate commerce.  Here, the Defendants used the mail, telephones, and email to solicit investors and otherwise carry out the scheme.  They also made interstate wire transfers.

**C.      Narayan Committed Fraud by Making Material Misrepresentations and Omitting Material Information.**

Securities Act Section 17(a)(2) makes it illegal for any person to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Similarly, Exchange Act Section 10(b) and Rule 10b-5(b) make it illegal for any person, in connection with the purchase or sale of a security, to make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of any security.  The "in connection with" requirement is satisfied if the fraud touches upon a securities transaction.  *See, e.g., SEC v. Zandford*, 535 U.S. 813, 819-20 (2002).[14]

---

[13] The Exchange Act makes an exception for notes with a maturity of less than nine months.  That exception does not apply here—since the notes had a maturity exceeding nine months.  In other rare exceptions, notes are not securities.  Those exceptions do not apply here.  *See Reves v. Ernst & Young*, 494 U.S. 56, 63-65 (1990) (notes are not securities only where they bear a strong family resemblance to certain types of notes—e.g., notes secured by mortgages).  Finally, the notes are also investment contracts—since they were: (1) an investment of money (2) in a common enterprise (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.  *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).

[14] Information is material if there is a substantial likelihood that disclosure of the misstated or omitted fact would have significantly altered the "total mix" of information to be considered by a reasonable investor when making the decision about whether to invest.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S.

Narayan solicited investors by making a number of materially false and misleading statements about the Ticket Reserve.  He also omitted material information.  He misled investors about, or failed to disclose that: (1) he was receiving funds from TTR in exchange for directing client investments to TTR; (2) investor funds were being used to make undisclosed payments to Narayan and other investors—as opposed to being invested in TTR's business; (3) he was on TTR's Board of Directors; (4) he owned millions of shares of TTR stock; (5) TTR was in poor financial condition; (6) TTR's auditor had expressed concerns about its ability to continue as a going concern; and (7) the TTR investments violated RGT's Code of Ethics.  Narayan also misrepresented his credentials as a CPA.

These misrepresentations and omissions are material as a matter of law.  A reasonable investor would want to know:[15]

- Funds were being diverted, including for promotional fees and Ponzi payments.  *SEC v. Helms, et al*, 2015 WL 5010298 (W.D. Tex. Aug. 21, 2015) (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir.1993));

- TTR was in poor financial condition.  *Id.* (citing *Cox v. Collins*, 7 F.3d 394, 396 (4th Cir.1993); *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir.1980);

- Narayan was conflicted—including being a TTR Board member and stockholder, and receiving millions in undisclosed finder's fees.  *Id.* ("It is indisputable that potential conflicts of interest are 'material' facts")  (citing *Vernazza v. SEC*, 327 F.3d 851, 859 (9th

---

438, 449 (1976)).  *See also, Koehler v. Pulvers*, 614 F. Supp. 829, 842 (S.D. Cal. 1985) (finding omissions and misrepresentations about "the use of investor funds" material).

[15] As their sworn declarations confirm, these misrepresentations and omissions were material to Oswalt, Peavy, and Sanchez—confirming that a reasonable investor would find them material.

Cir.2003); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 201, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963)) ; and

- Narayan was lying about his professional background and experience. *Id.* (citing *S.E.C. v. Constantin*, 939 F. Supp. 2d 288, 306 (S.D.N.Y. 2013)).

### D.     The Defendants Are Engaged in a Fraudulent Scheme.

In addition to their fraudulent statements, Defendants are engaged in a fraudulent scheme. Securities Act sections 17(a)(1) and (3) and Exchange Act sections 10(b) and Rule 10b-5(a) and (c) make it illegal to employ any device, scheme, or artifice to defraud, or to engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.[16]

The Defendants are engaged in a fraudulent scheme. The scheme includes or has included: Narayan making unauthorized investments in TTR using his clients' money;[17] the Defendants routing client funds back to Narayan to fund the undisclosed fees; the Defendants concealing the true nature of the fees by characterizing them as director's fees or loans; the Defendants drafting and executing sham, backdated documents; the Defendants making Ponzi-like payments in which they used new investments to pay off earlier investments; and now, Narayan sending fraud proceeds back to TTR to keep it afloat. In addition, Narayan made repeated misstatements over time in furtherance of the scheme.

---

[16] For simplicity's sake, this brief uses the term "scheme" to refer to these actions collectively. *See, e.g., In the Matter of Cady, Roberts & Co.*, 40 S.E.C. 907, Exchange Act Rel. No. 6668, 1961 WL 60638, *4 (Nov. 8, 1961) ("The three main subdivisions of Section 17 and Rule 10b–5 have been considered to be mutually supporting rather than mutually exclusive."); see also *United States v. Naftalin*, 441 U.S. 768, 773 (1979).

[17] This act alone is a violation. In *Zandford*, the Supreme Court held: "[i]ndeed, each time respondent 'exercised his power of disposition (of his customers' securities) for his own benefit,' that conduct, 'without more,' was a fraud [under Rule 10b-5(a) and (c)]." 535 U.S. at 815; see also *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152 (1972) (noting that while Rule 10b-5(b) targets false statements or omissions, paragraphs (a) and (c) "are not so restricted").

### E.   The Defendants Acted with *Scienter.*

Securities Act section 17(a)(1) Exchange Act section 10(b) and Rule 10b–5 require a showing of *scienter*—a mental state embracing intent to deceive, manipulate or defraud. *Aaron v. SEC*, 446 U.S. 680, 691, 697 (1980). Negligence suffices for Section 17(a)(2) or (3) violations.[18] *Id.* *Scienter* is established by showing that the defendant acted intentionally or with severe recklessness. *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961 (5th Cir. 1981). *See, e.g., Helms*, 2015 WL 5010298 at *13.

Here, the Defendants acted with *scienter.* His misrepresentations and omissions were made to many different investors over an extended period of time. These repeated misrepresentations and omissions were made intentionally or recklessly. The Defendants likewise acted intentionally or recklessly in carrying out their scheme. Repeatedly and over an extended period of time, they made undisclosed payments to Narayan, drafted and executed sham loan documents, and misappropriated investor funds for their own benefit. They discussed attempting to make their actions look "kosher." They ignored the fact that their actions might violate other federal laws (e.g., tax laws). Finally, Harmon admitted to being "uncomfortable" with the amount of investor funds being paid to Narayan; while Kaptrosky acknowledged that the Ponzi-like payments "didn't feel right." The Defendants thus acted intentionally or recklessly. At the absolute minimum, their actions were unreasonable.

### F.   Narayan violated Sections 206(1) and 206(2) of the Advisers Act.

Narayan violated Sections 206(1)-(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(1)-(2)]. Section 206(1) makes it illegal for an investment adviser to employ any device, scheme, or artifice to defraud. Section 206(2) prohibits an investment adviser from engaging in any fraudulent transaction, practice, or course of business. In addition, in *S.E.C. v. Capital Gains*

---

[18] Negligence can take the form of a departure from the applicable standard of care or of unreasonable conduct. *SEC v. Ginder*, 752 F.3d 569, 574 (2d. Cir. 2014)

*Research Bureau, Inc.*, 375 U.S. 180, 194 (1963), the Supreme Court held that under Section 206,

advisers have an affirmative obligation of utmost good faith and full and fair disclosure of all material

facts to their clients, as well as a duty to avoid misleading them. The SEC must prove materiality and,

for Section 206(1), that a defendant acted with *scienter*. *Steadman v. SEC*, 603 F.2d 1126, 1134 (5th

Cir. 1979), *aff'd*, 450 U.S. 91 (1981). *Scienter* is not required to establish a 206(2) violation. *Capital

Gains*, 375 U.S. 180 at 195.

      As detailed above, Narayan repeatedly misled his clients, failed to disclose conflicts of interest,

and engaged in a fraudulent scheme. He acted with *scienter* (or at a minimum, negligently) when doing

so. He also violated his affirmative obligations of good faith and full and fair disclosure. He thus

violated Sections 206(1)-(2).

## III.   THE DEFENDANTS CONTINUE THEIR ILLEGAL CONDUCT.

      The second prong of the temporary restraining order test—that a substantial likelihood exists that

the wrong will be repeated unless restrained or enjoined—is also satisfied here. In fact, the illegal

scheme is still ongoing.[19]   This ongoing conduct shows not only a high probability—but a certainty—

that the conduct will continue unless enjoined.

      The conduct has continued for years and involved a high degree of *scienter*. Assets available for

recovery are being actively dissipated. And the Defendants have not acknowledged the wrongfulness of

their conduct. They should be enjoined.

---

[19] Among the factors to be considered in assessing the likelihood that defendants will repeat their wrongdoing are (1) the character of the violation, (2) the degree of *scienter* involved, and (3) whether a defendant has acknowledged the wrongfulness of his conduct and given sufficient assurances that it will not be repeated. *See SEC v. Savoy Industries, Inc.*, 587 F.2d 1149, 1168 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 913 (1979); *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 100-01 (2d Cir. 1978).

**IV.**    **THE COURT SHOULD GRANT ADDITIONAL RELIEF TO FACILITATE THE PRESERVATION OF INVESTOR ASSETS AND THE PROSECUTION OF THIS CASE.**

In addition to the TRO and Preliminary Injunction, the Court should also order additional relief to help preserve any remaining investor assets, including: (1) an asset freeze; (2) an accounting; (3) an order preventing the alteration or destruction of documents; (4) expedited discovery; (5) an order directing financial institutions and others to identify account and safeguard assets; and (6) an order appointing a receiver.

**A.    The Court Should Enter an Asset Freeze to Protect Investor Funds.**

A freeze of Defendants' remaining assets is necessary to preserve funds and other property that later may be necessary to satisfy any order of disgorgement, civil penalty, prejudgment interest or other relief that may ultimately be imposed by the Court. The ancillary remedy of an asset freeze is appropriate to protect defrauded investors against further dissipation of their assets and to ensure satisfaction of whatever monetary relief the Court may ultimately order. *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978); *see* Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)] ( "[i]n any action or proceeding brought or instituted by the SEC under any provision of the securities laws, the SEC may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors"). An order for disgorgement or other final monetary relief will often be rendered meaningless without an asset freeze during the pendency of the action. *See SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990).

In addition, an asset freeze may be granted "even in circumstances where the elements required to support a traditional SEC injunction have not been established." *See SEC v. Unifund SAL*, 910 F.2d

1028, 1041 (2d Cir.), *rehearing denied*, 917 F.2d 98 (1990).[20]  When there are concerns that defendants

might dissipate assets, a Court need only find "some basis" for inferring a violation of the securities laws

to impose a freeze order. *Unifund SAL*, 910 F.2d at 1041 (upholding asset freeze order even though the

evidence was insufficient to support entry of a preliminary injunction); *see also SEC v. Heden*, 51 F.

Supp. 2d 296, 298 (S.D.N.Y. 1999).

Defendants' assets should be frozen.  They have already dissipated or misappropriated millions

in client funds.  They are actively dissipating what is left.  Absent a freeze, the Defendants will misuse

and dissipate assets that might otherwise be returned to investors and used to satisfy any monetary relief

ordered by the Court.

### B. The Court Should Order an Accounting.

The SEC requests that the Court order that Defendants prepare a sworn accounting of all investor

funds received.  This will enable the SEC to determine the scope of the fraud and the disposition of

investor funds, and ensure the proper distribution of available assets.  *See SEC v. International Swiss*

*Investments Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990); *SEC v. Manor Nursing Centers*, 458 F.2d

1082,1105-06.  This remedy is frequently imposed to provide an accurate measure of all funds obtained

as a result of fraud, as well as a measure of unjust enrichment and a defendant's current financial

resources.  *See, e.g., Manor Nursing Ctrs.*, 458 F.2d at 1105; *SEC v. Oxford Capital Securities, Inc.*, 794

F. Supp. 104, 105-06 (S.D.N.Y. 1992); *SEC v. Bloom*, 1988 U.S. Dist LEXIS 2487 (S.D.N.Y. Jan. 12,

1988).

Due to the expedited nature of the SEC's investigation, the whereabouts and availability of any

---

[20]  To obtain an asset freeze, the SEC need not show a reasonable likelihood of future violations. *Muller*, 570 F.2d at 1300.  The burden when seeking an asset freeze is lower than when seeking a temporary or preliminary injunction, because injunctive relief raises the possibility of future liability for contempt; an asset freeze only preserves the *status quo*. *Unifund SAL*, 910 F.2d at 1039.

remaining investor assets may be unknown. A prompt and complete accounting will assist in determining what assets remain and where they are located and whether the Defendants have defrauded any new investors.

### C.     The Court Order that Documents not be Altered or Destroyed.

The SEC also asks the Court to enter an order prohibiting the Defendants from destroying and altering documents. This is appropriate in light of their past and ongoing fraudulent conduct. Such orders are routinely granted to preserve evidence and protect the integrity of the litigation. *See, e.g., Unifund SAL*, 910 F.2d at 1040 n.11. Good faith preservation of documents cannot be assumed in the context of a fraudulent scheme.

### D.     The Court Should Authorize Expedited Discovery.

In order to protect defrauded investors, the Court should order that expedited discovery is allowed. This will let the SEC quickly obtain additional bank and other records necessary to identify and preserve remaining assets, and determine whether the Defendants are engaged in other ongoing frauds. In order to maintain the confidentiality of its investigation, the SEC has not attempted to interview all persons who have information relevant to this matter, or to take investigative testimony from them. The opportunity to take discovery prior to a preliminary injunction hearing may enable the parties to present a more complete evidentiary record to the Court and will sharpen and focus the issues that must be decided by the Court at such a hearing.

### E.     The Court Should Direct Financial Institutions and Others to Identify Accounts and Safeguard Assets.

To facilitate the SEC's attempts to determine the full scope of Defendants' fraud and the disposition of investor funds, and ensure the proper distribution of available assets, the Court should require any entity or person that holds, controls or maintains custody of any account or asset of, or has

held, controlled, or maintained custody of any account for Defendants at any time since January 2010,

to: (a) prohibit any person (other than any Receiver who may be appointed) from withdrawing or

encumbering assets of Defendants; (b) deny any person access to each and every safe deposit box of

Defendants; (c) provide the SEC (or Receiver) with a written statement describing assets and accounts

held by or on behalf of Defendants; and (d) allow representatives of the SEC (or Receiver) access to

inspect and copy records pertaining to Defendants' financial accounts and other assets.

### F.    The Court Should Appoint a Receiver over TTR.

As noted above, pursuant to its general equity powers, the Court may order ancillary relief to

effectuate the purposes of the federal securities laws, to preserve defendants' assets, and to ensure that

wrongdoers do not profit from their unlawful conduct. The power of the district court to appoint a

receiver to marshal and preserve assets and perfect property rights is well-established. *SEC v. Materia*,

745 F.2d 197 (2d. Cir. 1984); *SEC v. First Financial Group*, 645 F.2d 429, 438 (5th Cir. 1981). *See*

*also* 12 C. Wright, A. Miller & R. Marcus, "Federal Practice & Procedure" § 2983 at 23-24 (2d ed.

1997).[21]

The evidence presented here establishes that a receiver is warranted here. The Defendants have

are engaged in an ongoing fraud scheme. . They have misappropriated millions of dollars received

from investors and are in possession of assets acquired with investor funds that are at risk of

disappearing. In addition, the Defendants may have transferred investor money or assets derived from it

to other parties who may not have a legitimate claim to that money or those assets. Under these

circumstances, the appointment of a receiver is essential to providing meaningful relief to investors.

---

[21] An evidentiary hearing is not required on Plaintiff's request to appoint a receiver where the record discloses sufficient facts to warrant such an appointment. *Bookout v. Atlas Fin. Corp.*, 395 F. Supp. 1338, 1342 (N.D. Ga. 1974), *aff'd*, 514 F.2d 757 (5th Cir. 1975); *United States v. Mansion House Center N. Redevelopment Co.*, 419 F. Supp. 85, 87 (E.D. Mo. 1976).

### G.    The Court Should Allow Service by the U.S. Marshal or Alternative Service.

The SEC requests the Court to authorize and direct the U.S. Marshal in any district in which the Defendants reside, transact business, or may be found, to effect service of process, at the request of the SEC or any duly appointed agent of the Court, of all pleadings and other papers filed in this case. The SEC will also attempt to serve the Defendants. However, the SEC is concerned that it may not be able to quickly locate and personally serve the Defendants. Thus, the SEC also requests the Court to authorize the SEC to effect service upon the Defendants by alternative methods—namely by fax, email, overnight courier, or by mail upon the Defendants, their agents or their attorneys by representatives of the SEC, or by an alternative provision for services permitted by Rule 4 of the Federal Rules of Civil Procedures, or as this Court may direct by further order. The SEC intends to effect actual notice of the Court's orders as quickly as possible because the Defendants will continue to violate the federal securities laws and dissipate investor funds if they are not restrained. The alternative service methods requested by the SEC are reasonably calculated to provide Defendants with actual notice of the Court's orders at the earliest moment, which is critical to secure the relief sought herein.

### CONCLUSION

For all the foregoing reasons, and those set forth in the accompanying pleadings, declarations and exhibits thereto, the SEC respectfully requests that the Court grant its Application.

Dated:  May 24, 2016                            Respectfully submitted,

                                                _____
                                                Chris Davis
                                                Plaintiff's Lead Attorney
                                                Texas Bar No. 24050483
                                                Jessica B. Magee
                                                Texas Bar No. 24037757
                                                United States Securities and Exchange Commission

Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, Texas 76102
Telephone: (817) 900-2638
FAX: (817) 978-4927
E-mail: davisca@sec.gov

COUNSEL FOR PLAINTIFF SECURITIES AND
EXCHANGE COMMISSION