ORIGINAL

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JUNE 6 3:

DEPUTY CLERK

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § § | |
| Plaintiff, | § § | SEALED |
| vs. | § § | Civil Action No. 3:16-cv-1417-M |
| ASH NARAYAN, THE TICKET RESERVE, INC. a/k/a FORWARD MARKET MEDIA, INC., RICHARD M. HARMON, and JOHN A. KAPTROSKY, | § § § § § | SEALED |
| Defendants. | § § | |

## DECLARATION OF MICHAEL D. NAPOLI

I, Michael D. Napoli, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     My name is Michael D. Napoli. I am over the age of twenty-one years, of sound mind, and fully competent to testify in this cause. I have personal knowledge of the facts stated herein, all of which are true and correct.

2.     I am a member in the law firm of Dykema Gossett PLLC, which operates as Dykema Cox Smith in the State of Texas. I was admitted to the practice of law in the State of Texas in 1991. I am the court-appointed receiver for the Ticket Reserve, Inc. a/k/a Forward Market Media, Inc. (Ticket Reserve).

3.     Since my appointment on May 24, 2016, I have undertaken an investigation into the business and affairs of Ticket Reserve. Among other things, I have (i) searched the office maintained by Ticket Reserve in Lake Forest, Illinois; (ii) reviewed documents recovered from that office and from DropBox accounts maintained by Ticket Reserve employees and former employees; (iii) interviewed

Richard Harmon and John Kaptrosky, defendants in this case and the last remaining employees of Ticket Reserve; (iv) interviewed Matt Nelson, a former employee of Ticket Reserve, who managed its license arrangements; (v) spoken with counsel for Harmon and Kaptrosky; (v) spoken with counsel for RGT; (vi) spoken with other shareholders of Ticket Reserve; (vi) spoken extensively Brisa Trinchero, the head of ShooWin, Inc. which holds an exclusive license for Ticket Reserve's technology; (vii) spoken with other license holders; (viii) reviewed a statement of accounts held at Northern Trust for Ticket Reserve, Forward Market Media, Inc. (FMM) and Resource Acquisition Group, LLC; and (ix) reviewed summaries of the accounting records maintained by Kaptrosky.

4.     I located documents (including blank checks) related to Ticket Reserve, FMM and Resource Acquisition in the Ticket Reserve office in Lake Forest. The blank checks, bank account statements and other documentation that I located showed that all three entities shared the same office. Harmon and Kaptrosky confirmed that all remaining operations of all three companies were housed in the Lake Forest office.

5.     Among the documents that I reviewed were the license agreements with ShooWin, Inc., CFP Events, the Peach Bowl, the Fiesta Bowl and the Trump Hotel Collection, which Harmon and Nelson separately informed me were the only operative license agreements. The licensor under each of these licenses is FMM; not Ticket Reserve. Trinchero and ShooWin's counsel confirmed that there understanding was that FMM was a separate entity from Ticket Reserve. FMM has

its own bank account into which the revenue of the licenses is deposited. The QuickBooks accounting file maintained by Kaptrosky for FMM shows the receipt of revenues and payments of refunds to customers of licensees. The QuickBooks accounting file maintained by Kaptrosky for Ticket Reserve does not show similar entries.

6.      I questioned Kaptrosky and Harmon about FMM. They informed me that FMM was a wholly owned subsidiary of Ticket Reserve and that Harmon and Herb Rudoy were the sole remaining directors of both entities. They also told me that all operative license agreements were at FMM and that Ticket Reserve was currently a holding company. The also told me that with one exception related to Resource Acquisition, all investments were made in Ticket Reserve.

7.      I was able to confirm these statements with the records that I located. I reviewed the corporate formation documents (articles of incorporation etc.) of the Ticket Reserve and FMM. The records showed that Ticket Reserve was formed in 2001 as an Illinois corporation. FMM's corporate formation documents show that it was formed in 2005 in Delaware under the name "The Ticket Reserve, Inc." and that it changed its name to "Forward Market Media" in 2012. I also reviewed numerous documents related to investments in the form of stock purchases, notes and warrant agreements located at the Ticket Reserve offices. Among the documents that I reviewed were documents related to investments by the persons identified as Client 1, Client 2 and Client 3 in the complaint. Each of these



documents reflected an investment in Ticket Reserve. I located no documents reflecting investments in FMM.

8.  Kaptrosky and Harmon also informed me that they were the sole remaining employees of Ticket Reserve. Matt Nelson informed me (which I confirmed through payroll records) that he had been employed by Ticket Reserve but prior to his dismissal managed FMM's license agreements. I was able to confirm Nelson's work by my review of records, my interview of Harmon and Kaptrosky and by my conversations with executives of ShooWin and CFP Events. I also reviewed historical payroll records which show that the employer of all persons associated with Ticket Reserve and FMM were employed by Ticket Reserve. I found no payroll records for FMM.

9.  I reviewed the board minutes of Ticket Reserve for 2015. I searched for but have been unable to locate board minutes for FMM. According to the minutes, the board of directors of Ticket Reserve approved the ShooWin license and authorized the officers of Ticket Reserve to enter into the agreement. Yet, the agreement is between FMM and ShooWin. Ticket Reserve is not a signatory to the agreement. Based on this document, others like it and my discussions with Harmon, Kaptrosky, Nelson and others, I have concluded that Ticket Reserve's officers, board and employees controlled FMM. A copy of the Minutes for the December 6, 2015 meeting of Ticket Reserve's board of directors is attached as Exhibit 1. I have redacted the details of the ShooWin license as they are commercially sensitive and not relevant to this motion.

10.    The minutes of the September 28, 2015 meeting of Ticket Reserve's board of directors reflects a discussion of a potential loan to the Ticket Reserve. The term sheet (which was Exhibit C to the minutes) reflects that Forward Market Media was an assumed name of the Ticket Reserve. 9/28/2015 Minutes (Exhibit 2 to this declaration) at 1 ("The Ticket Reserve, Inc. DBA Forward Market Media"). In the interests of space and relevance, I have excluded all exhibits to the 9/28/2015 Minutes except for Exhibit C.

11.    I reviewed the operating agreement and tax returns related to Resource Acquisition. They reflect that FMM is the sole equity member of the company and that Harmon is a non-equity member and manager of the company. When I asked him about Resource Acquisition, Harmon told me that Ticket Reserve had created the entity to pursue an opportunity presented by a consultant from New York. To that end, they raised some money (about $100,000) in Resource Acquisition. When the opportunity did not materialize, Resource Acquisition transferred almost all of its funds to FMM (about $50,000) and Ticket Reserve (also about $50,000).

12.    My staff and I have performed a preliminary review of the QuickBook accounting records maintained by Kaptrosky for Ticket Reserve, Resource Acquisition and FMM. The records show numerous intercompany transfers. Due to the way the records were kept (mainly inconsistencies in how transfers were described), the QuickBooks software cannot easily summarize these transactions. We were, however, able to identify in excess of $1 million in transfers from Ticket

Reserve to FMM and in excess of $500,000 in transfers from FMM to Ticket Reserve. These are in addition to the approximately $100,000 transferred from Resource Acquisition to FMM and Ticket Reserve discussed above.

13.    At this point, I cannot conclude that these transfers were improper. The pattern of transfers does, however, indicate that funds were moved between FMM and Ticket Reserve as necessary to meet obligations or other needs for cash.

*[Remainder Of This Page Intentionally Left Blank]*

I declare under penalty of perjury that the foregoing is true and correct.

Michael D. Napoli

# EXHIBIT 1

# THE TICKET RESERVE, INC.
## MEETING OF THE BOARD OF DIRECTORS
### December 6, 2015

**Directors Present**
Rick Harmon
Herbert Rudoy
Ash Narayan

**Directors Absent**

**Others Present**
King Milling
Charles Leuin
Lance Anderson

**Employees Present**
John Kaptrosky

Pursuant to notice duly given to all directors of The Ticket Reserve, Inc., an Illinois corporation (the "Company"), a telephonic meeting of the Company's Board of Directors (the "Board") was held on the above date at 10:00am (Central). John Kaptrosky, Secretary of the Company kept the minutes of the meeting.

## MINUTES

The Board reviewed and approved the minutes from the meeting of the Board of Directors held on November 23, 2015.

## COMPANY MATTERS

Mr. Harmon had emailed the final draft of the Shoowin agreement for the Boards review (Exhibit A). Mr. Harmon indicated to the Board that the Shoowin deal addresses the current realities of FMM with a surging new opportunity, the deal allows the Company to get to cash flow neutral, and it sets the Company up for a sale at some point down the road. Mr. Harmon further indicated that this is a very good deal for the Company with powerful teeth in the agreement. Mr. Harmon added that Shoowin already has the $1.5M financing lined up and has approximately five times that soft

circled from institutions and other parties including WME/IMG.

Lance Armstrong had provided the Board with an email overview of the Shoowin agreement (Exhibit B).  Mr. Armstrong indicated to the Board that the agreement gives Shoowin the ability to deploy all of FMM existing rights including the technology and IP rights as a stand-alone mobile app platform focusing on the business to consumer space. Mr. Anderson also indicated that there are adequate controls in the agreement in the event that Shoowin is not successful. Mr. Anderson reviewed the following details regarding the Shoowin agreement:

# Redacted

# Redacted

# Redacted

Mr. Milling commented that the^Redacted royalty rate on all Shoowin revenue was a very favorable term.   Mr. Rudoy indicated that he had a conversation with Brisa Trinchero the previous day and came away impressed with her energy and enthusiasm and she is ready to go.

After further discussion, upon motion duly made and seconded, it was unanimously:

> **RESOLVED:**  That the Development and License Agreement (in substantially the form attached as Exhibit A) is hereby approved, and the officers of the Company are hereby authorized to enter into the agreement with Shoowin Inc.

## FINANCIAL MATTERS

In the same fashion as was first discussed in the Board meeting on July 23, 2014, the Board discussed the request of Mr. Narayan that he desires to attract new unsecured debt so that certain repayments of existing unsecured debt now held by his clients could be effectuated.  The Board asked Mr. Narayan if the new debt funding from RGT clients in order to make the payments to existing RGT clients in the Company was consistent with the policy's and protocol as established by RGT.  Mr. Narayan confirmed that this is indeed the case.

There being no further business, the meeting was adjourned.

John Kaptrosky, Secretary

# EXHIBIT 2

## THE TICKET RESERVE, INC.

## MEETING OF THE BOARD OF DIRECTORS

### September 28, 2015

| | |
|---|---|
| **Directors Present** | **Others Present** |
| Rick Harmon | King Milling |
| Herbert Rudoy | Charles Leuin |
| Ash Narayan | David Barnes |
| | |
| **Directors Absent** | **Employees Present** |
| | John Kaptrosky |

Pursuant to notice duly given to all directors of The Ticket Reserve, Inc., an Illinois corporation (the "Company"), a telephonic meeting of the Company's Board of Directors (the "Board") was held on the above date at 7:30am (Central). John Kaptrosky, Secretary of the Company kept the minutes of the meeting.

## MINUTES

The Board reviewed and approved the minutes from the meeting of the Board of Directors held on August 19, 2015.

## FINANCIAL MATTERS

Mr. Barnes of JD Ford provided an overview of his deal proposal email (Exhibit A) to CAA. Mr. Barnes indicated that his feedback from his discussions with CAA is that they currently have a lot of debt and TPG is keeping their powder dry. Mr. Barnes added that a higher upfront price is more likely to trigger a quick no and the long term value is in a revenue share arrangement with CAA. The Board discussed the proposal details and decided that $30M was the number to put in the CAA proposal (Exhibit B).

Mr. Barnes indicated that he would make the suggested changes and email the proposal to CAA and then left the call.

Mr. Harmon updated the Board on the prospects of completing a $2M financing backed by a personal guarantee (term sheet Exhibit C). Mr. Harmon indicated that he and Mr. Narayan had a call with Rally Capital and their insistence on a hard asset pledge is a deal breaker. Mr. Harmon further indicated that he will review the $2M offering to Josh Carl and see how optimistic Mr. Carl is about placing this deal. Mr. Harmon also indicated that he would send the term sheet to Peter Cuneo and Frank Krasovek to get input on the structure of the deal. Mr. Narayan indicated that the personal guarantee will be from a very financially qualified individual and he will provide the necessary documentation when necessary.

Mr. Harmon updated the Board on the Company's immediate capital requirements. Mr. Harmon indicated that the Company doesn't have the funds to cover September payroll, payroll taxes, litigation matters, and other necessary operating costs including health insurance. The Board discussed the capital requirements and securing the necessary funding to meet the requirements.

**<u>BUSINESS DEVELOPMENT MATTERS</u>**

Mr. Harmon had provided a European update to the Board via email (Exhibit D) and updated the Board that we should be getting a long form agreement from Wembley in short order.

There being no further business, the meeting was adjourned.

John Kaptrosky, Secretary

**The Ticket Reserve, Inc.**
**(DBA Forward Market Media)**

**Summary of Terms and Conditions**
**("Term Sheet")**
**September 28, 2015**

The purpose of this Term Sheet is to set forth the essential terms pursuant to which, and subject to certain conditions set forth herein, that certain accredited investors (each, an "Investor") would purchase certain securities of the Issuer, and the Issuer would sell such securities to the Investor.

| | |
|---|---|
| **Issuer:** | The Ticket Reserve, Inc. (the "Company"). |
| **Issue:** | $2,000,000 of Debt (the "Debt"). |
| **Issue Date:** | Closing not later than October 15, 2015 (the date of any issuance, the "Issue Date"). |
| **Warrant Coverage:** | The Debt will have warrant coverage on a 1 to 1 basis (two million shares) with exercise price of $.01/share. |
| **Scheduled Redemption:** | Company shall redeem the Debt by paying the principal amount plus all accrued and unpaid interest thereon in cash by eighteen months from the Issue Date (the "Scheduled Redemption"). |
| **Source of Repayment:** | Either from internal cash flow or proceeds from a strategic financial transaction or by guarantor. |
| **Minimum Purchase:** | $2,000,000 (single party Purchaser) |
| **Use of Proceeds:** | To fund the working capital requirements of the Company, certain capital expenditures and various non-recurring costs and liabilities associated with the current and ongoing process of a material strategic financial transaction. |
| **Security:** | The Debt will be senior in liquidation preference to all equity and debt securities of the Company and subordinate only to the Senior Secured Debt. The Security Agreement executed by the Company in favor of Investor pursuant to this offering, specifically sets forth the seniority of the Debt, and in effect grants Investor a "Second Lien" position as to the assets of the Company. |
| **Guarantee:** | The Lender will receive a satisfactory personal guarantee from a high net worth individual (the "Guarantor"), whose liquid assets are multiple times the amount guaranteed. |
| **Interest:** | 8.0% per annum. |
| **Conditions to Closing:** | The issuance of this Debt will be subject to the execution by the Company of a mutually acceptable Promissory Note and Security Agreement as well as the personal guarantee agreement from the Guarantor. |
| **Expenses:** | All of the parties will bear their own expenses with respect to this transaction. |