IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Civil Action No. 3:16-cv-1417-M |
| ASH NARAYAN, THE TICKET RESERVE, INC. a/k/a FORWARD MARKET MEDIA, INC., RICHARD M. HARMON, and JOHN A. KAPTROSKY, | § § § § § | |
| Defendants. | § § | |

## RECEIVER'S QUARTERLY REPORT AND CERTIFIED INITIAL FEE APPLICATION

Respectfully submitted,


By:  _/s/ Eduardo S. Espinosa_
  Eduardo S. Espinosa
  State Bar No. 24010014

DYKEMA COX SMITH
1717 Main Street, Suite 4200
Dallas, TX  75201
Phone: (214) 462-6400
Fax: (214) 462-6401
EEspinosa@dykema.com

**COUNSEL FOR MICHAEL D. NAPOLI, RECEIVER**

4829-7310-9306.1

# TABLE OF CONTENTS

I.     Introductory Remarks ................................................................................ 1

II.    Case Status ............................................................................................... 2

    A.    Cash and Cash Equivalents .............................................................. 2

    B.    Case Administration.......................................................................... 2

        1.    Sources of Cash .......................................................................... 3

        2.    Uses of Cash ............................................................................... 3

        3.    Accrued Administrative Expenses ............................................. 4

    C.    Creditor's Claims ............................................................................. 4

    D.    Assets ................................................................................................ 6

        1.    Liquidated Assets ...................................................................... 6

        2.    Remaining Assets ...................................................................... 7

    E.    Receiver's Claims ............................................................................. 8

III.   Standardized Fund Accounting Report............................................... 8

IV.    The Applicant and the Application ........................................................ 9

    A.    Fee Schedule .................................................................................. 10

    B.    Billing History ................................................................................ 11

V.     Current and Previous Billings ............................................................ 11

    A.    Total Compensation and Amount Requested ................................ 11

    B.    Previous Awards ............................................................................ 12

    C.    Billing Summary............................................................................ 12

VI.    Records Supporting This Application ................................................. 12

VII.   Argument and Authorities ................................................................... 13

    A.    The Court should use a lodestar analysis to determine a reasonable fee for
        the Receiver and his professionals ................................................ 13

    B.    The lodestar analysis supports the Application ........................... 15

        1.    Time and Labor Required. ...................................................... 15

        2.    The Novelty and Complexity of the Issues.............................. 17

        3.    The Skill Required to Perform the Services............................. 18

        4.    The Preclusion of Other Employment Due to Acceptance of the Case. .... 18

        5.    The Customary Fee. ................................................................. 18

        6.    Whether the Fee is Fixed or Contingent. ................................ 19

        7.    Time Limitations....................................................................... 19

8.    The Amount Involved and the Results Obtained.......................................19

VIII.   Conclusion.................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983)...............................................................................................13

*Johnson v. Georgia Highway Express, Inc.*,
  488 F.2d 714 (5th Cir. 1974) .........................................................................14, 15

*Louisiana Power & Light Co. v. Kellstrom*,
  50 F.3d 319 (5th Cir. 1995) .............................................................................13, 14

*SEC v. Tyler*,
  No. 3:02-CV-282-P, 2003 WL 21517879 (N.D. Tex. June 30, 2003) (Solis, J.) ...................13

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Civil Action No. 3:16-cv-1417-M |
| ASH NARAYAN, THE TICKET RESERVE, INC. a/k/a FORWARD MARKET MEDIA, INC., RICHARD M. HARMON, and JOHN A. KAPTROSKY, | § § § § § | |
| Defendants. | § § | |

**RECEIVER'S CERTIFIED INITIAL FEE APPLICATION
AND QUARTERLY REPORT**

Michael D. Napoli, in his capacity as the Receiver for the Ticket Reserve, Inc. (TTR), Forward Market Media, Inc. (FMM) and Rights Acquisition Group, LLC (together with TTR and FMM, the Receivership Entities) hereby submits his Initial Fee Application, Quarterly Report and accompanying Certification.

## I.   INTRODUCTORY REMARKS

This Application covers the period of time from the beginning of the receivership on May 24, 2016 through September 30, 2016. While the period covered is longer than three months, the Receiver deferred his initial application by about one month so that future applications would coincide with calendar quarters.

At this point, the estate lacks sufficient cash to pay the fees of the Receiver and his professionals. While the Receiver anticipates that the assets of the estate will ultimately generate sufficient funds, the Receiver has yet to liquidate the

estate's illiquid assets;[1] most notably the ShooWin License and claims against various persons who have done business with the Receivership Entities. Accordingly, this Receiver asks the Court to approve the fees of the Receiver and his professionals when sufficient cash becomes available to pay them.

## II.   CASE STATUS

### A.   Cash and Cash Equivalents

As of September 30, 2016, the estate had cash on hand of $18,972.41. The estate's cash beginning cash balance on May 24, 2016 was $14,413.27.[2] During this period, the estate received $31,934.71 and disbursed $27,375.37.

### B.   Case Administration

Immediately upon appointment, the Receiver set out to assume custody and control of all Receivership assets.  As of his appointment, the Receivership Entities had only two employees – Defendants Harmon and Kaptrosky – and were attempting to operate five contingent reservation markets. Four of these markets were related to the playoffs for the then-upcoming college football season. The last market was for hotel reservations at the new Trump hotel in Washington D.C. for the Presidential inauguration.

The Receiver retained the necessary assistance to operate these markets and finalized the contractual arrangement with the largest of the markets, CFP Events. *See* Dkt. Nos. 60 and 63. He operated all five markets through the period of this

---

[1] Please see the Receiver's Plan of Liquidation (Dkt. No. 80-1) for a description of the Receiver's plans in this regard.

[2] This includes cash held by FMM and Rights Acquisition, which were not initially part of the Receivership.

Application. In October 2016, the Receiver and the Trump Hotel Collection closed the Trump hotel market because it was not economical to operate.[3] The Receiver will continue to operate the football markets through the end of the football season.

### 1.    Sources of Cash

On May 24, 2016, the Receiver seized $14,413.27 in cash. During the application period, the estate received $31,934.71.  These payments were largely from the football markets and represented payments of fees owed to FMM (approximately $22,000)[4] as well as payments from the football markets for customer refunds (approximately $4,600).[5]

### 2.    Uses of Cash

The estate disbursed $27,375.37 during the Application Period. Aside from small payments for administrative expenses (e.g., unemployment taxes and rent on the CubeSmart storage units), the disbursements by the estate related to the football markets – to pay vendors such as xStream as well as the disbursement of the withdrawal payments.

---

[3] There had been no purchases in the market since the beginning of the Receivership. The Receiver is in the process of documenting the termination of this market.

[4] This figure represents money actually received through September 30, i.e., revenues based on market sales through August 2016. Revenues for September market sales were billed and received in October. As such, this revenue reflects market activity prior to the beginning of the college football season, which started in September.

[5] As part of its contractual relationship with the football bowls, FMM processes all customer refunds (called, "withdrawals"). Because they receive all of the payments on the markets directly, the bowls pay for the refunds by sending the Receiver an amount equal to the total refunds each month, which the Receiver then distributes to the customers.

### 3.      Accrued Administrative Expenses

To date, the estate has not accrued any administrative expenses. The Receiver anticipates that the estate will need to accrue amounts for federal and state payroll taxes relating to the second quarter of 2016. Although the Receiver terminated all employees as of May 25, 2016, TTR's employees had been paid earlier in the quarter. The Receiver's accountants are in the process of preparing the payroll tax returns.

### C.     Creditor's Claims

The Receiver and his team have identified numerous potential claims against the estate. These claims may generally be divided into the following categories:

| Category | | Est. Number | Est. Principal Amount[6] |
|---|---|---|---|
| 1.    Investor Claims | | | |
| 1a. | Debt | 16 | $ 36,282,094 |
| 1b. | Equity | 239 | $ 33,409,618 |
| 2.    Secured Debt[7] | | 1 | $   1,754,500 |
| 3.    Trade Debt | | 40+ | $   2,174,306 |
| 4.    Federal, State and Local Taxes | | Unknown | Unknown |

In addition, the Receiver has filed a notice of receivership and abated litigation in several different proceedings against one or more of the Receivership Entities. This litigation ranges from attempts by trade creditors to collect debts to claims by investors for fraud.

At this point, the Receiver has not determined the validity of any particular claim. For example, the Receiver has questions about the validity and priority of

---

[6] The Entities' books show in excess of $5.7 million in accrued interest as of 12/31/2015.

[7] Certain of the Investor Claims may be secured. Those claims are reflected as Investor Claims rather than Secured Claims and may need to be reclassified at a later date.

certain of the secured debt. Similarly, the Receiver does not know whether equity investors who purchased prior to January 2010 should be considered creditors or merely equity holders. Whether such investors may be considered creditors depends on, *inter alia*, whether the Court determines that they invested as a result of fraud by a Receivership Entity.

Moreover, there  are certain categories of debt shown on TTR's books that the Receiver considers to be either invalid, misrepresented or otherwise not payable by the estate. These categories include accrued wages in the amount of $3.6 million and accrued directors' fees in the amount of $3.8 million. There is also a category for "Other Accrued Liabilities" in the amount of $370,000, which is highly questionable.

The Receiver and his accountants have reviewed the books maintained by the Receivership Entities. They are not completely reliable. As an example, the Receivership Entities often did not record payee information correctly in QuickBooks. As a result, it is difficult to determine exactly how much a particular payee received. Moreover, notes to investors were often restated when they were extended. Sometimes the new notes reflected accrued but unpaid interest as principal. Further, there are differences between the debts and paid-in capital shown in the Entities' QuickBooks records and those shown in other records maintained by Defendants. Accordingly, the Receiver is unable to easily and reliably determine an investor's net investment (dollars paid less dollars received), which is the methodology typically used to value claims in receiverships of this type. At an appropriate time (likely after liquidation of the estate's assets other than

claims), the Receiver will recommend that the Court undertake a proof of claim process to confirm and validate claims against the estate.

### D.   Assets

As of September 30, 2016, the estate had cash on hand of $18,972.41. The estate's beginning cash balance on May 24, 2016 was $14,413.27. The estate's non-cash assets (other than records and claims) consisted of:

(1)   office furniture and equipment located at TTR's offices in Lake Forest, Illinois;

(2)   office furniture and equipment in a storage unit in North Chicago, Illinois;

(3)   seven United States patents and four pending patent applications;

(4)   several trademarks;

(5)   proprietary software to operate the contingent reservation markets;

(6)   contractual relationships with CFP Events, Inc.,[8] the Fiesta Bowl, the Peach Bowl and the Trump Hotel Collection;

(7)   a license agreement and ownership interest in ShooWin, Inc.; and

(8)   policies of insurance

#### 1.   Liquidated Assets

The Receiver has not begun the process of liquidating the significant assets of the estate. He reached an agreement with TTR's landlord to exchange the office furniture and equipment (other than computers) for termination of TTR's lease on its office. *See* Dkt. No. 48. In addition, the Receiver cancelled an insurance policy covering losses due to unauthorized access to computers as part of an agreement with Flatiron Capital, TTR's premium financier. *See* Dkt. No. 62. The Receiver is also operating under the contracts with the various markets. Except for the Trump market which is already closed, the markets will terminate on their own at the close

---

[8] Although the contract with CFP Events was finalized and approved by the Court after the start of the Receivership, the parties were operating as if the old contract had been renewed.

of the current football season. Thus, the current contractual relationships are, in a sense, in the process of liquidation.

### 2.    Remaining Assets

The estate's primary assets are its intellectual property (its patents, trademarks and software) and the related license agreement and ownership interest in ShooWin. As discussed in greater detail in the Receiver's Plan of Liquidation (Dkt. No. 80-1), the Receiver plans to sell these assets in an auction after the first of the year. The Receiver believes that waiting to sell these assets until the first quarter of 2017 will improve their sale value. By the time of the sale, the Receiver will have completed the operation of the current markets, which will generate some revenue for the estate; hopefully spur the development of ShooWin and generate data for potential buyers to evaluate. In addition, ShooWin, which has recently launched its business, has just started another round of capital raising. If successful, ShooWin's fundraising will increase its value and make it more likely to be able to generate revenues with which to pay royalties under its license with FMM. This, in turn, will increase the value of the estate's stake in ShooWin as well as the value of the license. Moreover, ShooWin is expected to bid on these assets. The stronger its financial position, the more ShooWin will be able to pay.

The Receiver has made claims on the existing insurance policy, on which he expects to eventually collect. He does not, however, believe that the office equipment and furniture located in the North Chicago storage unit to be of substantial value.

### E.   Receiver's Claims

The Receiver and his team continue to scour through the Receivership's records in order to identify third party beneficiaries, fraudulent transfer recipients and other potential recovery sources and to assess whether pursuing such claims is feasible. In addition, the Receiver's contingency fee counsel has requested documents (both formally and informally) from various persons who have done business with the Receivership Entities, including their lawyers and accountants. The Receiver and his counsel are working to identify and prioritize a list of potential defendants. The Receiver expects to shortly begin sending demand letters.

The Receiver has also continued to investigate the allegations in the derivative suit against TTR's officers and directors brought by RGT Capital. The work that the Receiver and his team have performed since the Initial Report has tended to confirm the Receiver's initial impression that the derivative suit was meritorious.

### III.   STANDARDIZED FUND ACCOUNTING REPORT

Attached as Exhibit A is the Standardized Fund Accounting Report (SFAR) for the Receivership for the Application Period. As indicated above, the Receiver will recommend a proof of claim process to affirmatively identify the claimants, the amount and classification of their claims. Accordingly, the number and amount of claims has been purposefully left blank to avoid confusion with the official claims submitted pursuant to a proof of claims process. The Receiver has estimated the potential claims in Section II.C above.

No claimants have received payment during the Application Period. Moreover, the Receiver does not anticipate that any of the claimants will receive a payment until they all receive a payment pursuant to a to-be-proposed plan of distribution.

## IV.  THE APPLICANT AND THE APPLICATION

The Securities and Exchange Commission filed this suit on May 24, 2016, alleging that the Defendants orchestrated a fraudulent investment scheme designed to defraud investors purchasing securities issued by TTR. The Court contemporaneously appointed the Receiver to take over the business and assets of TTR. The Court subsequently extend the receivership to FMM and Rights Acquisition Group. The entities that are subject to the receivership, and their relationship to the Defendants are listed on Exhibit B.

The Court approved the Receiver's engagement of Dykema Cox Smith (Dykema) as Receiver's counsel on June 6, 2016. *See* Dkt. No. 22. Dykema began work on this matter on May 25, 2016. The Court also approved the Receiver's engagement of Litzler, Segner, Shaw & McKinney, LLP (LSS&M) as the Receiver's accountants on August 2, 2016. *See* Dkt. No. 48. LSS&M began work on July 27, 2016. This Application seeks the Court's approval to allow the Receiver to pay from the Receivership's assets the fees and expenses for the Receiver, Dykema and LSS&M for the time period from May 24, 2016 through September 30, 2016 (the Application Period), when sufficient cash is available to pay them.

A.     **Fee Schedule**

The billing rates of all Dykema timekeepers, including the Receiver, reflect a discount from their standard billing rates. In general, Dykema has discounted its rates by at least 10% and capped the fees charged by its professionals at $450/hour. Travel time is billed at 50% of the discounted rate. The fees and costs for the first thirty days of the case (May 24 through June 23) were limited to $75,000. Order Appointing Receiver (Dkt. No. 12) at ¶ 46. Each Dykema invoice includes a summary that reflects each timekeeper's: (1) name; (2) title; (3) hours worked; (4) the effective hourly rate; and (5) total fees billed.  The effective hourly rate reflects the realized billing rate in light of all rate caps, rate discounts, and travel discounts. The cap for the first thirty days is not shown in the invoices but is accounted for on Exhibit C-1.

LSS&M's billing rates reflect a 20% discount from its standard billing rates. Each LSS&M invoice includes a summary that reflects each timekeeper's: (1) name; (2) title; (3) hours worked; (4) hourly rate; and (5) total fees billed.

The Receiver's, each Dykema timekeeper's and each LSS&M timekeeper's name, title, standard billing rates and matter billing rates are reflected on Exhibits C-1 and C-2.  Exhibit C-1 tabulates the aggregate hours and amount billed by each timekeeper from May 24, 2016 through June 23, 2016 and shows the application of the fee and costs cap. Exhibit C-2 tabulates the same information from June 24, 2016 through September 30, 2016.

10

**B.   Billing History**

This is the Receiver's Initial Fee Application. As to the Receiver and Dykema, this Application covers the period from the receivership's inception on May 24, 2016 through September 30, 2016. As to LSS&M, this Fee Application covers the period July 27, 2016 through September 30, 2016.  Accordingly no prior orders have been entered as to any interim applications, no amounts have been allowed, disallowed, or any previous payments made.

**V.   CURRENT AND PREVIOUS BILLINGS**

**A.   Total Compensation and Amount Requested**

The Receiver is requesting approval of fees in the amount of $301,466.60  and expenses of $10,248.35 to be paid when the estate has sufficient cash to do so. The allocation of the fees among the Receiver, his counsel and his accountants is shown in section V.B below.

This request takes into account the cap of $75,000 on fees and expenses for the first thirty days. As a result of the application of the cap, the Receiver and Dykema have reduced their fees for the first thirty days by an additional 32.6% off of their time which was billed at a discount in excess of 10%.  The application of the cap is shown on Exhibit C-1.

11

## B.     Previous Awards

The total compensation and expenses award by the Court are tabulated below.

| Description | | Applied To Date | | Previously Awarded |
|---|---|---|---|---|
| Receiver | $ | 101,475.13 | $ | 0.00 |
| Dykema | $ | 191,980.97 | $ | 0.00 |
| LSS&M | $ | 8,030.50 | $ | 0.00 |
| Expenses | $ | 10,248.35 | $ | 0.00 |
| Total | $ | 311,734.95 | $ | 0.00 |

## C.     Billing Summary

During the Application Period, the Receiver billed 403.6 hours to this matter, other timekeepers at Dykema billed 447.8 hours and LSS&M billed 32.1 hours. An itemization of hours and dollars billed, per timekeeper is reflected on Exhibits C-1 and C-2.

## VI.     RECORDS SUPPORTING THIS APPLICATION

In support of this Application, the Receiver has attached invoices from Dykema and LSS&M for the Application Period. Attached as Exhibits D-1 and D-2 are Dykema's invoices numbered 3085373 and 30929921 respectively. Each Dykema invoice contains: (i) a Professional Summary, summarizing the time billed, rate and total billing per timekeeper and (ii) a Fees Billed per Task summary, reflecting the current and cumulative hours and fees per Task.  Attached as an addendum to each invoice is supporting documentation evidencing each expense incurred in excess of $75.00.

12

Attached as Exhibit E is LSS&M invoice numbered 8-00005M. Each LSS&M invoice contains a Professional Summary summarizing the time billed, rate and total billing per timekeeper. Attached as an addendum to each invoice is supporting documentation evidencing each expense incurred in excess of $75.00 if any.

## VII.   ARGUMENT AND AUTHORITIES

### A.   The Court should use a lodestar analysis to determine a reasonable fee for the Receiver and his professionals

The professional fees and expenses requested in this Application are governed by the lodestar method of calculation. *See Hensley v. Eckerhart*, 461 U.S. 424 (1983); *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319 (5th Cir. 1995); *SEC v. Tyler*, No. 3:02-CV-282-P, 2003 WL 21517879 (N.D. Tex. June 30, 2003) (Solis, J.).   The lodestar is calculated by multiplying the number of hours reasonably expended by a reasonable hourly rate.   *Hensley*, 461 U.S. at 433.   In evaluating the reasonableness of the number of hours expended, the Court must "determine whether the total hours claimed are reasonable [and] also whether particular hours claimed were reasonably expended."   *Kellstrom*, 50 F.3d at 325. Reasonable hourly rates may be determined by considering the applicant's regular rates and the prevailing rates in the community.   *Id.* at 328.   After multiplication of the two amounts, the Court may adjust the loadstar result upward or downward as it sees fit based on consideration of the twelve factors enumerated originally in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974); *Kellstrom*, 50 F.3d at 329.   The factors include: (i) time and labor required; (ii) novelty and difficulty of issues; (iii) the skill required to perform the legal services

13

properly; (iv) preclusion from other employment; (v) customary fees; (vi) fixed or contingent fees; (vii) time limitations imposed by client or other circumstances; (viii) results achieved; (ix) experience, reputation and ability; (x) the undesirability of the case; (xi) the nature and length of professional relationship with client; and (xii) awards in similar cases. *Id.*

In support of this Application, the Receiver submits the following exhibits for the Court's review:

- Exhibits C-1 and C-2 tabulating the hours worked by each timekeeper;

- Exhibits D and E reflecting the invoices for the professional fees and expenses covered by this Application showing: (a) the date the services were rendered; (b) the nature of the services rendered; (c) the time required for the performance of such services; and (d) the fees charged for each service rendered; and

- Certification of Michael D. Napoli stating the reasonableness of the rates charged and hours billed by professionals at Dykema and LSS&M.

Both Dykema and LSS&M have charged fees that are below the standard billing rates for the professionals working on this matter, and those fees are at or below customary fees charged by like professionals in their respective markets. In addition, the Receiver and Dykema limited their fees to $75,000 for the first 30 days of the Receivership. Further, Dykema's and LSS&M's expenses for transportation, parking & tolls, postage/overnight delivery, long distance telephone charges, telecopy and research are billed at actual cost; and in-house copying charges are billed at the lesser of the firms' standard rates or $0.15 per page. No request is made for overhead charges. The fees and expenses sought in this Application are

reasonable and were necessary for proper administration of the duties and responsibilities charged to the Receiver by the Court.

### B.     The lodestar analysis supports the Application

Application of the relevant *Johnson* factors to the professional services provided in this case demonstrates that the fees and expenses should not be adjusted, either upward or downward.

#### 1.     Time and Labor Required.

The time and labor required for this receivership are set forth in the invoices attached for the Court's review. As demonstrated in those documents, this receivership is complex due to a number of factors, including the Defendants' poor record-keeping; the need to operate a business that TTR lacked the funds and personnel to operate; the inherent difficulty in identifying, valuing and managing the intangible assets held by TTR and FMM, which had not been accurately represented in Defendants' records and the need to support the launch of ShooWin, Inc., in which a substantial portion of the estate's assets are tied.

In addition, the lack of funds has made the Receiver's job much more difficult. As detailed in the Initial Report, the estate lacked sufficient funds to operate the five contingent reservation markets which FMM was committed to operate. As a result, the Receiver and his counsel had to spend extensive time negotiating an agreement by which former employees of TTR would operate the markets and advance the hard costs necessary to maintain the markets. Further, the Receiver has had to negotiate arrangements with secured creditors, such as Flatiron Capital to avoid post-receivership defaults that would impair the estate's assets.

15

In short, since this case was instituted, the Receiver and many of his employees have devoted substantial portions of their time to managing the Receivership's assets. Substantial assistance from legal counsel has been necessary to review and evaluate records, investigate leads of misappropriated funds and assets and to secure those assets, ensure that the Receivership could legally conduct operations, and for numerous other legal services.  The services performed by the Receiver and Dykema during the Application Period include:

- Took possession and control over the business and assets of TTR.

- Coordinated and executed intensive plan to marshal assets for the benefit of investors and creditors of the Receivership entities and to ascertain the true nature and state of affairs of the businesses and activities of the Receivership entities;

- Mitigated the Receivership's expenses by vacating leased premises and returning them to the landlord;

- Coordinated retrieval of documents and electronic data from the Defendants' offices, and then reviewed and analyzed them;

- Interviewed the Defendants, and Defendants' employees, vendors and suppliers;

- Communicated with investors and their respective counsels;

- Established a website by which to disseminate information updates;

- Prepared the Initial Report within 30 days are required by the Court;

- Prepared and largely completed the Plan of Liquidation recently filed as required by the Court;

- Retained xStream to operate FMM's current markets; negotiating a contract by which the xStream would advance the costs of the operating the markets and agree to defer its fees and reimbursement;

- Convinced CFP Events, FMM's largest market, to continue operating the market and to execute a new agreement for this football season;

16

- Resolved claims by secured parties such as TTR's landlord and premium financier without payment by the estate;

- Assisted in the launch of ShooWin by convincing the Court to extend the seal on this case for several weeks and by working with CFP Events and other bowls to convince them to contract with ShooWin;

- Retained contingency fee counsel and began the process of investigating potential claims by the estate; and

- Managed general activities of receivership estate, including dealing with tax, employment and insurance issues.

The time spent on these activities and others are detailed on the attached invoices.

LSS&M works closely with the Receiver and his team to provide accounting support. Its work during the Application period is detailed in its attached invoice, but in summary, its services during the Application period include:

- Setting up the Receivership's books and records;

- Reconciling historical and current processing of refunds on behalf of the football bowls;[9] and

- Analyzing the tax issues faced by TTR and FMM.

## 2. The Novelty and Complexity of the Issues

By its very nature, each receivership is unique and complex. This Receivership has been particularly complex, in part, due to: (a) the existence of operating markets without the personnel or capital necessary to operate them; (b) deciphering the Receivership Entities' books and records, which were kept in an idiosyncratic fashion and scattered in various electronic and paper files; (c) the intangible nature of TTR's assets, which largely consist of patents, trademarks,

---

[9] The process by which FMM handles refunds to consumers in the markets is described in the Plan of Liquidation.

software burdened by an exclusive license agreement with ShooWin, which has no operating history; (d) the length of TTR's operating history which has created numerous classes of potentially defrauded investors and other creditors and (e) numerous, poorly documented payments to or on behalf of Defendant Harmon.

### 3.    The Skill Required to Perform the Services.

The services performed in this matter required professionals who have specialized knowledge and experience, including on such topics as (a) substantive and procedural law applicable to receiverships; (b) accounting; (c) forensic financial analysis and fund tracing; (d) electronic data recovery; (e) assets administration and liquidation; and (f) tax. The Receiver, Dykema, and LSS&M have considerable experience in such areas.

### 4.    The Preclusion of Other Employment Due to Acceptance of the Case.

Neither, the Receiver, Dykema, nor LSS&M has declined any representation solely because of the Receiver's work. However, because of the magnitude of the effort required, the Receiver and many of members of his team have devoted substantial portions of their time to this.

### 5.    The Customary Fee.

As set forth in the Certification of Michael D. Napoli filed in connection with this Application, the hourly rates charged in this matter are: (a) discounted off of the professional's ordinary and customary rates; (b) commensurate with the rates charged by other professionals of similar experience in their respective geographic markets; and (c) reasonable, necessary and commensurate with the skill and

18

experience required for the activity performed. Due to the cap on fees for the first thirty days, Dykema discounted its fees by an additional 32.6% on top of discount on its rates. *See* Exhibit C-1.

### 6.    Whether the Fee is Fixed or Contingent.

The fees of the Receiver, Dykema and LSS&M are fixed insofar as they are based upon hourly rates. But, payment of any fees and expenses is contingent upon the Court's discretion and sufficient funds. As has been noted herein and in the Receiver's reports to date, the estate does not, at this point, have sufficient funds to pay the Receiver and his professionals.

### 7.    Time Limitations.

Time is of the essence in a receivership, especially in the initial stages. The efforts undertaken in this case related to the stabilization of FMM's business operations, the recovery of receivership assets and analysis of records to locate assets were necessarily conducted on an expedited basis. In addition, the Court required that the Receiver make a comprehensive report regarding the estate within thirty days of his appointment. While certainly helpful to the Court, the parties and the Receiver in determining how to administer the Receivership, the report placed additional time pressure on the Receiver and his counsel.

### 8.    The Amount Involved and the Results Obtained

This case involves investments (in debt or equity) by approximately 260 persons totaling more than $70 million. The priority of these various claims is yet to be determined. There is also substantial additional trade debt. There are assets – intellectual property and causes of action – that are likely valuable but which have

yet to be monetized. Thus, in terms of dollars returned to investors and other creditors, it is too early to tell how successful the Receiver and his professionals have been or will be.

That being said, the Receiver and his team have performed significant work and achieved real results for the estate. As discussed above, the Receiver has (i) stabilized the operating business of FMM allowing it to comply with its contractual obligations and generate some revenue; (ii) increased the value of the estate's investment in ShooWin; (iii) provided the Court and the parties with a detailed analysis of the financial status of TTR and its subsidiaries; and (iv) provided the Court and the parties with a plan for resolving the Receivership engaging the various stakeholders in reviewing and potentially modifying that plan.

## VIII.   CONCLUSION

For the reasons stated herein, the Receiver requests that the Court approve the Application.

Respectfully submitted,


By: */s/ Eduardo S. Espinosa*
    Eduardo S. Espinosa
    State Bar No. 24010014

DYKEMA COX SMITH
1717 Main Street, Suite 4200
Dallas, TX 75201
Phone: (214) 462-6400
Fax: (214) 462-6401
EEspinosa@dykema.com

**COUNSEL FOR MICHAEL D. NAPOLI,
RECEIVER**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 27, 2017, the foregoing document was electronically submitted to the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to all counsel of record.

          */s/ Eduardo S. Espinosa*
          Eduardo S. Espinosa

21

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Civil Action No. 3:16-cv-1417-M |
| ASH NARAYAN, THE TICKET RESERVE, INC. a/k/a FORWARD MARKET MEDIA, INC., RICHARD M. HARMON, and JOHN A. KAPTROSKY, | § § § § § | |
| Defendants. | § § | |

**RECEIVER'S CERTIFICATE IN SUPPORT OF
INITIAL FEE APPLICATION**

I, Michael D. Napoli, the court appointed Receiver in the above captioned matter and in connection with the Initial Fee Application therein (the Application) do hereby certify that:

(a)  I have read the Application;

(b)  to the best of my knowledge, information and belief formed after reasonable inquiry, the Application and all fees and expenses therein are true and accurate and comply with the Billing Instructions;

(c)  all fees contained in the Application are based on the rates listed in the Fee Schedule attached hereto and such fees are reasonable, necessary and commensurate with the skill and experience required for the activity performed;

22

(d)    the amount for which reimbursement is sought does not include the amortization of the cost of any investment, equipment, or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth herein for photocopies and facsimile transmission); and,

(e)    the requests for reimbursement of services that were justifiably purchased or contracted for from third parties (such as copying, imaging, bulk mail, messenger service, overnight courier, computerized research, or title and lien searches), request reimbursement only for the amount billed to Dykema Cox Smith by the third-party vendor and paid by Dykema Cox Smith to such vendor.  To the extent such services were performed within Dykema Cox Smith, it is not making a profit on such reimbursable service.

Michael D. Napoli, Receiver

**EXHIBIT A**
**STANDARDIZED FUND ACCOUNTING REPORT**

**EXHIBIT B**
**RECEIVERSHIP ENTITIES**

The Ticket Reserve, Inc., an Illinois corporation

Forward Market Media, Inc., a Delaware corporation

Rights Acquisition Group, LLC, a Delaware limited liability company

**EXHIBIT C-1**
**FEE SCHEDULE**
**(MAY 24, 2016 – JUNE 23, 2016)**

| | Dykema Cox Smith | | | This Application | | |
|---|---|---|---|---|---|---|
| Timekeeper | Title | Matter Rate | | Hours | Amount | |
| ALLEMAN, T | Member | $ | 450.00 | 11.2 | $ | 5,040.00 |
| ANDREACCHI, D | Paralegal | $ | 175.00 | 18.7 | $ | 3,272.50 |
| ESPINOSA, E | Member | $ | 425.00 | 86.9 | $ | 36,932.50 |
| HUSAIN, J. | Associate | $ | 310.00 | 17.8 | $ | 5,518.00 |
| KAIN, E | E-Disc | $ | 180.00 | 1.0 | $ | 180.00 |
| NAPOLI, M | Member | $ | 443.69 | 107 | $ | 47,475.00 |
| PLUMMER, T | Associate | $ | 270.00 | 2.5 | $ | 675.00 |
| STANTON, P | Member | $ | 450.00 | 11.7 | $ | 5,265.00 |
| TIDBALL, T | Staff | $ | 108.00 | 0.4 | $ | 43.20 |
| | | | | 257.2 | $ | 104,401.20 |

| | | | |
|---|---|---|---|
| Application of Cost Cap -- Order ¶ 46 | Actual Time | $ | 104,401.20 |
| | Actual Expenses | $ | 4,640.80 |
| | Total | $ | 109,042.00 |
| | Cap | $ | 75,000.00 |
| | Discount | $ | (34,042.00) |

| | | | |
|---|---|---|---|
| Discount applied to fees only | Actual Time | $ | 104,401.20 |
| | Less Discount | $ | (34,042.00) |
| | Fees Requested | $ | 70,359.20 |
| | Percentage | | 32.6% |

| | | | |
|---|---|---|---|
| Total Request for 30 days | Fees | $ | 70,359.20 |
| | Expenses | $ | 4,640.80 |
| | Total | $ | 75,000.00 |

EXHIBIT C-1 – FEE SCHEDULE (MAY 24, 2016 – JUNE 23, 2016)

EXHIBIT C-2
FEE SCHEDULE
(JUNE 24, 2016 – SEPTEMBER 30, 2016)

| Dykema Cox Smith | | | This Application | |
| --- | --- | --- | --- | --- |
| **Timekeeper** | **Title** | **Matter Rate** | **Hours** | **Amount** |
| ALLEMAN, T | Member | $ 450.00 | 4.5 | $ 2,025.00 |
| ANDREACCHI, D | Paralegal | $ 175.00 | 32.5 | $ 5,687.50 |
| BAUER, J. | Associate | $ 220.50 | 2.4 | $ 529.20 |
| ESPINOSA, E | Member | $ 425.00 | 82.5 | $ 35,062.50 |
| GALEOTO, G | Associate | $ 292.50 | 11.6 | $ 3,393.00 |
| GIANDILETTI, M | Paralegal | $ 256.50 | 30.5 | $ 7,823.25 |
| HAYES, M | E- Disc | $ 180.00 | 0.3 | $ 54.00 |
| HEIMBECHER, R | Member | $ 450.00 | 10.7 | $ 4,815.00 |
| JESSUP, S | Paralegal | $ 202.50 | 6.4 | $ 1,296.00 |
| HUSAIN, Z | Associate | $ 310.00 | 11.4 | $ 3,534.00 |
| LOPEZ, A | Member | $ 432.00 | 2.0 | $ 864.00 |
| NAPOLI, M | Member | $ 450.00 | 296.6 | $ 133,470.00 |
| NEWMAN, B | Member | $ 432.00 | 2.2 | $ 950.40 |
| PERKOWITZ, C | Paralegal | $ 216.00 | 76.8 | $ 16,588.80 |
| PLUMMER, T | Associate | $ 270.00 | 0.2 | $ 54.00 |
| SHAPIRO-BARR, T | Associate | $ 292.50 | 23.3 | $ 6,815.25 |
| STANTON, P | Member | $ 450.00 | 0.3 | $ 135.00 |
| | | | 594.2 | $ 223,096.90 |

| LSS&M | | | This Application | |
| --- | --- | --- | --- | --- |
| **Timekeeper** | **Title** | **Matter Rate** | **Hours** | **Amount** |
| BOCK, J. | Staff | $ 195.00 | 9.6 | $ 1,872.00 |
| MCCULLOUGH, K | Partner | $ 425.00 | 7.7 | $ 3,272.50 |
| WORTHAM, K | Staff | $ 195.00 | 14.8 | $ 2,886.00 |
| | | | 32.1 | $ 8,030.50 |

EXHIBIT C-2 – FEE SCHEDULE (JUNE 23, 2016 – SEPTEMBER 30, 2016)