**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| ASH NARAYAN, | § | Civil Action No.: 3:16-cv-1417-M |
| THE TICKET RESERVE INC. | § | |
| a/k/a FORWARD MARKET MEDIA, INC., | § | |
| RICHARD M. HARMON, and | § | |
| JOHN A. KAPTROSKY, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Motion for Entry of Order Allowing Advancement of Defense Costs, filed by Defendants Richard Harmon and John Kaptrosky ("Movants") [ECF No. 81], and Defendant Ash Narayan's Motion to Join [ECF No. 87]. Also pending is Narayan's Motion to Join Harmon and Kaptrosky's Response to Non-Party RGT Holding, Inc.'s Amicus Brief [ECF No. 103]. For the reasons stated below, the Motion for Entry of Order Allowing Advancement of Defense Costs is **GRANTED**. In light of Narayan and RGT Holding Inc.'s Joint Supplemental Notice Regarding Payment of Ticket Reserve Insurance Proceeds [ECF No. 116], the Motions to Join filed by Narayan are both **DENIED**.

## I. BACKGROUND

On May 24, 2016, the Securities and Exchange Commission (the "SEC") filed this action against The Ticket Reserve, Inc. ("TTR"), a/k/a Forward Market Media, Inc. ("FMM"), and also against Richard M. Harmon, John A. Kaptrosky, and Ash Narayan. The SEC alleged that Narayan engaged in a multi-million dollar fraud scheme centered around TTR, with the assistance of TTR's Chief Executive Officer, Harmon, and its Chief Operating Officer,

Kaptrosky [ECF No. 2]. Narayan is a member of TTR's board of directors. The SEC pled that in his capacity as an investment advisor, Narayan directed his clients to make high-risk investments in TTR and received millions of dollars in undisclosed finder's fees, which were covered up by Harmon and Kaptrosky. On May 24, 2016, the Court entered an Order appointing a receiver, Michael Napoli, ("the Receiver") "for the purposes of marshaling and preserving all assets of [TTR]" (the "Receivership Estate"). ECF No. 12 at 1. The Court's Order Appointing Receiver enjoined all persons, other than the Receiver, "from directly or indirectly transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of or withdrawing" TTR's assets. *Id.* at 2.

On October 24, 2016, Harmon and Kaptrosky filed their Motion for Entry of Order Allowing Advancement of Defense Costs (the "Motion"). On November 3, 2016, the Court entered an agreed Final Judgment as to Narayan. On November 4, 2016, Narayan requested to join the Motion.

Relevant to the resolution of this Motion is a derivative suit filed by RGT Holdings, Inc. ("RGT") in the Northern District of Illinois on May 23, 2016. *See RGT Holdings, Inc. v. Harmon*, No. 16-cv-5457 (the "Derivative Action"). The Derivative Action names Movants and Herbert Rudoy, a TTR board member who is not named in the case currently before this Court. ECF No. 33 at 4–35. RGT is a minority stockholder in TTR, and filed the Derivative Action on behalf of all TTR shareholders to remedy alleged wrongdoing by Movants and Rudoy. The Derivative Action asserts claims for breach of fiduciary duty, breach of due care, gross mismanagement, and unjust enrichment, and makes factual allegations that are consistent with those made by the SEC in this case.

The Derivative Action was initially stayed by the Court's Order Appointing Receiver, which stayed "[a]ll civil legal proceedings . . . involving . . . the Receivership Defendant [TTR]." ECF No. 12 ¶ 25. On November 23, 2016, this Court permitted RGT to file an amicus brief

regarding the Motion. Harmon and Kaptrosky have responded to RGT's amicus brief [ECF No. 102] and Narayan has moved to join Harmon and Kaptrosky's response [ECF No. 103].

On January 31, 2017, Narayan and RGT filed a Joint Supplemental Notice Regarding Payment of ticket Reserve Insurance Proceeds, announcing that Narayan "has settled his dispute with RGT and now supports the Receiver's request that the full Hiscox Policy proceeds be paid to the [Receivership] [E]state." ECF No. 116 at 1.

## II. THE POLICY

The Motion for Entry of Order Allowing Advancement of Defense Costs concerns the proceeds of a direct or officer liability policy, #UVA1384150.15 (the "Policy"), issued by Hiscox Insurance Company, Inc. for the period of November 13, 2015, through November 13, 2016 (the "Policy Period"). The "Named Entity" on the Policy is listed as "The Ticket Reserve, Inc.; Forward Media, Inc." ECF No. 82-1 at 2. The Policy states that it is a "Claims-Made Policy" and that "coverage is limited to those Claims first made during the Policy Period or any applicable Discovery Period." *Id.* The Policy's aggregate limit of liability for all covered losses is $1,000,000. *Id.* The Court has previously ordered that the first $9,605.24 of proceeds received under the Policy will be paid to Flatiron Capital, a party to a premium finance agreement with TTR, to satisfy an outstanding debt. ECF No. 62 at 1.

The Policy provides the following coverage:

> Coverage A: Individual Insurance Coverage
>
> This D&O Coverage Part shall pay the Loss of an Individual Insured arising from a Claim first made against such Individual Insured during the Policy Period . . . for any actual or alleged Wrongful Act of such Individual Insured, except when and to the extent that a Company has indemnified the Individual Insured for such Loss.
>
> Coverage B: Company Reimbursement Coverage
>
> This D&O Coverage Part shall pay the Loss of a Company arising from a Claim first made against an Individual Insured during the Policy Period . . . for any actual or alleged Wrongful Act of such Individual Insured, but only when and to the extent that such Company has indemnified such Individual Insured for such Loss.

> Coverage C: Company Coverage
>
> This D&O Coverage Part shall pay the Loss of a Company arising from a Claim first made against a Company during the Policy Period . . . for any actual or alleged Wrongful Act of a Company.
>
> . . .
>
> Coverage E: Derivative Demand Coverage
>
> This D&O Coverage Part shall pay the Investigation Costs of a Company arising from a Derivative Demand Investigation in response to a Derivative Demand first made during the Policy Period . . . , up the amount of the Derivative Demand Limit of Liability.

ECF No. 82-1 at 25.

The Policy defines "Claim" to include "a civil . . . proceeding for monetary, non-monetary or injunctive relief which is commenced by: . . . service of a complaint or similar pleading." ECF No. 82-1 at 26. Under the Policy, "Insured" includes "a Company; or . . . an Individual Insured." *Id.* at 28. An "Individual Insured" means any "Executive of a Company," "Employee of a Company," or "Outside Entity Executive." *Id.* "Loss" refers to "the amount that any Insured becomes legally obligated to pay in connection with any covered Claim," and includes judgments, settlements, defense costs damages, and with respect to Coverage E, investigation costs. *Id.* at 28–29. The Policy provides that "[d]efense [c]osts are included within, serve to reduce and may completely exhaust the applicable Limits of Liability," and that "the Insurer shall advance Defense Costs in excess of the applicable Retention on behalf of the Insured prior to final disposition of the claim." *Id.* at 2, 26. The Policy contains an order of payment provision, which requires Hiscox to first pay claims arising under Coverage A; with respect to whatever remaining limit of liability is available after payment under Coverage A, Hiscox then pays for claims arising under Coverage B, and then under Coverage C, D, and E, in that order. *Id.* at 40–41.

On June 9, 2016, Hiscox's counsel sent a letter to TTR, stating Hiscox's belief that, subject to a reservation of rights, "coverage has been triggered under the Policy for TTR, and for Messrs. Harmon, Kaptrosky and Rudoy for the SEC and RGT Matters." ECF No. 82-2 at 2, 13.

Shortly thereafter, Receiver's counsel objected to the advancement of defense costs under the Policy as violating the Court's Order Appointing Receiver, stating that the Receiver believed the Policy to be an asset of the Receivership Estate. ECF No. 82-3 at 2. On July 21, 2016, Hiscox's counsel sent a letter to Narayan's counsel stating that "[b]ased on the information provided, it appears that a Claim as defined by the Policy has been asserted . . . [and] Hiscox agrees to advance Mr. Narayan's reasonable and necessary Defense Costs, subject to the Policy's terms and conditions and Hiscox's reservation of rights as set forth herein." ECF No. 87 at 6.

On September 20, 2016, Hiscox sent a letter to the Receiver's counsel, stating its belief that defense costs are included within the Policy's Limit of Liability and that Coverage C of the Policy is not implicated by the Derivative Action. ECF No. 82-4 at 3–5. Hiscox also denied a request from the Receiver's counsel for "payment of fees and expenses incurred . . . as Receiver's counsel" as a covered Loss under the Policy. *Id.* at 5.

Hiscox, although agreeing with Movants that there is coverage under the Policy for the advancement of defense costs, seeks "acknowledgment that [advancing defense costs] will not be in violation of the stay imposed by the Receivership Order and/or consent of the appointed Receiver or the court presiding over the SEC lawsuit." ECF No. 82-2 at 12. The Receiver opposes advancing defense costs, and despite repeated efforts to resolve the dispute, the parties continue to disagree.

## III. MOTIONS TO JOIN

As an initial matter, the Court considers Narayan's Joinder in Harmon and Kaptrosky's Motion for Entry of Order Allowing Advancement of Defense Costs and Joinder in Harmon and Kaptrosky's Response to RGT's amicus brief. Narayan and RGT's Joint Supplemental Notice has since been filed, in which Narayan "announces that he supports and cooperates with the Receiver and RGT's request for Hiscox Insurance Company to pay the full policy limits of the Hiscox Policy to the Receiver." ECF No. 116 at 1. The Court construes this Notice as a

withdrawal of Narayan's earlier requests to join in Harmon and Kaptrosky's Motion. The Court thus **DENIES** Narayan's requests for Joinder, and he shall be excluded from any relief granted to Harmon and Kaptrosky pursuant to their Motion for Entry of Order Allowing Advancement of Defense Costs.

## IV. DISCUSSION

The Receiver argues that the Policy and its proceeds are assets of the Receivership Estate, and Movants should not be allowed "to determine how to dissipate this asset and whether claimants against and creditors of TTR will see any of the proceeds." ECF No. 88 at 7. In its amicus brief, RGT likewise argues that the Policy's proceeds are part of the Receivership Estate, but also maintains that the proceeds should not be used to pay Harmon and Kaptrosky's counsel, against whom RGT makes allegations of wrongdoing in the underlying fraud. ECF No. 92-1 at 5. Movants maintain that TTR, and therefore the Receivership Estate, does not have an interest in the proceeds of the Policy and thereby cannot prevent Movants from coverage. ECF No. 82 at 4. Movants further speculate that that the Receiver seeks to preserve the proceeds as part of the Receivership Estate to pay the Receiver's own fees. *Id.* at 6.

There are few cases addressing the district court's oversight of an equity receivership. Courts that do address the issue recognize that "the district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership." *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 373 (5th Cir. 1982) (quoting *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978)) (internal quotation marks omitted); *see also Quilling v. Trade Partners, Inc.*, 572 F.3d 293, 298 (6th Cir. 2009). Such powers include the court's "inherent equitable authority to issue a variety of 'ancillary relief' measures in actions brought by the SEC to enforce the federal securities laws." *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980).

**a. THE COURT HAS DISCRETION TO PERMIT PAYMENT OF DEFENSE COSTS**

The Court now turns to determining whether the Policy proceeds are part of the Receivership Estate. As one court to have previously considered this issue noted, "[b]ecause there are comparatively few cases examining the ownership of insurance proceeds in the context of a receivership, it is appropriate to consider the treatment of the issue under bankruptcy law, where the courts must frequently decide whether persons insured under a D & O policy are entitled to the proceeds when the named insured is a debtor in bankruptcy proceedings." *SEC v. Morriss*, No. 4:12-cv-80, 2012 WL 1605225, at *2 fn.7 (E.D. Miss. May 8, 2012); *see also Exec. Risk Indemnity, Inc. v. Integral Equity, L.P.*, No. 3:03-cv-0269, 2004 WL 438936, at *13 (N.D. Tex. Mar. 10, 2004) (noting, in a receivership action, "there is clear Fifth Circuit precedent on a closely related issue—the treatment of liability insurance proceeds in the context of bankruptcy"). Whether the proceeds of a D&O liability insurance policy are the property of the estate must be analyzed in light of the facts of each case and the policy terms. *See In re Sfuzzi, Inc.*, 191 B.R. 664, 668 (Bankr. N.D. Tex. 1996).

In *In re Louisiana World Exposition*, 832 F.2d 1391, 1399 (5th Cir. 1987), the Fifth Circuit considered whether the debtor owned the proceeds to an insurance policy that only provided coverage to directors and officers. The Fifth Circuit rejected the argument that the debtor's mere ownership of the policy conferred an interest in the proceeds; the debtor "had no ownership interest whatever in the proceeds from the liability coverage," as "the obligation of the insurance companies was only to the directors and officers and they are the named and the only insured," and "[t]hese proceeds would be paid only if the directors and officers incurred some covered legal expense or liability." *Id.* The Fifth Circuit in *In re Edgeworth*, 993 F.3d 51, 55–56 (5th Cir. 1993), further distinguished ownership of the policy and an interest in the proceeds as distinct property interests:

> The question is not who owns the policies, but who owns the liability proceeds. . . . The overriding question when determining whether insurance proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim. When a payment by the insurer cannot inure to the debtor's pecuniary benefit, then that payment should neither enhance nor decrease the bankruptcy estate. In other words, *when the debtor has no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate.*

*Id.* (emphasis added).

The issue arose again in *In re Vitek, Inc.*, 51 F.3d 530 (5th Cir. 1995), in which the Fifth Circuit summarized its prior holdings as existing along a continuum:

> [i]n this circuit, we are therefore in the position of knowing how to resolve cases on either end of the continuum, but we have not yet decided how to resolve cases lying somewhere along the continuum. On one extreme, when a debtor corporation owns a liability policy that exclusively covers its directors and officers, we know from *World Exposition* that the proceeds of the D & O policy are not part of the debtor's bankruptcy estate. On the other extreme, when a debtor corporation owns an insurance policy that covers its own liability vis-a-vis third parties, we—like almost all other courts that have considered the issue—declare or at least imply that both the policy and the proceeds of that policy are property of the debtor's bankruptcy estate. But we have not grappled with how to treat the proceeds of a liability policy when (1) the policy-owning debtor is but one of two or more coinsureds or additional named insureds, (2) the rights of the other coinsured(s) or additional named insured(s) are not merely derivative of the rights of one primary named insured, and (3) the aggregate potential liability substantially exceeds the aggregate limits of available insurance coverage.

*Id.* at 535.

The Receiver argues that the proceeds of the Policy inures to the benefit of the Receivership Estate, and accordingly the proceeds belong to the Receivership Estate and cannot be advanced to the Movants for defense costs. Specifically, the Receiver maintains that proceeds paid under Coverage C for losses related to TTR's wrongful acts "reduce[] the estate's liability and therefore [are] a material benefit to the [Receivership] [E]state." ECF No. 88 at 20. The Receiver also argues that any defense costs incurred by TTR would be covered under Coverage C of the Policy, which would reduce the Receivership Estate's liability. And finally, the Receiver points to Coverage E of the Policy, which provides up to $150,000 to pay the

investigation costs associated with a derivative demand made against TTR. Payment of these claims is a material benefit to the Receivership Estate, because it reduces its total liability, and thus, the Receiver argues, the proceeds must be considered an estate asset.

However, the Court concludes that this case falls somewhere along the continuum of cases described in *Vitek*, and accordingly cannot be resolved as simply as the Receiver suggests. TTR's directors and officers—Narayan, Harmon, Kaptrosky, and Rudoy—have coverage as Individual Insureds under Coverage A of the Policy, while TTR is eligible for separate Company Coverage under Coverage C for any loss arising from a claim for TTR's alleged wrongful act, or Coverage E for any derivative investigation costs. In this instance, therefore, the Policy provides coverage to TTR as well as to the individual directors and officers, and thus does not fall into either extreme described in *Vitek*. In dicta, the Fifth Circuit in *Vitek* noted:

> [w]hen ultimately we are faced with such a midcontinuum case, we shall have to decide which of two positions to take: either (1) the proceeds of a liability policy should be wholly included in the bankruptcy estate of the debtor that owns the liability policy—even though there are other coinsured or additional named insureds who have some 'interest' in the proceeds or (2) the proceeds should be divided among all coinsured, either per capita or in proportion to the potential or actual liability faced by each insured party.

*Id.*

Accordingly, the mere fact that TTR may have an interest in the Policy's proceeds does not automatically mean that the entire proceeds become an asset of the Receivership Estate. Instead, as the Fifth Circuit in *Vitek* suggests, in midcontinuum cases such as this one the Court must consider the facts of the case and the insurance policy at issue in determining how to allocate proceeds. Here, the Court finds strong justification to permit the advancement of defense costs to Movants, regardless of whether or not the proceeds are deemed part of the Receivership Estate.

b. **THE COURT FINDS COMPELLING REASONS TO PERMIT THE ADVANCEMENT OF DEFENSE COSTS**

"The general rule is that a receiver acquires no greater rights in property than the debtor had"; in other words, a receiver "stand[s] in the shoes of the entity in receivership." *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 793 (6th Cir. 2009) (quoting *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 625 (6th Cir. 2003)). Thus, if TTR's interest in the proceeds would have been limited under the terms of the Policy, the Receiver's right in the proceeds asserted on behalf of the Receivership Estate should be similarly limited. *Cf. In re Great Gulfcan Energy Tex., Inc.*, 488 B.R. 898, 910 (Bankr. S.D. Tex. 2013) ("[I]f a debtor's interest in property is limited at the time of filing, the estate's right in the property is also so limited."); *In re Chestnut*, 300 B.R. 880, 886 (Bankr. N.D. Tex. 2003), *aff'd*, 422 F.3d 298 (5th Cir. 2005) ("Whether something is property of the estate depends solely on whether an interest in that property exists under applicable nonbankruptcy law."). The potential benefit to the Estate under Coverage C and Coverage E does not appear to negate Movants' contractual rights to Coverage A under the Policy, and the Receiver provides no basis to expand TTR's rights under the contract simply because the Court imposed a receivership.

Furthermore, the Court finds that the potential harm to Movants in withholding defense costs far outweighs harm to the estate. Bankruptcy courts that have considered whether to advance defense costs in this situation have balanced the harm to the debtor if the automatic stay is modified, with the harm to directors and officers if they are prevented from executing on their rights to defense costs. *In re Mila, Inc.*, 423 B.R. 537, 543 (9th Cir. B.A.P. 2010); *In re Hoku Corp.*, No. 13-40838, 2014 WL 1246884, at *4 (Bankr. D. Idaho 2014) ("Further, '[c]lear, immediate, and ongoing' losses to the directors and officers in incurring defense costs trumps only 'hypothetical or speculative' claims by the trustee." (quoting *In re Mila*, 423 B.R. at 545)); *In re Allied Digital Techs. Corp.*, 306 B.R. 505, 514 (Bankr. D. Del. 2004); *In re CyberMedica*,

*Inc.*, 280 B.R. 12, 18 (Bankr. D. Mass. 2002). Even in cases that have determined that D&O policy proceeds are part of the bankruptcy estate, "courts have nonetheless granted relief from the stay to allow the insurer to advance defense costs payments when the harm weighs more heavily against the directors or officers than the debtor." *In re Mila*, 423 B.R. at 544; *see also SEC v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-298, 2009 WL 8707814, at *3–*4 (N.D. Tex. Oct. 9, 2009) (declining to determine whether D&O policy proceeds are part of the receivership estate, but holding that even if they were, the Court would permit the advancement of defense costs).

Hiscox has admitted that coverage under the Policy exists for defense costs for Narayan, Harmon, Kaptrosky, and Rudoy, as individual insureds for claims brought against them in this suit and in the Derivative Action. ECF No. 82-2 at 2–3; ECF No. 87 at 5–6. The Policy provides that "the Insurer shall advance Defense Costs in excess of the applicable Retention on behalf of the Insured prior to final disposition of the Claim." ECF No. 82-1 at 26. The Court finds that the Movants are experiencing "clear, immediate, and ongoing" defense expenses arising from the litigation in this Court and in the related Derivative Action. *Cf. In re Mila*, 423 B.R. at 545. Hiscox notified Movants of coverage in June and July of 2016, and it appears that they have been seeking defense costs since that time. Without money to fund a defense, Movants' ability to defend themselves in ongoing litigation will likely be substantially impaired.

In contrast, the claims asserted by the Receiver on behalf of TTR do not appear to signify clear, immediate, and ongoing loss to the same degree as are likely to be suffered by the Movants. The Receiver identifies numerous claims against TTR that it suggests may be entitled to coverage under the Policy.[1] However, the Receiver does not present evidence of a current

[1] The Receiver lists the following "claims involving TTR or its directors and officers": (1) Flatiron Capital, by the Court's Order dated August 16, 2016 (ECF No. 62); (2) the Munson Family Trust, for damages arising from currently pending litigation against TTR in California; (3) "[O]ver 250 other investors that may have claims against TTR for securities fraud or other causes of action"; (4) RGT, for whatever settlement or judgment it may recover

right to payment under the Policy or an acknowledgment from Hiscox that coverage has been triggered.[2] Instead, the Receiver apparently seeks to preserve the Policy proceeds as "a significant asset of the estate" for future distribution to claimants against the Receivership Estate, rather than as a defendant seeking defense costs or liability protection. ECF No. 88 at 22; *see also In re Mila*, 423 B.R. at 544 n.6 ("At least two bankruptcy courts have chastised trustees for attempting to use their 'super powers' to prevent directors or officers from getting their bargained-for right to receive defense costs. They recognize that the trustee's real concern is that defense costs payments may affect the trustee's right as a plaintiff seeking to recover from the D & O policy rather than, as trustees often claim, a potential defendant seeking protection.").

On balance, therefore, it appears the Movants are apparently incurring actual expenses in defending the Derivative Action and this case, and have demonstrated a current right to payment. The Receiver has only pointed to claims that may be paid out in the future. The Court, therefore, finds there is a clear, immediate, and actual harm to Movants that greatly outweighs any speculative and potential harm to the Receivership Estate.

### c. ARGUMENTS FOR WITHHOLDING DEFENSE COSTS ARE UNPERSUASIVE

In support of his argument that Movants are not entitled to an advancement of defense costs, the Receiver points to numerous claims that TTR may make on the policy. As discussed, there is no indication of any current right to payment or acknowledgment of coverage by Hiscox

---

from the Derivative Action; (5) the SEC, for whatever settlement or judgment it may recover from this lawsuit; (6) the IRS, for an "[i]nvestigation for taxes and penalties; possible criminal activity—costs of defending TTR"; (7) Greenberg Traurig, for attorney's fees for defending Harmon and Kaptrosky; (8) the Kendall Law Group, for attorney's fees for defending Narayan; (9) "Other counsel," for attorney's fees for representation of Rudoy; (10) TTR / the Receivership Estate, for investigation costs associated with the Derivative Action; and (11) TTR / the Receivership Estate, for costs associated with the SEC investigation. ECF No. 88 at 12–14.

[2] There is no indication in the record that the Receiver has submitted a claim for defense costs to Hiscox for TTR's Company Coverage under Coverage C; TTR has not answered or taken steps to defend itself in this lawsuit, and the Receiver admits that "the [Receivership] Estate has as much right to reimbursement of defense costs it *may* incur in defending the SEC suit as Movants do." ECF No. 88 at 21. The Receiver maintains that TTR has been sued in California state court by the Munson Family Trust, but does not indicate that any claim for defense costs under the Policy has been made.

for these claims. Furthermore, even if the Receivership Estate has a current claim for coverage on TTR's behalf, the Policy contains an order of payment provision, which requires Hiscox to pay claims under Coverage A (under which Movants are entitled to coverage) before claims under any other coverage clause, including those of TTR, which would be under Coverage C or Coverage E, whether asserted by TTR or the Receiver. ECF No. 82-1 at 40–41. The Policy, thus, appears to subordinate any claim that the Receiver may have for TTR's defense costs or derivative investigation expenses to the coverage for Movants and other individual insureds under Coverage A.

On November 5, 2016, RGT made a settlement offer to Rudoy, offering to dismiss all claims against him in the Derivative Action in exchange for payment of the lesser of the Policy's $1,000,000 limit of liability or all remaining insurance proceeds. ECF No. 88-2 at 4. According to RGT, Rudoy has "accepted the offer and issued a request to Hiscox for payment of the settlement." ECF No. 98 at 2. The Receiver argues that "because of the nature of the claims against Defendants Harmon and Kaptrosky, Mr. Rudoy may have greater ultimate entitlement to protect[ion] under Coverage A." ECF No. 88 at 22. RGT argues that the Policy "does not establish that defense costs take priority over other claims against the [P]olicy," and that the order of payments provision "does not address the priority of payments among equally situated Individual Insureds," and accordingly, Movants have no greater claim to the proceeds than does Rudoy. ECF No. 98 at 2–3.

As a member of TTR's board of directors, Rudoy qualifies as an individual insured, and the settlement proposal therefore implicates his coverage under Coverage A of the Policy. However, that fact does not give the Receivership an interest in Rudoy's interest under Coverage A. *See World Exposition*, 832 F.2d at 1394 ("One having a pending, unadjudicated tort claim against another does not . . . thereby have a property interest in liability insurance proceeds payable to the defendant . . . ."). RGT is correct that the Policy's order of payment

provision does not establish a priority of payments among equally situated individual insureds and that the Policy does not prioritize defense costs over other claims; however, RGT does not point to any provision in the contract that leads the Court to conclude that RGT's settlement proposal is entitled to priority over Movants' request for defense costs.

Furthermore, despite Rudoy's alleged acceptance of the proposal, the settlement demand has not been accepted by Hiscox; the Policy provides that "the Insured shall not . . . enter any settlement agreement . . . without prior written consent of the Insurer. If the Insured admits or assumes any liability in connection with any Claim without the consent of the Insurer, then the Insurer shall not have any obligation to pay Loss with respect to such Claim." ECF No. 82-1 at 38. Neither the Receiver nor RGT provide any indication that Hiscox has accepted RGT's settlement proposal. Furthermore, Hiscox's acceptance of the settlement would not necessarily prevent Movants from receiving defense costs; the proposed settlement agreement clearly contemplates that the Policy may pay out on other claims, as it provides that RGT will drop all claims against Rudoy for "the lesser of the Policy's $1,000,000 limit of liability *or all remaining insurance proceeds*." ECF No. 88-2 at 4 (emphasis added).

The Receiver argues that the Policy's order of payment provision does not cover the order of payment when there is more than one claim to be paid, so that Movants' claims for defense costs under Coverage A do not take priority over TTR's claims under Coverage C and E. ECF No. 88 at 25–26. Specifically, the Receiver maintains that the use of "Claim," singular, means that the provision dictates the order in which to pay a loss payable under multiple coverage parts but that arises from a single claim, not multiple claims under different coverages.[3]

[3] The relevant portion of the Policy, Clause XI, "Order of Payments," states:

> In the event of Loss arising from any Claim for which payment is due under the provisions of this D&O Coverage Part but which Loss, in the aggregate, exceeds the remaining available Limit of Liability applicable to this D&O Coverage Part, then the Insurer shall:
>
> A. first pay such Loss for which coverage is provided under Coverage A of this D&O Coverage Part, then with respect to whatever remaining Limit of Liability is available after payment of such Loss;

The Court is unpersuaded by the Receiver's argument. As an initial matter, courts interpreting similar provisions, with the same use of "Claim" and "Loss," have not adopted the reading advocated by the Receiver. *See, e.g.*, *In re Pasquinelli Homebuilding, LLC*, 463 B.R. 468, 472–473 (Bankr. N.D. Ill. 2012); *In re Downey Fin. Corp.*, 428 B.R. 595, 607–08 (Bankr. D. Del. 2010) (interpreting a nearly identical order of payments provision and concluding that it "clearly provides that Coverages B(i) and B(ii)—entity and indemnification coverages, respectively—are, *under all circumstances*, junior to Coverage A, which provides direct coverage to the Insureds" (emphasis added)). Furthermore, even assuming that the Receiver's proposed interpretation is correct, he has not shown how this reading prevents Movants from receiving payment for defense costs for which Hiscox has conceded they are entitled under the Policy, when the Receiver has provided no indication that he has a current right to payment for any of the claims for which he asserts TTR may be entitled to coverage.

Receiver also argues that Movants are seeking defense costs for claims that, if proven, will be excluded from coverage, thus triggering the Repayment provision of the Policy.[4] Hiscox has offered to advance defense costs to Movants subject to a reservation of rights, including policy exclusions.[5] ECF No. 82-2 at 9; ECF No. 87 at 6. The Policy excludes, for example,

---

> B. then pay such Loss for which coverage is provided under Coverage B of this D&O Coverage Part, and
>
> C. then pay such Loss for which coverage is provided under Coverage C, D or E of this D&O Coverage Part.

ECF No. 82-1 at 40–41.

[4] The relevant portion of the Policy is as follows:

> When the Insurer has not assumed the defense of a Claim pursuant to this Clause VII[], the Insurer nevertheless shall advance, at the written request of the Insured, Defense Costs prior to the final disposition of a Claim. Such advanced payments by the Insurer shall be repaid to the Insurer by each and every Insured, severally according to their respective Interests, in the event and to the extent that any such Insured shall not be entitled under the terms and conditions of this D&O Coverage Part to payment of such Loss.

ECF No. 82-1 at 38.

[5] The relevant portion of the letter sent to Harmon and Kaptrosky by Hiscox states that "Hiscox has concluded that this matter triggers the initial scope of coverage under the D&O Coverage Part of the Policy for TTR, Harmon, Kaptrosky and Rudoy. Please note, however, that there are a number of Policy provisions that operate, or could

coverage for loss if any final adjudication establishes that a deliberate criminal or deliberate fraudulent act, or willful violation of statute, rule or law was committed by an Insured. ECF No. 82-2 at 9. In the event that coverage is rescinded, the Insured shall repay to the Insurer any funds already advanced to the extent that the Insured was not entitled to coverage. ECF No. 82-1 at 38. In both this lawsuit and the Derivative Action, claims are asserted against Movants which, if proven, may limit or preclude coverage under the Policy.[6] However, there is no Policy provision that prevents advancement of defense costs until such a determination is made; on the contrary, the Policy clearly provides for such an advancement.

Receiver argues that the Movants must provide tangible security for reimbursement, to ensure that any defense fees advanced for non-covered claims will be repaid. ECF No. 88 at 7. However, even assuming that claims asserted in this case and in the Derivative Action would be excluded from coverage if proven, Receiver has not identified any Policy provision, nor cited any precedent, requiring that Insureds provide security for repayment in the event reimbursement is later required.

The Receiver also argues that any covered defense costs must be evaluated for reasonableness, and that Movants are not entitled to costs because they have not submitted bills for approval. ECF No. 88 at 25. The Receiver appears to be arguing that the Movants must seek Court approval prior to receiving defense costs, and cites to *Netsphere, Inc. v. Baron*, No. 3:09-cv-0988, 2013 WL 3327858 (N.D. Tex. May 29, 2013), for support, in which the court

---

operate, to limit or preclude such coverage as may otherwise be available under the Policy." ECF No. 82-2 at 9. Specifically, "[t]he allegation that TTR, with the participation of Harmon, Kaptrosky, and/or Rudoy, paid improper remuneration to Narayan in the form of undisclosed finder's fees, director's fees, or otherwise, potentially implicates Exclusion A(ii), and Hiscox reserves its right accordingly." *Id.* at 10. Hiscox further states that coverage would not be available "for any payment made in connection with the demand for exemplary damages against the Individual Insureds in the RGT Derivative Lawsuit for such Individual Insureds' own conduct," and for "any judgments or payments representing disgorgement, civil fines or penalties, or any other amounts that fall outside the Policy's definition of Loss." *Id.* Finally, Hiscox reserves its rights "to the extent that any representation made in connection with TTR's application for coverage with Hiscox proves to have been false at the time it was made." *Id.* at 10–11.

[6] For a list of exclusions identified by Hiscox that may preclude coverage, see *supra* note 5.

considered whether a claim made on a receivership for attorney's fees was reasonable. The Court finds *Netsphere* unpersuasive in this context; *Netsphere* concerned fees expended on behalf of the Receiver, and not in the context of a D&O policy to which the Receivership had a potential claim. Instead, the Court finds that it is Hiscox's responsibility to determine the reasonableness of any fees incurred by Movants; the Policy defines "Defense Costs" to mean "reasonable and necessary fees, costs and expenses *consented to by the Insurer*." ECF No. 82-1 at 26 (emphasis added).

Finally, in its amicus brief, RGT claims that the law firm of Greenberg Traurig, whose lawyers represent Harmon and Kaptrosky, had knowledge of TTR's financial condition and "substantial involvement with the fraudsters who controlled" TTR, and that it would be inequitable for the firm to "profit from its complicity at the expense of defrauded investors." ECF No. 98 at 4–5. Specifically, RGT points to emails sent in 2014 from Harmon to Charles Leuin of Greenberg Traurig, then-counsel to TTR, concerning TTR's financial condition.

The Court is unpersuaded by RGT's argument. RGT points only to emails sent from Harmon *to* Greenberg Traurig, which fail to demonstrate "Greenberg's substantial involvement" with the alleged fraud. *Id.* at 5. Instead, the emails indicate only that Harmon, an executive of TTR, was in contact in 2014 with TTR's corporate counsel regarding its financial condition. Importantly, the Receiver makes no such objections to Greenberg Traurig's representation of Harmon and Kaptrosky. Accordingly, the Court finds that allegations by RGT of this conflict of interest have little bearing on whether Movants are entitled to defense costs under the Policy.

#### d. WITHOUT DECIDING WHETHER PROCEEDS ARE PART OF THE RECEIVERSHIP ESTATE, THE COURT PERMITS THE ADVANCEMENT OF DEFENSE COSTS

For the foregoing reasons, the Court permits Hiscox to advance defense costs to Movants. The Movants stand to suffer immediate harm if they are not advanced defense costs. In contrast, the Receiver has no current right to insurance payments. This decision does not resolve a

potential non-ripe dispute between Movants and Rudoy. No defense costs or proceeds from the Policy shall be paid to, for, or on behalf of Narayan.

Today, the Court holds only that its prior orders do not bar Hiscox from advancing defense costs to Movants in accordance with the Policy's terms and conditions. The Court is not now resolving Policy exclusions that might preclude coverage for Movants or justify payments to or on behalf of TTR.

## V. CONCLUSION

For the foregoing reasons, the Motion for Entry of Order Allowing Advancement of Defense Costs is **GRANTED.**

**SO ORDERED.**

February 2, 2017.

Barbara M G Lynn

**BARBARA M. G. LYNN**
**CHIEF JUDGE**