IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Civil Action No. 3:16-cv-1417-M |
| ASH NARAYAN, THE TICKET RESERVE, INC. a/k/a FORWARD MARKET MEDIA, INC., RICHARD M. HARMON, and JOHN A. KAPTROSKY, | § § § § § | |
| Defendants. | § § | |

**RECEIVER'S QUARTERLY REPORT
FOR THE FIRST AND SECOND QUARTERS OF 2019
AND CERTIFIED SEVENTH AND FINAL FEE APPLICATION**

Respectfully Submitted,

By: */s/ Eduardo S. Espinosa*
    Eduardo S. Espinosa
    State Bar No. 24010014

**AKERMAN LLP**
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Phone: (214) 720-4300
Fax: (214) 981-9339
Eduardo.Espinosa@akerman.com

**COUNSEL FOR MICHAEL D.
NAPOLI, RECEIVER**

## <u>TABLE OF CONTENTS</u>

I.      Introductory Remarks .............................................................................. 1
II.     Case Status ............................................................................................... 2
    A.  Cash and Cash Equivalents .............................................................. 3
    B.  Case Administration .......................................................................... 3
    C.  Creditors' Claims .............................................................................. 5
    D.  Assets ................................................................................................. 6
III.    Standardized Fund Accounting Report ................................................... 7
IV.     The Applicant and the Application .......................................................... 8
    A.  Fee Schedule ...................................................................................... 8
    B.  Billing History ................................................................................... 9
V.      Current and Previous Billings ............................................................... 10
    A.  Total Compensation and Amount Requested ............................... 10
    B.  Previous Awards .............................................................................. 10
    C.  Billing Summary .............................................................................. 10
VI.     Records Supporting This Application .................................................... 11
VII.    Argument and Authorities ...................................................................... 12
    A.  The Court should use a lodestar analysis to determine a reasonable fee for
        the Receiver and his professionals ............................................... 12
    B.  The lodestar analysis supports the Application ........................... 14
VIII.   Conclusion ............................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### FEDERAL CASES

Hensley v. Eckerhart,
  461 U.S. 424, 433 (1983) ............................................................................... 12

Johnson v. Georgia Highway Express, Inc.,
  488 F.2d 714 (5th Cir. 1974) .......................................................... 12, 13, 14

Louisiana Power & Light Co. v. Kellstrom,
  50 F.3d 319, 325, 329  (5th Cir. 1995).......................................................... 12

Netsphere, Inc. v. Gardere Wynne Sewell, L.L.P.,
  657 Fed. Appx. 320 (5th Cir. 2016).............................................................. 13

Netsphere, Inc. v. Jeffrey Baron & Ondova Co.,
  No. 3:09-CV-0988-F, 2013 U.S. Dist. LEXIS 94308, 47-48 (N.D. Tex.
  May 29, 2013) ................................................................................................. 13

SEC v. Tyler,
  No. 3:02-CV-282-P, 2003 WL 21517879 (N.D. Tex. June 30, 2003) .......................... 12

49620936;2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Civil Action No. 3:16-cv-1417-M |
| ASH NARAYAN, THE TICKET RESERVE, INC. a/k/a FORWARD MARKET MEDIA, INC., RICHARD M. HARMON, and JOHN A. KAPTROSKY, | § § § § § | |
| Defendants. | § § | |

**RECEIVER'S QUARTERLY REPORT
FOR THE FIRST AND SECOND QUARTERS OF 2019
AND CERTIFIED SEVENTH AND FINAL FEE APPLICATION**

Michael D. Napoli, in his capacity as the Receiver for the Ticket Reserve, Inc.,

Forward Market Media, Inc. and Rights Acquisition Group, LLC (collectively, TTR)

hereby submits his Quarterly Report for the First and Second Quarters of 2019, his

Seventh Fee Application and accompanying Certification. The Application Period for

this Application is January 1, 2019 through July 31, 2019.

## I.   INTRODUCTORY REMARKS

This Application should be the Receiver's last interim report. Concurrently

with the Application, the Receiver has moved the Court to make a distribution to the

investors.[1] Once the Court makes a final award of fees and authorizes a distribution,

the Receiver will distribute the remaining assets of the estate to the investors. At

---

[1] The Special Receiver has also filed her final fee application. Dkt. No. 211.

that point, the Receiver will be able to take the steps necessary to close the Receivership.

As of the date of the Application is filed, the estate has $1.56 million in cash and 666 shares of ShooWin common stock.[2] Unfortunately, not all of the $1.56 million is available for distribution. Aside from out of pocket expenses and a small payment to the accountants, the Receiver has not paid himself, his professionals or the Special Receiver. The Receiver must pay these professionals before distribution.

## II.   CASE STATUS

Except for distributing assets and winding up the estate, the Receiver has finished his work.[3] He and his professionals began work in May 2016. For over three years, they have worked for the benefit of the investors without pay. Initially, there were not sufficient assets to pay fees. Later, when assets were collected, the Receiver elected not to make interim payments so that the Court could make a final fee award taking into account the results of the Receivership.

When he took over, TTR was out of business. It had stopped operations and fired all of its employees except for the individual defendants. Its assets consisted of $15,000 in the bank, contracts with three college football bowls (which it could not perform), seven patents that begin to expire this year, an exclusive license with ShooWin (who could not pay the required fees), and 2.3 million shares of ShooWin

---

[2] TTR initially held one million shares of ShooWin preferred stock. Through a forced conversion into common stock and a series of reverse stock splits, TTR's holdings were consolidated to 666 shares of common stock. *See* Receiver's Report on ShooWin (Dkt. No. 212) for further details.

[3] As set forth in her final fee application (Dkt. No. 211), the Special Receiver has also completed her work.

preferred stock. None of these assets was particularly valuable and, aside from the cash, none was liquid. Moreover, Skelly Capital Partners claimed a security interest on all of it. The liquidation value of the estate at that time was essentially zero.

Despite these dire beginnings, the Receiver and Special Receiver created value from largely nothing. Among other things, the Receivers:

- Operated TTR's ticket option markets for the 2016 football season generating a small profit;

- Settled Skelly Capital Partners' security interest resulting in a payment of $100,000 to the estate and allowing TTR to retain half of its preferred shares in ShooWin; and

- Settled claims against TTR's principals and third parties for well more than $1 million.

After three years of work, the Receiver increased TTR's cash from $15,000 to $1.56 million, eliminated the sole secured creditor and retained half of its ownership in ShooWin.

### A.    Cash and Cash Equivalents

As of June 30, 2019, the estate had cash on hand of $1,556,857.86. The estate's beginning cash balance on January 1, 2019 was $174,045.63.  As of the date of this Application, the estate has cash on hand of $1,560,688.77.

### B.    Case Administration

During the Application Period, the Receiver was primarily engaged in receiving, reviewing and accepting proofs of claim by investors and others. He requested and received approval to institute a proof of claims process. As required by the Court, he solicited proofs of claims, evaluated the claims that he received and prepared a schedule of claims identifying the claims made and the Receiver's initial

49620936;2

determination of their validity. He subsequently resolved all of the investors' disputes as to his claim determinations. The Receiver prepared and filed federal income tax returns for the TTR entities for tax years 2014 through 2018. He also prepared a plan of distribution and motion to approve distribution that has been filed concurrently with this application.

During the Application Period, the Special Receiver resolved the estate's claims against CBS Corporation for a confidential amount.[4] CBS has paid the settlement and the Special Receiver dismissed the suit against CBS.

As of the end of the Application Period, the Receiver has liquidated nearly all of TTR's assets. The estate's sole remaining assets are cash and the ShooWin shares.

### 1.      Sources of Cash

As of January 1, 2019, the Receiver had $174,045.63 on hand. During the Application Period, the estate received $1,390,375.53, which represented payments on the settlements by the Receiver and Special Receiver, less approved fees to litigation counsel.

### 2.      Uses of Cash

The estate disbursed $7,563.30 during the Application Period.[5] These expenditures were for the publication of the notices required by the claims process

---

[4] By separate order entered in Case No. 3:17-cv-1106-M (Dkt. No. 80), the Court approved the fees and expenses of the Special Receiver's contingency fee counsel.

[5] This does not include the fees and expenses approved for litigation counsel. In accordance with standard practice, litigation counsel offset the approved fees and expenses from the first settlement payment before transferring the funds to the Receiver. The Receiver's financial records reflect the net deposit after payment of these fees and expenses.

49620936;2

($6,055.00), long-term storage of TTR's books and records ($689.20), registered agent fees ($519.10) and state taxes ($300.00).

### 3.    Accrued Administrative Expenses

To date, the estate has accrued administrative expenses of $657,100.29. This sum represents fees approved by the Court for the Receiver and his professionals, but not paid by the Receiver. The Receiver has paid the federal and state payroll taxes relating to the second quarter of 2016. Although the Receiver terminated all employees as of May 25, 2016, TTR paid its employees earlier in the quarter. Despite the settlements in 2018 and 2019, the Receivership Entities do not owe income tax due to the massive losses they suffered during their operational period.

### C.    Creditors' Claims

The Receiver and his team have completed the claims process that he recommended and the Court approved. The Receiver has divided the claims into the following categories:

| Category | Number | Amount |
|---|---|---|
| 1.    Investor Claims | 135 | $    32,908,571.95 |
| 2.    Secured Debt | 0 | $    0.00 |
| 3.    Trade Debt[6] | 40+ | $    2,174,306 |
| 4.    Federal, State and Local Taxes[7] | 1 | $    0.00 |

The Receiver has detailed the creditors' claims in his First Amended Schedule of Claims (Dkt. No. 210-1).

---

[6] Because the estate's assets are insufficient to pay the investor claims in full, the Receiver has not reviewed the Trade Debt. Accordingly, he has estimated its amount.

[7] The Receiver is currently disputing the IRS's proof of claim that seeks penalties and interest in regard to TTR's payroll taxes from 2016.

5

### D.    Assets

As of the start of the Receivership, the estate's non-cash assets (other than records and claims) consisted of:

(1)    office furniture and equipment located at TTR's offices in Lake Forest, Illinois;

(2)    office furniture and equipment in a storage unit in North Chicago, Illinois;

(3)    seven United States patents and four pending patent applications;

(4)    several trademarks;

(5)    proprietary software to operate the contingent reservation markets;

(6)    contractual relationships with CFP Events, Inc.,[8] the Fiesta Bowl, the Peach Bowl and the Trump Hotel Collection;

(7)    a license agreement and ownership interest in ShooWin, Inc.; and

(8)    policies of insurance.

### 1.    Liquidated Assets

The Receiver has liquidated the significant assets of the estate. He reached an agreement with TTR's landlord to exchange the office furniture and equipment (other than computers) for termination of TTR's lease on its office. *See* Dkt. No. 48. In addition, the Receiver cancelled an insurance policy covering losses due to unauthorized access to computers as part of an agreement with Flatiron Capital, TTR's premium financier. *See* Dkt. No. 62. The Receiver was also operating under the contracts with the various markets. All of these contracts have now been terminated.

The Receiver reached a settlement with Skelly Capital Partners regarding the estate's intellectual property (patents and trademarks), the ShooWin license and

---

[8] Although the contract with CFP Events was finalized and approved by the Court after the start of the Receivership, the parties were operating as if the old contract had been renewed.

certain of the ShooWin stock. The settlement is discussed in detail in the Receiver's Motion to Approve Settlement and Dispose of Property (Dkt. No. 178).

The Receiver has reached a settlement with an unnamed party. The settlement is described in the Receiver's Motion to Approve Distribution of Settlement Proceeds (Dkt. No. 194). The Special Receiver has reached a settlement with CBS Corporation.

The Receiver has also disposed of the office equipment and furnishings held in the Chicago storage unit and terminated the lease on that unit.

### 2. Remaining Assets

The estate's remaining assets are cash (discussed above) and 666 shares of ShooWin stock. The Receiver proposes to distribute the remaining ShooWin stock to the creditors along with any distributable cash.

### III. STANDARDIZED FUND ACCOUNTING REPORT

Attached as Exhibits A-1 and A-2 are the Receivership's Standardized Fund Accounting Reports (SFAR) for the first and second quarter of 2019, respectively. As indicated above, the Receiver conducted a claims process to identify the claimants, and the amount and classification of their claims. Accordingly, the number and amount of claims was purposefully left blank on the SFARs to avoid confusion with the official schedule of claims created pursuant to the claims process. The Receiver has described the claims in Section II.C above.

No claimants have received payment during the Application Period. Moreover, the Receiver does not anticipate that any of the claimants will receive a payment until they all receive a payment, pursuant to the proposed plan of distribution.

49620936;2

IV.    THE APPLICANT AND THE APPLICATION

The Securities and Exchange Commission filed this suit on May 24, 2016, alleging that the Defendants orchestrated a fraudulent investment scheme designed to defraud investors purchasing securities issued by TTR. The Court contemporaneously appointed the Receiver to take over the business and assets of TTR. The Court subsequently extend the receivership to FMM and Rights Acquisition Group. The entities that are subject to the receivership, and their relationship to the Defendants are listed on Exhibit B.

The Court approved the Receiver's engagement of Dykema Cox Smith (Dykema) as Receiver's counsel on June 6, 2016. *See* Dkt. No. 22. Dykema began work on this matter on May 25, 2016. The Court also approved the Receiver's engagement of Litzler, Segner, Shaw & McKinney, LLP (LSS&M) as the Receiver's accountants on August 2, 2016. *See* Dkt. No. 48. LSS&M began work on July 27, 2016. On March 1, 2018, the Receiver and his counsel resigned from Dykema and joined Akerman, LLP (Akerman). This Application seeks the Court's approval to allow the Receiver to pay from the Receivership's assets the fees and expenses for the Receiver, Akerman and LSS&M for the time period from January 1, 2019 through July 31, 2019 (the Application Period).[9]

A.    Fee Schedule

The billing rates of all Akerman timekeepers, including the Receiver, reflect a discount from their standard billing rates. In general, Akerman has discounted its

---

[9] Dykema did not perform work for the Receiver during the Application Period.

rates by at least 10% and capped the fees charged by its professionals at $450/hour. Travel time is billed at 50% of the discounted rate. The fees and costs for the first thirty days of the case (May 24 through June 23) were further limited to $75,000. Order Appointing Receiver (Dkt. No. 12) at ¶ 46. Each Akerman invoice includes a summary that reflects each timekeeper's: (1) name, (2) title, (3) hours worked, (4) the effective hourly rate, and (5) total fees billed.  The effective hourly rate reflects the realized billing rate in light of all rate caps, rate discounts, and travel discounts.

LSS&M's billing rates reflect a 20% discount from its standard billing rates. Each LSS&M invoice includes a summary that reflects each timekeeper's: (1) name, (2) title, (3) hours worked, (4) hourly rate, and (5) total fees billed.

The Receiver's, each Akerman timekeeper's and each LSS&M timekeeper's name, title, and matter billing rates are reflected on Exhibit C.  Exhibit C tabulates the aggregate hours and amount billed by each timekeeper during the application period.

B.    **Billing History**

This is the Receiver's Seventh Fee Application. It covers the period from January 1, 2019 through July 31, 2019. On June 19, 2018, the Court entered an order (Dkt. No. 191) approving the Receiver's First through Fourth Fee Applications in full. The Receiver paid $26,399.50 to LSS&M, the Receiver's accountants, for its approved fees and $17,600.77 to Dykema to reimburse it for expenses advanced on the Receiver's behalf. The Court subsequently approved the Receiver's Fifth Fee Application in full. Dkt. No. 202. The Receiver paid $1,470.25 to Dykema and $1,634.43 to Akerman to reimburse them for expenses advanced on the Receiver's

9

behalf. The Court has also approved the Receiver's Sixth Fee Application in full. Dkt. No. 209.

## V.   CURRENT AND PREVIOUS BILLINGS

### A.   Total Compensation and Amount Requested

The Receiver is requesting approval of fees of $170,271.55 and expenses of $618.91 incurred during the application period. The allocation of the fees among the Receiver, his counsel and his accountants is shown in Section V.B below.

### B.   Previous Awards

The total compensation and expenses award by the Court are tabulated below.

| Description | This Application | | Applied To Date | | Awarded | | Paid | |
|---|---|---|---|---|---|---|---|---|
| Receiver | $ | 99,405.00 | $ | 356,895.13 | $ | 257,490.13 | $ | - |
| Akerman | $ | 57,950.55 | $ | 80,694.90 | $ | 22,744.35 | $ | - |
| Dykema | $ | - | $ | 375,044.79 | $ | 375,044.79 | $ | - |
| LSS&M | $ | 12,916.00 | $ | 40,863.00 | $ | 27,947.00 | $ | 26,399.50 |
| Expenses | $ | 618.91 | $ | 21,597.88 | $ | 20,978.97 | $ | 20,705.45 |
| Total | $ | 170,890.46 | $ | 875,095.70 | $ | 704,205.24 | $ | 47,104.95 |

"Applied to date" includes this application.

### C.   Billing Summary

During the seven-month application period, the Receiver billed 220.9 hours to this matter, other timekeepers at Akerman billed 292.3 hours and LSS&M billed 76.0 hours. Due to an accounting error, Akerman billed attorney S. Lawrence at his standard rate instead of the discounted rate. The Receiver corrected this error.[10] An itemization of hours and dollars billed per timekeeper is reflected on Exhibit C.

---

[10] The correction regarding Mr. Lawrence's time is shown on Akerman invoice 9459679. Exhibit C shows Mr. Lawrence's time at the correct rate. The Receiver also wrote off $148.50 billed by the Special Receiver who is now a partner at Akerman.

LSS&M charged $0.20 per copy instead of the allowed $0.15 per copy. The Receiver has corrected this overcharge on Exhibit E.

## VI.   RECORDS SUPPORTING THIS APPLICATION

In support of this Application, the Receiver has attached invoices from Akerman and LSS&M for the Application Period. Attached as Exhibits D-1 through D-14 are Akerman invoices numbered 9429959, 9437150, 9444300, 9459678, 9466179, 9477290 and 9485008 representing the Receiver's time; and Akerman invoices numbered 9429960, 9437151, 9444301, 9459679, 9466180, 9477292 and 9485009 representing other Akerman timekeepers' time. Each Akerman invoice contains: (i) a Professional Summary, summarizing the time billed, rate and total billing per timekeeper and (ii) a Fees Billed per Task summary, reflecting the current and cumulative hours and fees per Task. Attached as an addendum to each invoice is supporting documentation evidencing each expense incurred in excess of $75.00, if any.

Attached as Exhibit E is LSS&M invoice numbered 2807. Each LSS&M invoice contains a Professional Summary summarizing the time billed, rate and total billing per timekeeper. Attached as an addendum to each invoice is supporting documentation evidencing each expense incurred in excess of $75.00, if any.

11

## VII.   ARGUMENT AND AUTHORITIES

### A.   The Court should use a lodestar analysis to determine a reasonable fee for the Receiver and his professionals

The professional fees and expenses requested in this Application are governed by the lodestar method of calculation. *See Hensley v. Eckerhart*, 461 U.S. 424 (1983); *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 325, 329 (5th Cir. 1995); *SEC v. Tyler*, No. 3:02-CV-282-P, 2003 WL 21517879 (N.D. Tex. June 30, 2003) (Solis, J.). The lodestar is calculated by multiplying the number of hours reasonably expended by a reasonable hourly rate. *Hensley*, 461 U.S. at 433.   In evaluating the reasonableness of the number of hours expended, the Court must "determine whether the total hours claimed are reasonable [and] also whether particular hours claimed were reasonably expended." *Kellstrom*, 50 F.3d at 325.   Reasonable hourly rates may be determined by considering the applicant's regular rates and the prevailing rates in the community.   *Id.* at 328.   After multiplication of the two amounts, the Court may adjust the loadstar result upward or downward as it sees fit based on consideration of the twelve factors enumerated originally in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974); *Kellstrom*, 50 F.3d at 329.   The factors include: (i) time and labor required; (ii) novelty and difficulty of issues; (iii) the skill required to perform the legal services properly; (iv) preclusion from other employment; (v) customary fees; (vi) fixed or contingent fees; (vii) time limitations imposed by client or other circumstances; (viii) results achieved; (ix) experience, reputation and ability; (x) the undesirability of the case; (xi) the nature and length of professional relationship with client; and (xii) awards in similar cases.

*Id; see also Netsphere, Inc. v. Jeffrey Baron & Ondova Co.*, No. 3:09-CV-0988-F, 2013 U.S. Dist. LEXIS 94308, *47-48 (N.D. Tex. May 29, 2013) (applying the *Johnson* factors in awarding attorneys' fees to the Receiver's attorneys), *aff'd Netsphere, Inc. v. Gardere Wynne Sewell, L.L.P.*, 657 Fed. Appx. 320 (5th Cir. 2016).

In support of this Application, the Receiver submits the following exhibits for the Court's review:

- Exhibit C tabulating the hours worked by each timekeeper;

- Exhibits D and E reflecting the invoices for the professional fees and expenses covered by this Application showing: (a) the date the services were rendered, (b) the nature of the services rendered, (c) the time required for the performance of such services, and (d) the fees charged for each service rendered; and

- Certification of Michael D. Napoli stating the reasonableness of the rates charged and hours billed by professionals at Akerman and LSS&M.

Akerman and LSS&M have charged fees that are below the standard billing rates for the professionals working on this matter, and those fees are at or below customary fees charged by like professionals in their respective markets. In addition, the Receiver and Dykema limited their fees to $75,000 for the first 30 days of the Receivership. Akerman bills travel at half the matter rate. Further, Akerman's and LSS&M's expenses for transportation, parking & tolls, postage/overnight delivery, long distance telephone charges, telecopy and research are billed at actual cost; and in-house copying charges are billed at the lesser of the firms' standard rates or $0.15 per page. No request is made for overhead charges. The fees and expenses sought in this Application are reasonable and were necessary for proper administration of the duties and responsibilities charged to the Receiver by the Court.

49620936;2

### B.  The lodestar analysis supports the Application

Application of the relevant *Johnson* factors to the professional services provided in this case demonstrates that the fees and expenses should not be adjusted, either upward or downward.

### 1.  Time and Labor Required.

The time and labor required for this receivership are set forth in the invoices attached for the Court's review. As demonstrated in those documents, this receivership is complex due to a number of factors, including the Defendants' poor record-keeping; the need to operate a business that TTR lacked the funds and personnel to operate; the inherent difficulty in identifying, valuing and managing the intangible assets held by TTR and FMM, which had not been accurately represented in Defendants' records and the need to support the launch of ShooWin, Inc., in which a substantial portion of the estate's assets are tied.

In addition, the lack of funds has made the Receiver's job much more difficult. As detailed in the Initial Report, the estate lacked sufficient funds to operate the five contingent reservation markets that FMM was committed to operate. As a result, the Receiver and his counsel invested extensive time negotiating an agreement by which former employees of TTR would operate the markets and advance the hard costs necessary to maintain the markets. Further, the Receiver has had to negotiate arrangements with secured creditors, such as Flatiron Capital, to avoid post-receivership defaults that would impair the estate's assets.

Further, one of the Defendants violated the Order Appointing Receiver by taking control over a storage locker containing estate property. As a result, the

14

Receiver was required to investigate this violation and to take steps to remedy it. This ultimately concluded in a Show Cause Hearing that required the Receiver to brief, prepare for and argue.

There has also been substantial motion practice regarding the assets of the estate and the proposed disposition of other assets. The Receiver was required to litigate motions to release insurance assets to the Defendants and a motion to terminate the Receivership.

Due to the paucity and poor quality of TTR's business records, the Receiver and his counsel (mainly a paralegal) had to engage in a proof of claims process. As of the date the SEC sued, TTR did not have banking or financial records prior to 2010. Unfortunately, the overwhelming number of investments occurred prior to 2010. While TTR did have some summaries of stock ownership, these summaries proved to be incomplete and inaccurate. TTR did not maintain a centralized summary of the debt securities that TTR issued to investors. And, given the passage of time, many investors did not have accurate records or recollection of their investments. As a result, the Receiver and his paralegal had to review and analyze TTR's (disorganized and often fragmentary) paper records as well as the records supplied by the investors. The majority of the time and fees for the Application Period relate to the claims process.

In short, since this case was instituted, the Receiver and many of his employees have devoted substantial portions of their time to managing the Receivership's assets. Substantial assistance from legal counsel has been necessary to review and evaluate

15

records, investigate leads of misappropriated funds and assets and to secure those assets, ensure that the Receivership could legally conduct operations, and for numerous other legal services.  The services performed by the Receiver and Akerman during the application period include:

- Responding to information and document requests from various federal and state agencies;

- Completing the proof of claims process, including the review and analysis of hundreds of claims;

- Resolving filed and threatened claims objections;

- Resolving the open tax issues;

- Preparing a plan of distribution and a motion to approve a distribution;

- Answering investor questions about the claim process and potential distribution;

- Working with the SEC to collect the judgment against Harmon; and

- Managing the general activities of the receivership estate, including responding to investor inquiries.

The time spent on these activities and others are detailed on the attached invoices.

LSS&M works closely with the Receiver and his team to provide accounting support.  LSS&M's work during the application period is detailed in its attached invoice, but in summary, its services during the application period include:

- Maintaining the Receivership's books and records;

- Preparing the SFAR reports required by the SEC; and

- Analyzing the tax issues faced by TTR and FMM and preparing tax returns.

49620936;2

### 2.     The Novelty and Complexity of the Issues

By its very nature, each receivership is unique and complex.  This Receivership has been particularly complex, in part, due to: (a) the existence of operating markets without the personnel or capital necessary to operate them; (b) deciphering the Receivership Entities' books and records, which were kept in an idiosyncratic fashion and scattered in various electronic and paper files; (c) the intangible nature of TTR's assets, which largely consist of patents, trademarks, software burdened by an exclusive license agreement with ShooWin, which has no operating history; (d) the length of TTR's operating history which has created numerous classes of potentially defrauded investors and other creditors; and (e) numerous, poorly documented payments to or on behalf of Defendant Harmon.

### 3.     The Skill Required to Perform the Services.

The services performed in this matter required professionals who have specialized knowledge and experience, including on such topics as (a) substantive and procedural law applicable to receiverships; (b) accounting; (c) forensic financial analysis and fund tracing; (d) electronic data recovery; (e) assets administration and liquidation; and (f) tax. The Receiver, Akerman and LSS&M have considerable experience in such areas.

### 4.     The Preclusion of Other Employment Due to Acceptance of the Case.

None of the Receiver, Akerman or LSS&M has declined any representation solely because of the Receiver's work. However, because of the magnitude of the effort

49620936;2

required, the Receiver and many of members of his team have devoted substantial portions of their time to this matter.

### 5. The Customary Fee.

As set forth in the Certification of Michael D. Napoli filed in connection with this Application, the hourly rates charged in this matter are: (a) discounted off of the professional's ordinary and customary rates; (b) commensurate with the rates charged by other professionals of similar experience in their respective geographic markets; and (c) reasonable, necessary and commensurate with the skill and experience required for the activity performed.

### 6. Whether the Fee is Fixed or Contingent.

The fees of the Receiver, Akerman and LSS&M are fixed insofar as they are based upon hourly rates. But, payment of any fees and expenses is contingent upon the Court's discretion and sufficient funds. As has been noted herein and in the Receiver's reports to date, the estate has not, up to this point, had sufficient funds to pay the Receiver and his professionals. Thus, the Receiver and his counsel have worked for more than three years without pay and, until very recently, insufficient funds to cover their fees.

### 7. Time Limitations.

Time is of the essence in a receivership, especially in the initial stages. The efforts undertaken in this case related to the stabilization of TTR's business operations, the recovery of receivership assets and analysis of records to locate assets were necessarily conducted on an expedited basis. In addition, the Court required that the Receiver make a comprehensive report regarding the estate within thirty

49620936;2

days of his appointment. While certainly helpful to the Court, the parties and the Receiver in determining how to administer the Receivership, the report placed additional time pressure on the Receiver and his counsel.

### 8.   The Amount Involved and the Results Obtained

Upon his appointment, the Receiver discovered an entity that was out of business and largely bereft of assets. It had $15,000 in cash, intellectual property assets (patents, licenses and trademarks) that turned out to be largely worthless, a few marginally profitable contracts and a large ownership share in a startup company that has yet to pan out. Skelly Capital Partners held a multi-million dollar perfected security interest on all of the assets.

Despite starting from such a low point, the Receiver and Special Receiver have managed to generate $1.56 million dollars (net of litigation expenses, taxes and operating costs) and to eliminate the secured debt. But for the work of the Receiver, the Special Receiver and their professionals, the estate would have no assets. To create these results, the Receiver (i) convinced several of TTR's former employees to front the out of pocket costs and work on a contingency fee so that it could complete its open contracts and generate some revenue; (ii) eliminated all of the secured debt while securing $100,000 from the secured creditor; and (iii) settled a major third-party claim in the amount of $1.1 million. The Special Receiver settled a claim against CBS Corporation for a significant sum.

In addition, the Receiver and his team have performed significant work and achieved real results for the estate. As discussed above, the Receiver: (i) worked with ShooWin to enable it to launch its business; (ii) provided the Court and the parties

49620936;2

with a detailed analysis of the financial status of TTR and its subsidiaries; (iii) provided the Court and the parties with a plan for resolving the Receivership engaging the various stakeholders in reviewing and potentially modifying that plan; (iv) resolved TTR's tax issues enabling the Receiver to offset the estate's revenue against TTR's operating losses saving thousands in taxes and (v) completed a complicated claims process that reduced claims from $50.7 million to $32.9 million.

To be sure, the amount that TTR owes far exceeds the available assets and the investors will recover only a small fraction of their investment. But, they would not recover at all but for the work of the estate's professionals. This is not a case where the Receiver simply had to manage and liquidate a large pool of valuable assets. Rather, this is a case where the Receiver (with the assistance of this team) created something from nothing.

## VIII.   CONCLUSION

For the reasons stated herein, the Receiver requests that the Court approve the Application.

Respectfully Submitted,

By: */s/ Eduardo S. Espinosa*
    Eduardo S. Espinosa
    State Bar No. 24010014

**AKERMAN LLP**
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Phone: (214) 720-4300
Fax: (214) 981-9339
Eduardo.Espinosa@akerman.com

**COUNSEL FOR MICHAEL D. NAPOLI,
RECEIVER**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 17, 2019, the foregoing document was electronically submitted to the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to all counsel of record.

    */s/ Eduardo S. Espinosa*
    Eduardo S. Espinosa

49620936;2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Civil Action No. 3:16-cv-1417-M |
| ASH NARAYAN, THE TICKET RESERVE, INC. a/k/a FORWARD MARKET MEDIA, INC., RICHARD M. HARMON, and JOHN A. KAPTROSKY, | § § § § § | |
| Defendants. | § § | |

### Receiver's Certificate in support of Seventh Fee Application

I, Michael D. Napoli, the court appointed Receiver in the above captioned matter and in connection with the Seventh Fee Application therein (the Application) do hereby certify that:

(a)   I have read the Application;

(b)   to the best of my knowledge, information and belief formed after reasonable inquiry, the Application and all fees and expenses therein are true and accurate and comply with the Billing Instructions;

(c)   all fees contained in the Application are based on the rates listed in the Fee Schedule attached hereto and such fees are (a) discounted off of the professional's ordinary and customary rates; (b) commensurate with the rates charged by other professionals of similar experience in their respective geographic markets; and (c) reasonable, necessary and

22

commensurate with the skill and experience required for the activity performed;

(d) the amount for which reimbursement is sought does not include the amortization of the cost of any investment, equipment, or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth herein for photocopies and facsimile transmission); and,

(e) the requests for reimbursement of services that were justifiably purchased or contracted for from third parties (such as copying, imaging, bulk mail, messenger service, overnight courier, computerized research, or title and lien searches), request reimbursement only for the amount billed to Akerman, LLP by the third-party vendor and paid by Akerman, LLP to such vendor. To the extent such services were performed within Akerman, LLP, it is not making a profit on such reimbursable service.


_____

Michael D. Napoli, Receiver