IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Civil Action No. 3:16-cv-1417-M |
| ASH NARAYAN, THE TICKET RESERVE, INC. a/k/a FORWARD MARKET MEDIA, INC., RICHARD M. HARMON, and JOHN A. KAPTROSKY, | § § § § § | |
| Defendants. | § § | |

## RECEIVER'S MOTION TO APPROVE
## A PLAN OF DISTRIBUTION AND TO DISTRIBUTE ASSETS

Michael D. Napoli, in his capacity as court-appointed receiver, moves this Court to approve a plan to distribute the assets of the estate and to order the distribution of assets in accordance with that plan.

## I.    Background

When the Receiver was appointed, TTR was out of business. It had stopped operations and fired all of its employees except for the individual defendants. Its assets consisted of $15,000 in the bank, contracts with three college football bowls (which it could not perform), seven patents that begin to expire this year, an exclusive license with ShooWin, Inc. (who could not pay the required fees), and 2.3 million shares of ShooWin preferred stock. None of these assets was particularly valuable

and, aside from the cash, none was liquid.[1] Moreover, Skelly Capital Partners claimed a security interest on all of it. The liquidation value of the estate at that time was essentially zero.

Initially, there were hopes that the ShooWin license and shares would have significant value, i.e., that ShooWin, better financed and better managed, would succeed where TTR had failed. Those hopes turned out to be illusory. ShooWin was unable to pay its minimum obligations under its license. And, no one was interested in purchasing TTR's substantial stake in ShooWin.

Despite these obstacles, the Receiver and Special Receiver have managed to generate some funds for distribution to the investors. Among other things, the Receivers:

- Operated TTR's ticket option markets for the 2016 football season generating a small profit;

- Settled Skelly Capital Partners' security interest resulting in a payment of $100,000 to the estate and allowing TTR to retain one million preferred shares in ShooWin; and

- Settled claims against TTR's principals and third parties for more than $1 million.

- Worked with the SEC to collect a portion of the judgments owed by Harmon and Narayan.

---

[1] For a more detailed explanation of the assets held by the estate, please see the Receiver's Initial Report (Dkt. No. 39-1), his Plan of Liquidation (Dkt. No. 80-1), his Report on Potential Claims (Dkt. No. 94-1) and his Report on TTR's Interest in ShooWin (Dkt. No. 212).

2

After three years of work, the Receiver increased TTR's cash from $15,000 to $1.56 million, eliminated the sole secured creditor and retained half of TTR's ownership in ShooWin.[2]

Unfortunately, this recovery is only a small portion of the amount invested. There are approximately $33 million of approved investor claims. Not. First Am. Claims Sch. (Dkt. No. 210) at 2. Moreover, not all of the $1.56 million is available for distribution. Aside from out of pocket expenses and a small payment to the accountants, neither the Receiver nor his professionals have been paid for their work in this matter. The Special Receiver has also not been paid. The fees of the Receiver and his professionals as well as those of the Special Receiver must be paid before distribution.

## II. The Court should determine the amount available for distribution to investors and other creditors.

The Receiver currently holds $1,560,688.77 in cash and 666 shares of ShooWin common stock.[3] Before the Receiver can make a distribution to the investors, the Court must determine what is available for distribution. Before he can pay investors and creditors, the Receiver must satisfy two categories of claims holding a priority – administrative expenses and priority government claims. III Clark on Receivers § 667

---

[2] For details of Skelly Capital Partners' lien on TTR's assets and its resolution, please see the Receiver's Motion to Approve Settlement and Dispose of Property (Dkt. No. 178).

[3] In the SCP settlement, the estate gave up its 1.3 million shares of ShooWin A-1 preferred stock and some other assets in exchange for the release of SCP's secured claims and $100,000. A series of new investments, reverse stock splits and forced conversions reduced TTR's 1 million shares of ShooWin A-2 preferred to 666 shares of common stock. *See* Receiver's Report on TTR's Interest in ShooWin (Dkt. No. 212).

at 1198 (3rd ed. 1959)(quoted in *SEC v. Megafund Corp.*, No. 3-05-CV-1328-L, 2007 WL 1099640 at \*2 (N.D. Tex. Feb. 14, 2007)).

Over the course of this case, the Receiver has submitted interim fee applications seeking the Court's approval for his fees and those of his counsel and accountants. The Court has approved the Receiver's first six fee applications. The Receiver and Special Receiver have now filed their final fee applications.[4]

Except for an interim payment to his accountants and reimbursement for out of pocket expenses, the Receiver has not paid himself or his professionals.[5] Nor has he paid the Special Receiver. The accrued fees and expenses (applied for or awarded, but not paid) through July 31, 2019 are $927,356.76.[6]

| Description | Applied For | Awarded | Paid |
|---|---|---|---|
| Receiver | $   356,895.13 | $   257,490.13 | $                - |
| Special Receiver | $     96,545.25 | $                - | |
| Akerman | $     80,694.90 | $     22,744.35 | $                - |
| Dykema | $   375,044.79 | $   375,044.79 | $                - |
| LSS&M | $     40,863.00 | $     27,947.00 | $     26,399.50 |
| Expenses | $     24,418.64 | $     20,978.97 | $     20,705.45 |
| Total | $   974,461.71 | $   704,205.24 | $     47,104.95 |

Thus, before it can authorize a distribution to creditors, the Court must rule on the Receiver's and Special Receiver's final fee applications and determine the final fees payable from the estate.

---

[4] The Receiver's seventh (and final) fee application is filed at Docket No. 213 and the Special Receiver's fee application is filed at Docket No. 211.

[5] Because the Receiver is a partner in the firm, his fee is payable to Akerman LLP.

[6] The Receiver and his counsel have not and, barring unforeseen circumstances, will not request fees for work performed after July 31, 2019.

4

In addition, the Receiver must reserve money to pay the estate's final expenses. These expenses are $12,711.94 and include (i) the cost of storing TTR's records for a reasonable period following the end of the receivership ($5,576.94); (ii) the expenses of making distributions, mainly postage and supplies ($135); and (iii) the cost of preparing and filing the entities' final tax returns ($7,000).

The Receiver must also satisfy any claims owed to the United States. The Federal Priority Statute governs the priority of payments by insolvent taxpayers, such as TTR. 31 U.S.C. § 3713(a)(2). It provides that a "claim of the United States Government shall be paid first," when the debtor is insolvent and "an act of bankruptcy" is committed. *Id.* at § 3713(a)(1). An "act of bankruptcy" includes the appointment of a general receiver. To enforce the government's priority, a receiver who pays any other person ahead of the government is personally liable for any unpaid claims owed to the government to the extent of the payments made. *Id.* at § 3713(b).

In this case, the Receiver owes no money to the United States. At the beginning of the receivership, TTR owed payroll taxes for the first and second quarters of 2016 in the amount of $23,784.22. The Receiver paid those taxes in 2017.[7] Shortly after he paid, the IRS filed a proof of claim claiming it was due interest and penalties. Pursuant to the Claims Order (Dkt. No. 204), the Receiver disputed the IRS's claim and provided the IRS with notice of the dispute. *See* Notice of Filing First Amended Claims Schedule (Dkt. No. 210) at 2. More than 20 days have passed since the

---

[7] He also paid payroll taxes due in Utah and Illinois.

Receiver provided notice to the IRS and the IRS has not filed an objection with the Court. The IRS has, thus, failed to object to the Receiver's determination of his claim and the Receiver's denial of the claim is final. Accordingly, the proposed plan does not provide for payments to the IRS. *See* Receiver's Declaration attached as <u>Exhibit C</u> to this Motion.

### III.   The Receiver proposes to treat all investors equally and to distribute the estate's distributable assets pro rata among the investors.

In approving a plan of distribution, the Court acts "pursuant to its inherent equitable powers." *United States v. Durham*, 86 F.3d 70, 72 (5th Cir. 1996). Accordingly, the Court is vested with broad discretionary power to determine how most equitably to distribute the assets of the estate. *SEC v. Forex Asset Mgmt.*, 242 F.3d 325, 331 (5th Cir. 2001). The Court should exercise its discretion to approve a plan of distribution that treats all victims of the Defendants' fraud equally.

### A.  The Receiver's Plan

The Receiver proposes a plan of distribution that he believes will provide for the most equitable distribution of the assets that are available for distribution. While the details of the Plan are set forth in the proposed order filed with this motion, the Plan may be summarized as follows:

- The Receiver has divided the claimants into two general categories for treatment under the Plan.

    - Distribution Class 1 – Investor Claims. This class is comprised of the claims by the victims of the fraud practiced by the Defendants out of which this case arises.

    - Distribution Class 2 – General Claims. This class includes (a) all other unsecured claims against the Receivership Entities and (b) claims against

the Defendants that are unrelated to TTR's securities scheme, including debts arising out of the individual defendants' other business ventures.

- The Receiver will pay administrative expenses pursuant to the procedures outlined in the Order Appointing Receiver. He will distribute any remaining funds to the Distribution Classes in order of priority beginning with Class 1. Distribution within a class will be pro rata. Based on the assets available, the Receiver will be able to pay the Class 1 claims only a small fraction of what they are owed.  There will be no funds available to pay lower distribution classes.

Attached as Exhibit A is a schedule showing the percentage each investor holds under the proposed Plan and the proposed distribution of the ShooWin shares. Attached as Exhibit B, is the Final Schedule of Claims resolving all known Class 1 claim disputes, resolving the IRS's claim and reflecting each Class 1 claimant's approved claim.

### B. The Court should approve the Receiver's Plan, as it is the most equitable manner of distributing the estate's assets.

The payment priorities set forth in the Receiver's Plan are in accordance with the manner in which equity receiverships generally make distributions to creditors. Courts have long held that

> Where a receiver is presented with competing claims to property, the order of priority of payment is (1) administrative expenses; (2) return of third-party property held in trust or otherwise by the defendant; (3) payment of priority government claims; (4) payment of secured parties from secured assets; (5) payment to creditors securing the appointment of the receiver as equity may require; (6) pro rata payment to general creditors; (7) surplus to the defendant for whom the receiver was appointed.

III Clark on Receivers § 667 at 1198 (3rd ed. 1959)(quoted in *SEC v. Megafund Corp.*, No. 3-05-CV-1328-L, 2007 WL 1099640 at *2 (N.D. Tex. Feb. 14, 2007)).

7

The proposed plan follows this standard distribution waterfall. In this case, TTR holds no property belonging to third parties. Further, there are neither priority government claims nor secured parties. The Plan pays the administrative claims first. And, it favors the interests of the creditors on whose behalf the Receiver was appointed – the victims of Defendants' investment scheme – over the claims of those who are otherwise owed money. The Court should approve the Receiver's Plan as the most equitable way to distribute the assets of the estate.

### 1. The victims of TTR's fraud should have priority over its general creditors.

The assets available for distribution are those derived from payments made by victims of the Defendants' fraud. Because the assets of the estate can be traced to the victims as a whole, their claims should be paid before those of other creditors. *Quilling v. Trade Partners, Inc.,* No. 1:03-CV-0236, 2006 WL 3694629 at *1 (W.D. Mich. Dec. 14, 2006) ("As an equitable matter in receivership proceedings arising out of a securities fraud, the class of fraud victims takes priority over the class of general creditors with respect to proceeds traceable to the fraud."); *CFTC v. PrivateFX Global One*, 778 F. Supp. 2d 775, 786 (S.D. Tex. 2011)(approving plan that paid victims before other creditors).

The Plan will pay only those claims that arise out of the operation of TTR's investment fraud that is the subject of this suit. This means that the General Claims will not be paid. These claims simply do not arise out of the fraud at issue in this case. As such, they should not be paid before the claims of those defrauded by the scheme

8

that this receivership was created to resolve. *PrivateFX Global One*, 778 F. Supp. 2d at 786-87.

### 2.  The court should treat all of the fraud victims equally

In his Plan, the Receiver proposes to treat all of those who invested money in TTR equally. Each victim should be treated equally and the assets available for distribution be divided equally among them on a pro rata basis. In cases involving securities fraud, the usual and customary practice is to distribute the assets of the estate on a pro rata basis among the victims. *Forex Asset Mgmt.*, 242 F.3d at 33132; *Durham*, 86 F.3d at 72-73; *PrivateFX Global One*, 778 F. Supp. 2d at 780-84; *SEC v. Tyler*, No. 3-02-CV-282-P, 2003 WL 21281646 (N.D. Tex. May 28, 2003). Although courts routinely state that they have discretion in determining how to distribute assets to the victims of fraud, they equally routinely exercise that discretion to distribute assets on a pro rata basis.

Here all of the investors invested in TTR under similar circumstances. While it might be possible to draw distinctions among investors based on factors such as the timing of their investment or whether their investment was in the form of debt or equity, such distinctions would be largely arbitrary. Whether an investor invested in 2002 or 2015 should make no difference. Nor should there be a difference between investments called debt or those called equity. *See Janvey v. Brown*, 767 F.3d 430, 441-43 (5th Cir. 2014)(holding that investments in fake CDs were investment contracts rather than debt). None of the investors should have a priority over the other investors.

As the Supreme Court held when considering the distribution of the proceeds of Charles Ponzi's original fraud among his victims, "equality is equity." *Cunningham v. Brown*, 265 U.S. 1, 13 (1924). As Ponzi did in *Cunningham*, TTR commingled all of the funds contributed by the investors. Moreover, all of the investors stand in the same fundamental relationship with TTR: Each invested money in TTR based on some false representation from an official of TTR. Thus, all investors should recover equally. *See SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-89 (2d Cir. 2002)(collecting cases and holding that pro rata distribution is particularly appropriate in fraud cases).

The Fifth Circuit has considered the distribution of funds among victims of a fraud in *Durham* and in *Forex Asset Management*. In each case, the Fifth Circuit held that an equal distribution among investors was proper. To reach that result, it expressly rejected attempts to distinguish among victims on bases it considered arbitrary.

In *Durham*, some of the investors could trace their money to the last company's last remaining bank account. *Durham*, 86 F.3d at 72. Despite the ability of some claimants to trace money to the sole remaining bank account at a particular company, the trial court decided to divide the funds in that account (the only assets left) equally among all of the victims. *Id*. The district court reasoned that "all claimants stand equal in terms of being victimized by the defendant defrauders" and that the ability of certain victims to trace assets was "the result of the merely fortuitous fact that the defrauders spent the money of the other victims first." *Id*. The Fifth Circuit affirmed

10

holding that the trial court appropriately exercised its discretion in refusing to distinguish among investors based on the fraudster's choice of whose money to spend first. *Id.*

The Fifth Circuit reached the same result in *Forex Asset Management*. There, the district court determined to distribute a receivership's assets equally among the fraud victims. One of the victim families, the Whitbecks, had a special deal with the fraudster. Their funds were to be placed in a segregated account held by a separate company from those of the other victims and invested differently. *Forex Asset Mgmt.*, 242 F.3d at 327. The Whitbecks' funds were the only funds deposited in the account. Despite this, the district court approved a plan that distributed all assets ratably among the victims reasoning that Whitbecks' investment, while placed in a separate company, was simply another investment in the defendant's scheme. *Id.* at 328. Relying on *Durham*, the Fifth Circuit held that the trial court had the discretion to ignore this arbitrary difference among investors. *Id.* at 331.

As *Durham* and *Forex Asset Management* suggest, distinctions among investors based on the type or timing of their investments are arbitrary. All of the investors invested seeking a return if TTR were as profitable as disclosed. In each case, TTR misrepresented its prospects or some other aspect of the investment. The Court should, therefore, treat all investors equally.

## IV.   Approval of the Final Claims Schedule

The Receiver has complied in full with the Claims Order. He has identified all claims that he disputes and provided the affected creditors with the opportunity to

object to his claims determination. Only one creditor filed an objection and that objection has been resolved. *See* Goldberg Objection and Response (Dkt. Nos. 207, 208). None of the other creditors holding disputed claims has filed an objection. As such, the Receiver's determination is final. Therefore, the Court should approve the Final Claims Schedule attached hereto as <u>Exhibit B</u>.

## V.     Compliance with Order of January 19, 2017

The Receiver has complied with this Court's January 19, 2017 Order (Dkt. No. 114). He has given notice of this motion by (1) filing it using the Court's CM/ECF system; (2) posting a copy of the motion on his website along with a notice informing interested parties that they have a right to object; and (3) distributing the filing and notice via e-mail using the Receiver's then-available e-mail distribution list. In addition, he has scheduled an investor conference call to discuss the proposed distribution on September 27, 2019, a date prior to the submission of this motion pursuant to Local Rule 7.1.

ACCORDINGLY, the Receiver respectfully requests that the Court grant his motion, set the amount to be distributed and approve a distribution of the estate's assets.

Respectfully Submitted,

By: */s/ Eduardo S. Espinosa*
    Eduardo S. Espinosa
    State Bar No. 24010014

**AKERMAN LLP**
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Phone: (214) 720-4300
Fax: (214) 981-9339
Eduardo.Espinosa@akerman.com

**COUNSEL FOR MICHAEL D. NAPOLI,
RECEIVER**

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that on September 20, 2019, I electronically submitted the foregoing document to the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to all counsel of record.  Further, a copy of this Motion was: (i) posted on the Receiver's website; (ii) e-mailed to everyone on the Receiver's e-mail list; and (iii) mailed to any known creditors not on the Receiver's e-mail list.

    */s/ Eduardo S. Espinosa*
    Eduardo S. Espinosa

49474358;3